# EXHIBIT B

## Purchase and Sale Agreement



## PURCHASE AND SALE AGREEMENT)

PURCHASE AND SALE AGREEMENT ("__Agreement__"), made as of August 3, 2015 ("__Effective Date__"), between PITTSFIELD RESIDENTIAL II LLC, an Illinois limited liability company having a mailing address at 5151 Collins Avenue, Suite 1727, Miami Beach, PITTSFIELD HOTEL HOLDINGS, LLC AND Florida 33140 and PITTSFIELD DEVELOPMENT, LLC, an Illinois limited liability company having a mailing address at 5151 Collins Avenue, Suite 1727, Miami Beach, Florida 33140 (collectively, the "__Sellers__") and Adam David Partners 1, LLC, a Delaware limited liability company, having a mailing address at 8000 IH 10 West, Suite 1200, San Antonio, Tx, 78230, (the "__Purchaser__") (collectively, the "__Parties__").

### W I T N E S S E T H:

WHEREAS, Sellers are the owners of the Premises described in Section 1 hereof and related assets hereafter described; and

WHEREAS, Sellers desire to sell to Purchaser, and Purchaser desires to purchase from Sellers, the Premises on the terms and conditions hereafter set forth.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereafter set forth and subject to the terms and conditions hereof, Sellers and Purchaser hereby covenant and agree as follows:

1     __Premises Purchased__. Sellers agree to sell to Purchaser, and Purchaser agrees to purchase from Sellers, the following property (hereafter collectively referred to as "__Premises__");

A.     All of Sellers' right, title and interest in the building now known by the street address 55 East Washington, Chicago, Illinois (the "__Building__") as specifically described in the description attached hereto as __Exhibit A__

4807705 DOC / v 1                 I



EXHIBIT
B

B.    All fixtures, equipment, furnishings and other personal property owned by Sellers, located in the Premises and used exclusively in connection therewith, including, without limitation, all right, title, and interest of Sellers, if any, in all tangible and intangible which are located on and used in connection with the operation of the Premises as opposed to the Building in general which items are set forth in Exhibit C, attached hereto and made a part hereof.

2.    **Purchase Price**. [MONETARY TERMS SUBJECT TO SELLER REVIEW]The consideration for the sale shall be THIRTY  SIX MILLION AND 00/100 ($36,00,000.00) DOLLARS (the "**Purchase Price**") payable as follows:

A.    Within three (2) business days after the Effective Date, Purchaser shall deposit and deliver the sum of Five Hundred Thousand and 00/100 Dollars ($500,000 00) (hereafter "**Initial Deposit**") to Sutton Land Title Agency, 515 Rockaway Avenue, Valley Stream,  N.Y.  11581;  Tel:  516.837.6107;  Fax:  516 837 6407;  Email: rmoskovits@suttonalliance.com (the "**Escrow Agent**"), to be held in accordance with the terms and conditions of Section 13 hereunder. If the Initial Deposit is not timely received by the Escrow Agent, then after the expiration of any applicable notice and cure periods provided for in this Agreement, this Agreement shall automatically terminate and be deemed null and void and without any force and effect without the obligation of either party giving notice to the other.

B.    If Purchaser does not terminate this Agreement pursuant to Section 9 hereof, an additional sum of One Million Seven Hundred Fifty Thousand and 00/100 Dollars ($1,750,000 00) (the "**Additional Deposit**") shall be delivered to Escrow Agent within three (3) business days after the expiration of the Due Diligence Period (as hereafter defined), to be held in accordance with the terms and conditions of Section 13 hereunder (the Initial Deposit and the Additional Deposit shall hereafter collectively be referred to as the "**Deposit**") If the Additional

0077361 DOC / v 1

2

Deposit is not timely received by Escrow Agent, then after the expiration of any applicable notice and cure periods provided for in this Agreement, this Agreement shall automatically terminate and be deemed null and void and without any force and effect without the obligation of either party giving notice to the other except that, upon request by Sellers, Escrow Agent shall immediately release to Sellers the Initial Deposit which Purchaser shall be deemed to waive and forfeit to Sellers to compensate Sellers for its damages. At the closing of the transactions contemplated by this Agreement (the "**Closing**"), which shall occur on the Closing Date (as hereafter defined), Purchaser shall receive a credit against the Purchase Price for the Deposit, provided that the Deposit is made by Purchaser to Escrow Agent.

      C.     On the Closing Date, Purchaser shall wire transfer to the Escrow Agent in immediately available funds (in United States currency) in accordance with wiring instructions to be supplied by Escrow Agent to Purchaser the amount of THIRTY THREE MILLION SEVEN HUNDRED FIFTY THOUSAND AND 00/100 ($33,750,000.00) DOLLARS, plus or minus all prorations and other adjustments ("**Purchase Price Balance**") (Any net prorations and adjustments chargeable against Sellers shall be a credit against said sum; otherwise said amount shall be increased by the amounts chargeable against Purchaser).

      D.     Escrow Agent, by signing on the space indicated at the end of this Agreement, agrees to be bound by the terms and conditions herein set forth with respect to its obligations contained herein

      E.     Any interest earned on the Deposit shall not be applied towards the Purchase Price and shall be paid to the Purchaser.

    3     **Permitted Exceptions to Title.**

A.    The Premises shall be conveyed to Purchaser subject only to (i) the Leases (defined below), (ii) the matters set forth on Exhibit E attached hereto and made a part hereof, and (iii) the Declaration of Covenants, Conditions, Restrictions and Easements for the Pittsfield Building, 55 East Washington Street, Chicago, Illinois (the "Current REA") (collectively referred to as the "Permitted Exceptions)." Within five (5) business days after the Effective Date, Sellers shall provide Purchaser with true, correct and complete copies of all Leases (defined hereinafter), and amendments thereto, and a recorded copy of the Current REA, which are in Sellers' possession.

B.    Purchaser shall accept the Premises at Closing subject all leases and tenancies (written and unwritten) of those tenants listed on Exhibit B annexed hereto (collectively, the "Leases") and all other persons and entities, if any, that occupy the Premises without Sellers' knowledge or consent ("Unauthorized Occupants").

4.    Closing.    The Closing shall take place at the offices of Sellers or at the option of either party via escrow through the offices of the Escrow Agent at a time mutually acceptable to Sellers and Purchaser. The Closing shall take place on a date which is within 60 days following the expiration of the Due Diligence Period (the "Closing Date").

5.    Representations and Warranties.    Sellers represent, warrant, and agree, as of the date hereof (which representations, warrants and agreements shall NOT survive the Closing unless expressly stated otherwise in this Agreement), that:

A    Sellers are duly organized validly existing limited liability companies in good standing under the laws of the State of their formation, with corporate powers adequate for the making and performing of this Agreement and for carrying on the business now conducted or proposed to be conducted by it    Sellers have taken all company action required to execute,

deliver and perform this Agreement, and have caused this Agreement to be executed by a duly authorized officer or member;

B.    There are no leases, licenses, occupancy or use, or other rental agreements (written or unwritten) to which Sellers are a party or are bound affecting any portion of the Premises, other than the Leases and Unauthorized Occupants.

C.    There are no service contracts, management contracts, and union contracts, which are in effect with respect to the Premises ("Service Contracts") other than those set forth on Exhibit D annexed hereto.    Purchaser shall give notice to Sellers thirty (30) days before the Closing Date of which Service Contracts Purchaser elects to assume a pro-rata share.  At the Closing, Sellers shall terminate, to the extent that they affect the Premises, those Service Contracts that may be terminated and for which Purchaser did not give Sellers notice that Purchaser elects to assume; Sellers shall assign to Purchaser, to the extent that such contracts are assignable and affect the Premises, those Service Contracts that Purchaser gave notice that it elects to assume or which may not be terminated.  Notwithstanding the foregoing, the elevator contract listed on Exhibit D which serves the Premises shall not be terminated.

D.    Sellers are not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended;

E.    There are no pending or, to Sellers' knowledge, threatened condemnation or similar proceedings affecting the Premises or any part thereof;

F.    Sellers are not: (i) an "employee benefit plan" (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to the provisions of Title I of ERISA, (ii) a "plan" that is subject to the prohibited transaction provisions of Section 4975 of the Internal Revenue Code of 1986 (the "Code") or

{00077365.DOC / v. 4}

(iii) an entity whose assets are treated as "plan assets" under ERISA by reason of an employee benefit plan or plan's investment in such entity.

G.      To the best of Sellers' knowledge, Sellers are in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the office of Foreign Assets Control, Department of the Treasury ("OFAC") and in any enabling legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "Orders").

H.      To the best of Sellers' knowledge, neither Sellers nor any beneficial owner of Sellers:

(i)      is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists");

(ii)     is a person who has been determined by competent authority to be subject to the prohibitions contained in the Orders;

(iii)    is owned or controlled by, nor acts for or on behalf of, any person or entity on the Lists or any other person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders; or

(iv)     shall transfer or permit the transfer of any interest in Sellers or any beneficial owner in Sellers to any person or entity who is, or any of whose beneficial owners are, listed on the Lists.

Pittsfield Development vs 55 East Washington, LLC

I.    There is no action, suit or proceeding pending except or, to Sellers' knowledge, threatened against Sellers or the Premises, nor are any outstanding judgments, arbitration awards, decrees, or orders of any kind pending against Sellers or the Premises.

J.    Sellers have not received any written notices of default from any mortgagee of the Premises.

K.    Sellers have not entered into any agreement to sell the Premises to any third party or which gives any right of first refusal to purchase the Premises or option to purchase the Premises to a third party, which shall prevent it from completing the sale of the Premises to Purchaser under the terms of this Agreement or which would bind Purchaser in any manner subsequent to the consummation of this Agreement.

L.    This Agreement and all documents to be executed pursuant hereto by Sellers are and shall be binding upon and enforceable against Sellers in accordance with their respective terms.

M.    Except as otherwise set forth in this Agreement, there are no written agreements, easements, licenses, operating agreements, development agreements or other agreements regarding the operation, use or development of the Premises that would not appear on the public records of Cook County and that Sellers are parties thereto and would bind Purchaser in any manner subsequent to the consummation of this Agreement.

The continued validity in all respects of the foregoing representations and warranties through the date of Closing shall be a condition precedent to the obligation of Purchaser to close the transaction contemplated herein. If at any time on or before the Closing whether not true and

correct as of the date of this Agreement (i) any of Sellers' representations and warranties shall not be materially true and correct, or (ii) any change in facts or circumstances has made the applicable representation and warranty no longer materially true and correct, then Purchaser may, at Purchaser's option, exercised by written notice to Sellers (and as Purchaser's sole and exclusive remedy), either (y) proceed with this transaction, accepting the applicable representation and warranty as being modified by such subsequent matters or knowledge and waiving any right relating thereto, if any, or (z) terminate this Agreement and declare this Agreement of no further force and effect, in which event the Deposit shall be immediately returned to Purchaser and Sellers shall have no further liability hereunder by reason thereof.

The representations and warranties of Sellers herein shall NOT survive the Closing.

6.     **Prorations and Adjustments.**

A.     The following shall be adjusted between Sellers and Purchaser to be added or credited (as the case may be) the Purchase Price to be paid by Purchaser to Sellers on the Closing Date; all adjustments are to be made as of the Closing Date:

(i)     All real estate taxes, personal property taxes, sewer rents and charges and other state, county, school, district, municipal and other governmental and quasi-governmental taxes and charges assessed against the Premises, due and owing as of the Closing Date, and all penalties and interest thereon, and all special assessments affecting the Premises, whether payable in installments or not, shall be paid in full by Sellers at Closing. Real estate taxes applicable to the Premises for the year in which the Closing occurs shall be prorated as of the Closing Date based on 105% of the most recently ascertainable real estate taxes and Sellers shall provide Purchaser with a credit for same. By way of illustration, if closing occurs on August 1, 2015, then Sellers shall pay the 1st installment 2014 tax bill prior to Closing and

provide Purchaser with a 105% credit for the second installment 2015 tax bill and a 105% credit for the 2015 taxes up to the Closing Date, on a pro rata basis. Notwithstanding the foregoing, in the event a subdivision has not been accomplished to the effect of establishing separate tax lots, then, in that event, the foregoing adjustments shall be based on a pro-rata share (based on the square footage of the Premises and the square footage of the entire Building) of the applicable taxes based on one hundred percent (100%) of the prior year's tax bill.

      (ii)    Charges and payments under the Service Contracts set forth on Exhibit F for those contracts which will not be terminated under Section 5C above and based on the Premises percentage share of same pursuant to the Current REA.

      (iii)    All charges for utilities servicing the Premises, including, without limitation, charges for gas, electricity, water and sewerage, provided Sellers shall use reasonable efforts to obtain final meter readings of such utilities on or within three (3) days prior to the Closing Date. Notwithstanding the foregoing, to the extent final readings are obtained for the Premises on or within three (3) days prior to the Closing Date, Seller shall pay said final bills and no prorations shall be made; and

      (iv)    all other income and ordinary operating expenses for or pertaining to the Premises shall be prorated on a customary basis to the extent that the prorations reflect the Premises and the portion of the Building excluding the Premises (the "Building Remainder"), the parties shall act in good faith to accomplish a fair and equitable proration.

      (v)    collected rents from any tenants still in possession.

    In the event that the amount of any prorated item is not known at Closing, the Parties agree that such items shall be prorated at Closing upon the basis of the best information available, and shall be adjusted when the actual amount(s) of such items are known, with

appropriate charges and credits to be made. In the event any adjustment, subsequent to the Closing Date, shall be necessitated, then either party hereto who is entitled to additional monies shall invoice the other party for such additional amounts as may be owing, and such amount shall be paid within ten (10) days from receipt of the invoice.

At Sellers' option, the security deposits held by Sellers pursuant to the Leases shall, at Sellers' option at Closing, be transferred to Purchaser or credited towards the Purchase Price.

The provisions of this Section shall survive the Closing Date for a period of six (6) months.

B.   Special Assessments.   If, on the Closing Date, the Premises or the Building of which it is a part, shall be or shall have been affected by assessments which are, or which may become payable in annual installments, of which the first installment is then a charge or lien, or has been paid, then for the purposes of this Agreement, Sellers shall pay all installments through the day of closing and Purchaser shall pay the proportionate share of all installments subsequent to the Closing Date.

C.   Expenses.

(i)   Title insurance premiums for the extended coverage Title Policy (other than the costs of the endorsements to such Title Policy other than extended coverage), one-half (½) of the escrow fee, and all costs of obtaining the surveys attached hereto as Exhibit E (collectively, the "Survey"), for judgment searches relating to the selling entities, and the cost to record releases of Seller's financing documents, all costs for judgments and lien searches, shall be borne and paid by Sellers at or prior to Closing.

(ii)   The costs of the endorsements to the Title Policy, City of Chicago transfer taxes (excluding the portion of City of Chicago transfer taxes that are Seller's obligation pursuant to

10

the City of Chicago ordnance, which shall be paid by Sellers)], for updating and/or revising the Survey, one-half (½) of the escrow fee and all recording fees respecting the Deeds and Purchaser's financing documents, if any, shall be borne and paid by Purchaser at or prior to Closing.

(iii)    All other costs, charges, and expenses shall be borne and paid at Closing as provided in this Agreement, or in the absence of such provision, in accordance with applicable law or local custom.

7.    Procedure for Closing.

A.    At the Closing, Sellers shall deliver to Purchaser or the Escrow Agent, as the case may be:

(i)    Good and sufficient Special Warranty Deeds for the Premises (the "Deed"), duly executed and acknowledged by Sellers and in form for recording, containing all customary covenants free of all liens and encumbrances other than "Permitted Exceptions." Sellers shall provide to the Title Insurer original copies of any required real estate transfer tax excise or documentary stamp tax declarations executed by Sellers or any other similar documentation required to evidence the payment of any tax imposed by the state, county and city on the transaction contemplated hereby. Sellers may utilize closing proceeds to pay same.

(ii)    Bill of sale transferring and selling all right, title and interest in and to the personal property.

(iii)    An executed counterpart of the Assignment of Service Contracts assigning to Purchaser all of the liabilities and obligations thereunder accruing from and after the Closing Date for those Service Contracts affecting the Premises which will not be terminated under Section 5C above.

(iv)     Resolutions of Sellers authorizing the sale of the Premises pursuant to this Agreement and the authority of the officer executing the closing documents on behalf of Sellers.

(v)      Affidavit of Title reasonably acceptable to Sellers' and Purchaser's Title Insurer.

(vi)     Affidavits that Sellers are not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

(vii) All keys to the Premises, to the extent the same are in Sellers' possession or control.

(viii) All of the Leases.

(ix)     A certificate of Sellers dated as of the Closing Date certifying that the representations and warranties of Sellers set forth in Section 5 of this Agreement, as applicable, remain true and correct in all material respects as of the Closing Date.

(x)      The Bulk Sales Indemnity (hereafter defined), if applicable.

(xi)     An executed counterpart of the Assignment of Leases assigning to Purchaser all of the liabilities and obligations thereunder accruing from and after the Closing Date.

(xii)    Clean estoppel certificates from (i) the following retail tenants of the Premises: JPMorgan Chase Bank, Toni Sweets Chicago LLC and Fiancee Jewelry Mfg., Inc. and (ii) at least 50% of the office tenants under the Leases, the form of which shall be as provided in the Leases, of if there is no form required under the Leases, as reasonably approved by Purchaser.

(xiii)   Seller's executed counterpart of a settlement statement prepared by the Title Insurer;

(xiv)    Any additional documents reasonably required by the Title Insurer.

B       At Closing, Purchaser shall deliver to Sellers or the Escrow Agent, as the case may be:

00077365.DOC - ( )                                    12

(i)     The Purchase Price Balance required pursuant to Section 2C above, together with all adjustments, if any, in favor of Sellers.

(ii)     An executed counterpart of the Assignment of Service Contracts assuming all of the liabilities and obligations thereunder accruing from and after the Closing Date.

(iii)     An executed counterpart of the Assignment of Leases assuming all of the liabilities and obligations thereunder accruing from and after the Closing Date.

(iv)     Purchaser's counterpart of any applicable state, county or local realty transfer tax declarations;

(v)     Purchaser's executed counterpart of a settlement statement provided by the Title Insurer;

(vi)     Any additional documents reasonably required to effectuate the intents and purposes of this Agreement.

8.     **Title Objections; Survey and Permitted Exceptions**

A.     Sellers, within 15 business days after the full execution of this Agreement, shall order and request the delivery of a title insurance commitment (the "**Title Commitment**") from Stewart Title Insurance Company (the "**Title Insurer**") together with copies of all documents shown as exceptions therein to each of the attorneys for Sellers and Purchaser. Except as otherwise set forth in this Agreement, the cost of the Title Commitment shall be borne by Sellers..

B.     Subject to the Permitted Exceptions, if the Title Commitment or the Survey discloses any lien, encumbrance, easement, restrictive covenant, security interest, judgment, tax lien or any other exception to title other than Permitted Exceptions (collectively "**Objections**"), Purchaser shall have ten (10) business days following its receipt of the Title

00077365 DOC / v .1                                          13

Commitment ("**Title Review Period**") to disclose in writing to Seller the Objections, if any ("**Objection Notice**"). If Sellers do not notify Purchaser in writing within five (5) business days after receiving Purchaser's Objection Notice that Seller will, prior to Closing, remove or cure the defects giving rise to the Objections, then, Sellers shall conclusively be deemed to have refused to remove all said Objections at or before Closing. If Sellers notify Purchaser in writing within five (5) business days after receipt of Purchaser's Objection Notice that they have elected not to cure one or more of said Objections ("**Sellers' Notice**") or upon Seller's deemed refusal, Purchaser shall have the right to terminate this Agreement by delivering written notice within five (5) business days after Sellers' deemed refusal or receipt of such Sellers' Notice, in which event, the Deposit shall be returned to Purchaser and neither party shall have any further rights or obligations under the Agreement. If Purchaser fails to terminate this Agreement within such timeframe, the time being of the essence, Purchaser shall be deemed to have waived its right to terminate as a result thereof and shall be obligated to consummate the transaction contemplated by this Agreement in accordance with the terms hereof, in which event, all those Objections that Sellers have so elected (or has been deemed to elect) not to cure as well as all other matters shown in the Title Commitment and/or Survey which were not objected to by Purchasers shall conclusively be deemed to constitute "Permitted Exceptions"; provided however that Sellers shall be obligated to pay off the lien or encumbrance of a definite or ascertainable amount that affects the Premises and was voluntarily incurred or created by Sellers

        C.    If a search of the title discloses judgments, bankruptcies or other returns against other persons having names the same or similar to that of Sellers, Sellers will, on request, deliver to the Title Insurer an affidavit showing that such judgments, bankruptcies or other returns are not against Sellers. Sellers shall deliver such affidavits and/or documentary evidence

required by the Title Insurer to eliminate or modify standard exceptions for matters of survey and mechanics liens and parties in possession.

D.    Sellers, at their sole expense except as otherwise set forth in this Agreement, shall request to be delivered to Purchaser at Closing an owner's title insurance policy with extended coverage (the "**Title Policy**") issued by the Title Insurer, dated the day of Closing, in the full amount of the Purchase Price, subject only to the Permitted Exceptions. The Title Policy may contain any endorsements requested by Purchaser; provided that, Purchaser shall satisfy itself as to the availability of any such endorsements prior to the expiration of the Due Diligence Period. The costs of any such endorsements shall be paid for by Purchaser.

E.    At Sellers' request, Sellers shall be given a reasonable adjournment (not to exceed 15 days) of the Closing Date to permit Sellers to endeavor to eliminate any Title Objections. The fact that Sellers at Sellers' option may proceed to dispose of any of said alleged objections to title shall not deemed an admission of the validity of any of such objections or an admission of Sellers' obligation to cure/correct.

F.    Notwithstanding anything to the contrary, Purchaser shall not refuse title (and Seller shall have no obligation, if any, to incur any expense to cure an Objection or the title defect) if the Title Insurer is willing to insure (without the payment of an additional premium) against the enforcement of any Objection or defect in title provided the intended use of the Property is not affected

9    **Due Diligence Period**.  At any time prior to the date which is twenty one (21) days after the Effective Date (the "**Due Diligence Period**"), Purchaser shall have the right, in its sole and absolute discretion, and for any or no reason whatsoever, to terminate this Agreement by written notice to Sellers delivered by Purchaser on or prior to Due Diligence Period

expiration, in which case the Deposit paid to date shall be promptly returned to Purchaser and, thereupon, neither party shall have any further rights, duties, liabilities or obligations under this Agreement, except as otherwise expressly set forth herein. If Purchaser does not give Sellers such notice as and when required in this Section, the time being of the essence, the right given to Purchaser in this Section to terminate this Agreement shall be deemed to have been waived by Purchaser.

Within five (5) business days after the full execution of this Agreement, Seller shall deliver to Purchaser copies of any environmental, engineering, structural and/or roof reports of the Premises in the Seller's possession; copies of old or current plans and specifications (including site plans) of the Premises in the Seller's possession; income and expense statements for the Premises for the last three (3) calendar years and the calendar year to date.

A.   Right to Inspect.   Purchaser, and Purchaser's agents and representatives, shall have, subject to the rights of tenants and other occupants, reasonable access to the Premises during normal business hours, from time to time, prior to the Closing Date or earlier termination of this Agreement, for the purpose of conducting, surveys, architectural, engineering, geo-technical and environmental inspections and tests, and any other inspections, studies, or tests reasonably required by Purchaser subject to the terms hereof; *provided*, *however*, that Purchaser shall (i) give Sellers reasonable prior written notice of the time and place of such entry, in order to permit a representative of Sellers to accompany Purchaser; (ii) not unreasonably interfere with the operations of the Premises or any tenant thereof; (iii) restore/repair any damage to the Premises, Building or any adjacent property caused by such actions; (iv) indemnify, defend and save Sellers and, as the case may be, its partners, trustees, shareholders, directors, members, officers, employees and agents harmless of and from any and all claims and/or liabilities which

Sellers and its partners, trustees, shareholders, directors, members, officers, employees and agents may suffer or be subject by reason of or in any manner relating to such entry and such activities, including, without limitation, any claims by tenants and/or invitees of the Premises; (v) not enter into any tenant's leased premises or communicate with any tenant unless Sellers gives Purchaser written consent to do so and Purchaser is accompanied by Sellers or Sellers' agent in each instance, and (vi) prior to entry onto the Premises, furnish Sellers with a certificate of general liability and property damage insurance maintained by Purchaser with single occurrence coverage of at least $1,000,000 (and aggregate coverage of $3,000,000) and naming Sellers and its property manager as additional insureds. Such examination of the physical condition of the Premises may include an examination for the presence or absence of hazardous or toxic materials, substances or wastes (collectively, "**Hazardous Materials**"), which shall be performed or arranged by Purchaser at Purchaser's sole expense, provided Purchaser may not conduct any invasive or destructive testing or borings without Sellers' prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. The foregoing and the results thereof are not intended to, and shall not grant Purchaser any right to, modify this Agreement or entitle Purchaser to any abatement or offset against the Purchase Price.

Upon request of Seller, Purchaser shall promptly deliver to Sellers copies of all of the reports generated as a result of Purchaser's inspections of the Property. Purchaser agrees to promptly repair any damage caused to the Premises/Building in connection with the exercise of its inspections hereunder, and further hereby indemnifies and agrees to defend and hold harmless the Sellers from and against all liability, loss, damage and expense (including attorney's fees) arising from the inspection of the Premises/Building by Purchaser or its agents or consultants. In the event Purchaser discovers a preexisting condition at the Premises or Building, Purchaser

hereby covenants that it shall not disclose such condition to any person or entity other than its attorneys, agents and/or consultants in connection with the evaluation of the Premises or Building unless (a) required to disclose the discovery of such existing conditions to a governmental authority pursuant to applicable law or (b) in connection with its financing of the Premises. The provisions of this Section shall survive the Closing and the delivery of the Deed hereunder or the termination of this Agreement without the occurrence of Closing, as the case may be.

   B. <u>No Liens Permitted</u>. Nothing contained in this Agreement shall be deemed or construed in any way as constituting the consent or request of Sellers, express or implied by inference or otherwise, to any party for the performance of any labor or the furnishing of any materials to the Premises or any part thereof, nor as giving Purchaser any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials that would give rise to the filing of any liens against the Premises or any part thereof. Purchaser agrees to promptly cause the removal of, and indemnify, defend and hold Sellers harmless with respect to, any mechanic's or similar lien filed against the Premises or any part thereof by any party performing any labor or services at the Premises or supplying any materials to the Premises at Purchaser's request.

   C. <u>Survival</u>. The provisions of this Section 9 shall survive termination of this Agreement and/or the <u>Closing</u> and delivery of the Deeds.



  10. <u>Broker's Commission</u>. Each of the parties hereto agrees that it has not dealt with any broker in connection with ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ At Closing, Sellers shall pay Broker a commission pursuant to separate written agreement between Sellers and Broker. Sellers and Purchaser hereby each agree to indemnify and hold harmless

each other from and against any cost, expenses, claim, liability or damage resulting from a breach of the representation and warranty contained herein and from any claim by any broker in connection with this transaction. The party whose actions or alleged commitment for, the basis of such claim shall bear all expenses, costs, etc. referred to in this Section. The provisions of this Section 10 shall survive the Closing Date and delivery of the Deeds.

11.    Casualty. If, between the date hereof and the Closing, there shall occur a fire or other casualty affecting the Premises which would cost in excess of $250,000.00 to repair, then Purchaser shall have the right to terminate this Agreement and receive a refund of the Deposit via notice received within ten (10) days after Purchaser receives notice of the casualty, and, if necessary, the time of Closing shall be extended to permit such election. In the event Purchaser does not timely elect to terminate the Agreement, the time being of the essence, then to the extent that the insurance proceeds are allocated specifically to the Premises, Sellers shall pay to Purchaser an amount equal to the deductible under Sellers' policy of casualty insurance and Sellers shall execute and deliver to Purchaser all required proofs of loss, to the extent available, assignments of claims and other similar items. In no event shall Sellers have any obligation to repair any damage or destruction to any portion of the Premises, but Sellers shall have the right to do so and utilize insurance proceeds for such purpose.

If, prior to Closing, any of the improvements on the Premises are damaged or destroyed and such damage which would cost less than $250,000.00 to repair, Purchaser shall remain obligated to close hereunder with no abatement in the Purchase Price. At Closing, Sellers shall assign to Purchaser Sellers' rights in any insurance proceeds to be paid to Sellers in connection with such damage or destruction, and Purchaser shall receive a credit against the Purchase Price from Sellers in an amount equal to the deductible amount under Sellers' casualty

00077365.DOC / v. 4

19

insurance policy and Sellers shall execute and deliver to Purchaser all required proofs of loss to the extent available, assignments of claims and other similar items.

12.    Condemnation. If between the date hereof and the Closing, any condemnation or eminent domain proceedings are initiated which would result in the taking of any portion of the Premises, then Purchaser may terminate this Agreement and receive a refund of the Deposit, to the extent not heretofore released.  In no event shall Sellers have any obligation to repair or restore any portion of the Premises.

13.    Duties of Escrow Agent.

A.    The Deposit shall be held by the Escrow Agent, in trust, on the terms hereafter set forth:

B.    The Escrow Agent shall deposit the Deposit in an interest-bearing commercial bank account in the State of New York. Upon receipt of a W-9 executed by Purchaser, the Escrow Agent shall deposit the Deposit in an interest-bearing bank account.

C.    The Escrow Agent shall deliver the Deposit to Sellers or to Purchaser, as the case may be, under the following conditions:

(i)    To Sellers on the Closing Date, provided, Closing shall occur pursuant to this Agreement; or

(ii)    To Sellers upon receipt of written demand therefor ("Sellers' Demand for Deposit") stating that Purchaser has defaulted in the performance of Purchaser's obligation to close under this Agreement and the facts and circumstances underlying such default; provided, however, that the Escrow Agent shall not honor such demand until more than ten (10) business days after the Escrow Agent shall have sent a copy of such demand to Purchaser in accordance with the provisions of Section 13C of this Agreement

if the Escrow Agent shall have received a Notice of Objection (as hereafter defined) from Purchaser within such ten (10) business day period; or

(iii)     To Purchaser upon receipt of written demand therefor ("**Purchaser's Demand for Deposit**") stating that this Agreement has been terminated in accordance with the provisions hereof, or that Sellers have defaulted in the performance of any of Sellers' obligations under this Agreement, and the facts and circumstances underlying the same; provided, however, that the Escrow Agent shall not honor such demand until more than ten (10) business days after the Escrow Agent shall have sent a copy of such demand to Sellers in accordance with the provisions of Section 13D of this Agreement nor thereafter, if the Escrow Agent shall have received a Notice of Objection from Sellers within such ten (10) business day period.

D.     Within two (2) business days of the receipt by the Escrow Agent of a Sellers' Demand for Deposit or a Purchaser's Demand for Deposit, the Escrow Agent shall send a copy thereof to the other party by overnight mail via a recognized courier service such as Federal Express, with a signature required for delivery, and otherwise as provided in Section 20 of this Agreement. The other party shall have the right to object to the delivery of the Deposit by sending written notice (the "**Notice of Objection**") of such objection to the Escrow Agent by overnight mail via a recognized courier service such as Federal Express, with a signature required for delivery, and otherwise as provided in Section 20 of this Agreement which Notice of Objection shall be deemed null and void and ineffective if such Notice of Objection is not received by the Escrow Agent within the time periods prescribed in Section 13B of this Agreement. Such notice shall set forth the basis for objecting to the delivery of the Deposit.

Upon receipt of a Notice of Objection, the Escrow Agent shall promptly send a copy thereto to the party who sent the written demand.

      E.     In the event the Escrow Agent shall have received the Notice of Objection within the time periods prescribed in Section 13B of this Agreement, the Escrow Agent shall continue to hold the Deposit until (i) the Escrow Agent receives written notice from Sellers and Purchaser directing the disbursement of the Deposit, in which case the Escrow Agent shall then disburse the Deposit in accordance with such direction, or (ii) in the event of litigation between Sellers and Purchaser, the Escrow Agent shall deliver the Deposit to the clerk of the court in which said litigation is pending, or (iii) the Escrow Agent takes such affirmative steps as the Escrow Agent may, at the Escrow Agent's option, elect in order to terminate the Escrow Agent's duties including, but not limited to, depositing the Deposit in any court within the judicial jurisdiction of where the Premises are located and bring an action for interpleader, the costs thereof to be borne by whichever of Sellers or Purchaser is the losing party.

      F.     It is agreed that the duties of the Escrow Agent are only as herein specifically provided, and subject to the provisions of this Section, are purely ministerial in nature, and that the Escrow Agent shall incur no liability whatever except for willful misconduct or gross negligence, as long as the Escrow Agent has acted in good faith. Sellers and Purchaser each release the Escrow Agent from any act done or omitted to be done by the Escrow Agent in good faith in the performance of its duties hereunder.

      G.     The Escrow Agent is acting as a stakeholder only with respect to the Deposit. Upon making delivery of the Deposit in the manner herein provided, the Escrow Agent shall have no further liability hereunder.

H.     The Escrow Agent shall either execute this Agreement or indicate in writing that it has accepted the role of Escrow Agent pursuant to Agreement which in either case will confirm that the Escrow Agent is holding and will hold the Deposit in escrow, pursuant to the provisions of this Agreement.

I.     Upon Closing of title, any interest earned on the Deposit shall be credited to Purchaser at closing. Upon delivery of the Deposit to Sellers under Section 13B, interest shall be delivered to Sellers, and upon delivery of the Deposit to Purchaser under Section 13B, interest shall be delivered to Purchaser.

J.     On the Closing Date, if the Deposit, the Purchase Price Balance, the Adjustments and all the documents set forth in Section 7B have been received by the Title Insurer and if the Title Insurer is in a position to issue and will issue the Title Policy as provided hereunder, the Title Insurer shall:

(a)     Cause Deposit and Purchase Price Balance to be immediately released to Seller, together with the Adjustments (collectively, the "**Closing Funds**");

(b)     Cause the following to be filed for record: the Deed;

(c)     Cause the issuance and delivery to Purchaser of the Title Policy, as provided hereunder;

(d)     Charge to the account of Purchaser all sums properly chargeable against Purchaser hereunder;

(e)     Charge to the account of Seller all sums properly chargeable against Seller hereunder; and

(f)     Deliver (i) to Seller (1) a copy of the recorded Deed; (2) original executed counterparts of all other documents delivered by Seller, Purchaser or any other

party into the Closing Escrow; and (3) its settlement statement in duplicate showing all the charges and credits affecting the account of Seller (the "<u>Seller Documents</u>"); and (ii) to Purchaser: (1) the original recorded Deed; (2) original executed counterparts of all other documents delivered by Seller, Purchaser or any other party into the Closing Escrow; (3) copies of any recorded mortgage deposited by Purchaser; (4) the Title Policy; (5) the balance, if any, of the funds deposited by Purchaser remaining after disbursement in accordance with these directions; and (6) its settlement statement in duplicate showing all charges and credits affecting the account of Purchaser.

    K.     <u>Survival</u>. The provisions of this Article shall survive the Closing or any termination of this Agreement.

    14.     <u>"AS IS" CONDITION</u>. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES OF SELLERS SET FORTH IN THIS AGREEMENT AND THE CLOSING DOCUMENTS (AS DEFINED BELOW), PURCHASER UNDERSTANDS AND AGREES THAT SELLERS ARE NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE PREMISES OR THE BUILDING OR THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY SELLERS TO PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY. PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLERS SHALL TRANSFER AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PREMISES "<u>AS IS, WHERE IS, WITH ALL</u>

FAULTS", EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT.

PURCHASER REPRESENTS TO SELLERS THAT PURCHASER HAS CONDUCTED, OR WILL CONDUCT PRIOR TO CLOSING, SUCH INVESTIGATIONS OF THE PREMISES AND THE BUILDING, INCLUDING BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS PURCHASER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE PREMISES AND THE BUILDING, AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLERS OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLERS AS ARE EXPRESSLY SET FORTH IN THIS AGREEMENT.

PURCHASER ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS THE "AS IS, WHERE IS" NATURE OF THIS SALE AND ANY FAULTS, LIABILITIES, DEFECTS OR OTHER ADVERSE MATTERS THAT MAY BE ASSOCIATED WITH THE PROPERTY. PURCHASER, WITH PURCHASER'S COUNSEL, HAS FULLY REVIEWED THE DISCLAIMERS AND WAIVERS SET FORTH IN THIS AGREEMENT, AND UNDERSTANDS THE SIGNIFICANCE AND EFFECT THEREOF. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH HEREIN ARE AN INTEGRAL PART OF THIS AGREEMENT, AND THAT SELLERS WOULD NOT HAVE AGREED TO SELL THE PROPERTY TO PURCHASER FOR THE PURCHASE

PRICE WITHOUT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH IN THIS AGREEMENT. THE TERMS AND CONDITIONS OF THIS PARAGRAPH EXPRESSLY SURVIVE THE CLOSING, WILL NOT MERGE WITH THE PROVISIONS OF ANY CLOSING DOCUMENTS AND WILL BE INCORPORATED INTO THE DEED.

15.    Reserved.

16.    Purchaser's Remedies.   If Sellers default in closing hereunder, Purchaser may, at its sole election, either: (i) terminate this Agreement, whereupon the Deposit shall be immediately returned to Purchaser and neither party shall have any further liability or obligation to the other, except for any other provision of this Agreement that is expressly intended to survive the termination of this Agreement; or (ii) assert and seek judgment against Sellers for specific performance, provided that such suit is initiated within 90 days of the Closing Date.

17.    Sellers' Remedies.  If Purchaser shall fail to close title as required by the terms of this Agreement, or if Purchaser otherwise defaults hereunder, Sellers shall have the right, as its sole remedy, to have the Deposit paid to Sellers by the Escrow Agent as liquidated damages for Purchaser's default. Notwithstanding anything to the contrary herein, in the event that Purchaser breaches its obligations under Section 21 herein, Sellers may seek its remedies as are available at law and/or equity

18.    Default Notice. Except as otherwise set forth herein, no party shall be in default of this Agreement, nor shall any party have the right to exercise any remedy available to it under this Agreement until after the service on the non-performing party of written notice of said default and the expiration of ten (10) business days from the non-performing party receipt of said written notice.

00077365.DOC / v 4                                      26

19. <u>Assignment.</u> This Agreement may not be assigned by Purchaser without Sellers' prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, provided that this Agreement may be assigned by Purchaser to a legal entity that controls, is controlled by, or is under common control with Purchaser and/or its principals, provided that, such assignment shall not release Purchaser from its obligations under this Agreement and Seller reasonably approves the form and content of the assignment and assumption agreement.

20. <u>Notices.</u> All notices, demands or requests made pursuant to, under or by virtue of this Agreement must be in writing and delivered to the party to which the notice, demand or request is being made by overnight courier service, such as Federal Express, with a signature required for delivery, by hand, or by e-mail or facsimile transmission as long as a copy is sent with one of the other methods within two days, as follows:

|  |  |
|---|---|
| To Sellers: | Pittsfield Development LLC<br>5151 Collins Avenue<br>Suite 1727<br>Miami Beach, Florida, 33140<br>Fax No.: (305) 867-0047 |
|  | Pittsfield Residential II, LLC<br>5151 Collins Avenue<br>Suite 1727<br>Miami Beach, Florida, 33140<br>Fax No.: (305) 867-0047 |
| With a copy to: | Eric Rosenberg, Esq.<br>Rosenberg & Pittinsky, LLP<br>232 Madison Avenue, Suite 906<br>New York, New York 10016<br>Fax No. 212-286-6818<br>e-mail: eric@rpllplaw.com |
| To Purchaser: | Adam David Lynd<br>Adam David Partners 1, LLC<br>8000 IH 10 West, Suite 1200<br>San Antonio, Texas 78230 |

690°73e5-DOU°x-1

27

With a copy to:

Escrow Agent:     Sutton Land Title Agency
                  515 Rockaway Avenue
                  Valley Stream, New York 11581
                  Fax No.: (516) 837-6407

Notices, demands and requests which shall be served upon either party in the manner aforesaid shall be deemed sufficiently served or given for all purposes hereunder at the time such notice, demand, or request shall be received.

21. **Confidentiality.** Purchaser and its respective representatives shall hold in strictest confidence all data and information obtained with respect to the operation and management of the Building and Premises and the terms and conditions of this Agreement, whether obtained before or after the execution and delivery hereof, and shall not use such data or information for purposes unrelated to this Agreement or disclose the same to others except as expressly permitted hereunder; provided that nothing shall prohibit the Purchaser from advising third parties that it has executed a contract to purchase the Premises. The preceding sentence shall not be construed to prevent Purchaser from disclosing to: (y) its lenders or investors, or to its officers, directors, attorneys, accountants, architects, engineers and consultants to perform their designated tasks in connection with the transaction contemplated by this Agreement; provided that such disclosing party advises any such third party of the confidential nature of the information disclosed, or (z) the Title Insurer. However, neither party shall have this obligation concerning information which: (a) is published or becomes publicly available through no fault of either Purchaser or Sellers; (b) is rightfully received from a third party; or (c) is required to be disclosed by law.

00077565.DOC / v.1

28

22.  **Entire Agreement**. This Agreement together with Exhibits annexed hereto and made a part hereof contains all of the terms agreed upon between the Parties with respect to the subject matter hereof.

23.  **Modification**. This Agreement may not be changed, modified or terminated, except by an instrument executed by both Parties.

24.  **Waiver**. No waiver by either party of any failure or refusal to comply with its obligations shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

25.  **Successors and Assigns**. The provisions of this Agreement shall inure to the benefit of, and shall bind the administrators, successors and assigns of the respective parties.

26.  **Severability**. If any term or provisions of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

27.  **Recordation Not Permitted**. In no event shall this Agreement, or any memorandum hereof be recorded in the official or public records where the Premises are located, and any such recordation or attempted recordation shall constitute a default under this Agreement by the party responsible for such recordation or attempted recordation.

28.  **Counterparts**. This Agreement may be executed in two or more counterparts each of which when executed and delivered as prescribed shall constitute an original. Delivery of counterparts of this Agreement via e-mail or fax transmission shall constitute valid delivery of this Agreement and shall be binding as an original

00077365.DOC / v 1

29.    **Applicable Law.**    The provisions of this Agreement shall be construed in accordance with the laws of the State of Illinois.  If Illinois statutory or case law would hold that this Agreement is illusory or is otherwise unenforceable due to a right of termination granted to Purchaser hereunder (whether it be the right to terminate during the Due diligence Period, or otherwise), then if Purchaser elects to terminate pursuant to such right, then following such termination Seller will have the right to invoice Purchaser the sum of One Hundred Dollars (the "**Termination Right Consideration**") and Purchaser agrees to pay the Termination Right Consideration to Seller within thirty (30) days immediately following Purchaser's receipt of such invoice and the obligation to pay will survive the termination and the disbursement of the Deposit.

30.    **Covenants of Seller.**  During the pendency of this Agreement, Seller shall (a) intentionally omitted; (b) not grant or convey (or modify any existing) any easement, license, permit or any other legal or beneficial interest in or to the Premises, without the prior written consent of Purchaser which shall not be unreasonably be withheld, delayed or conditioned; (c) operate and maintain the Premises in accordance with Seller's normal maintenance and management practices utilized in the ordinary course of Seller's business; (d) not make any material alterations or changes to the Premises, except in the ordinary course of business, (e) not (except as otherwise set forth below), without Purchaser's prior written consent, which consent shall not be unreasonably withheld: (i) amend, renew or extend any Lease in any respect, unless required by law; (ii) grant a written lease to any tenant occupying space pursuant to an unwritten tenancy; (iii) terminate any Lease or unwritten tenancy except by reason of a default by the tenant thereunder (which shall not require any consent of the Purchaser); or (iv) permit

occupancy of, or enter into any new lease for, space in the Premises which is presently vacant or which may hereafter become vacant.

If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Sellers in violation of any restrictions contained in this contract. Sellers shall not grant any concessions or rent abatements for any period following the closing without Purchaser's prior written consent. Sellers shall not apply all or any part of the security deposit of any tenant unless such tenant has vacated the Premises.

Sellers do not warrant that any particular Lease or tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this contract in any manner or entitle Purchaser to an abatement of or credit against the Purchase Price or give rise to any other claim on the part of Purchaser.

31.     <u>Business Day</u> In the event a date of performance of either party under this Agreement falls on a federal or State of Illinois holiday or a weekend, the date of such performance shall be automatically expended until the next business day. A "business day" shall mean any day when national banks located in Chicago, Illinois, are open for business.

32.     <u>Counterparts</u> This Agreement may be executed in multiple counterparts all of which taken together shall constitute one executed original. For purposes of executing this Agreement, any signed document transmitted by facsimile machine or a PDF document transmitted by email transmission shall be considered as an original signature and shall be considered to have the same binding legal effect as an original document. At the request of any party, any document transmitted by facsimile or email shall be re-executed by the applicable

00077365 DOC / v 4                                   31

parties in an original form, it being agreed that the failure by any part to so re-execute such document shall not affect the binding legal effect of such document.

33.    **Preconditions to Obligation to Close**.

A.    Purchaser shall not be obligated to proceed with the Closing unless and until each of the following conditions has been either fulfilled or waived in writing by Purchaser:

(i)    Sellers shall be prepared to deliver or cause to be delivered to Purchaser all instruments and documents to be delivered to Purchaser at the Closing pursuant to Section 7A of this Agreement;

(ii)    Sellers shall have received bulk sales releases from the City of Chicago, Cook County and State of Illinois or in the event that a request for bulk sale release has been submitted by Sellers and a bulk sales release not yet issued, then an indemnification from Sellers indemnifying Purchaser for bulk sales liability of Sellers accruing prior to the Closing in form and substance reasonably acceptable to Purchaser ("**Bulk Sales Indemnity**"). Upon request, Purchaser shall promptly deliver to Seller such information relating to Purchaser as may be necessary for Seller to obtain a bulk sales release.

B.    Sellers shall not be obligated to proceed with the Closing unless and until each of the following conditions has been fulfilled or waived in writing by Sellers:

(i)    (x) Sellers receive from Purchaser the Purchase Price Balance and all other amounts to be paid to Seller at Closing under this Agreement together with written confirmation that Escrow Agent shall deliver to Seller on the Closing Date the Deposit and all adjustments or, as the case may be, (y) if the Deposit, the Purchase Price Balance, the adjustments have been received by the Escrow Agent and Escrow Agent confirms to

Seller in writing that it shall deliver to Seller on the Closing Date Deposit, the Purchase Price Balance and the adjustments;

(ii)     (x) Sellers receive from Purchaser all instruments and documents to be delivered to Sellers at the Closing pursuant to this Agreement or, as the case may be (y) if the documents to be delivered to Sellers under this Agreement have been received by Escrow Agent and Escrow Agent confirms to Seller in writing that it shall deliver to Seller on the Closing Date such documents; and

(iii)    However, with the consent of a Party, each acting in its sole discretion, a Party may agree to waive a condition precedent and proceed to Closing. In no event other than pursuant to a writing mutually executed by Sellers and Purchaser shall the Closing Date be extended.

34.    <u>Like-Kind Exchange.</u> Sellers and Purchaser confirm and agree that the transfer of the Premises to Purchaser may be a part of a deferred like-kind exchange of properties pursuant to which Sellers will receive like-kind property ("<u>Exchange Property</u>") in exchange for its transfer of the Premises to Purchaser. Purchaser agrees that Sellers' rights, interests and obligations under this agreement may be assigned to a qualified intermediary ("<u>Intermediary</u>"), in accordance with Treasury Regulation Section 26 C.F.R. § 1.1032(K)-1(g) to effect such exchange.

Purchaser agrees to cooperate with Sellers and Intermediary in a manner reasonably necessary to complete the like-kind exchange. Purchaser's sole obligation under this Agreement with regard to the like-kind exchange shall be the payment of all amounts and costs that are required to be paid by Purchaser pursuant to this Agreement and execution of an acknowledgement form. Any funds paid to Intermediary under this Agreement shall be held in

escrow in accordance with the terms and conditions of an exchange agreement entered into by Sellers and Intermediary.

35.    Further Assurances.    The parties each agree to do, execute, acknowledge and deliver all such reasonable further acts, instruments and assurances and to take all such reasonable further action before or after the Closing as shall be reasonably necessary or desirable to fully carry out this Agreement and to fully consummate and effect the transactions contemplated hereby.

36.    No Contingency.    It is further understood that this Agreement and the sale contemplated herein are not conditioned nor contingent on the sale or closing of any other property, whether real or personal, nor upon Purchaser obtaining a loan/mortgage or loan/mortgage commitment. Purchaser waives any such condition as an inducement to Seller to enter into this Agreement.

37.    Miscellaneous.

(a)    Time is of the essence of this Agreement.

(b)    Neither this Agreement nor any interest hereunder shall be assigned or transferred by Purchaser without the Seller's consent, which shall not be unreasonably withheld or delayed; provided that nothing shall prohibit Purchaser from identifying a nominee to take title to the Premises at Closing so long as the nominee is owned or controlled by principals of the Purchaser  Subject to the foregoing, this Agreement shall inure to the benefit of and shall be binding upon Seller and Purchaser and their respective successors and permitted assigns.

(c)    In the event any term or provision of this Agreement shall be held illegal, invalid, unenforceable or inoperative as a matter of law, the remaining terms and

provisions of this Agreement shall not be affected thereby, but each such term and provision shall be valid and shall remain in full force and effect.

(d)     All actions required pursuant to this Agreement necessary to effectuate the transaction contemplated herein has been or will be taken promptly and in good faith by Purchaser and Seller and their representatives, employees and agents.

(e)     In the event any litigation is undertaken to enforce the provisions of this Agreement, the party obtaining a judgment in its favor in connection therewith shall also receive, as part of the judgment, an amount equal to its reasonable attorneys' fees and other costs incurred in connection with such litigation, including without limitation post-closing and appellate proceedings.

(f)     The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

(g)     The introductory provisions on the first page of this Agreement are incorporated into this Agreement and made a part hereof

NO FURTHER TEXT ON THIS PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement the day and year first written above.

SELLERS:

PITTSFIELD RESIDENTIAL II, LLC, an Illinois
limited liability company

By: _____
     Name:  Robert A. Danial
     Title:   Manager

PITTSFIELD HOTEL HOLDINGS , LLC and
PITTSFIELD DEVELOPMENT LLC, an Illinois
limited liability company

By:    55 Pittsfield Corp., a Delaware corporation

     By: _____
       Name:  Robert Danial
       Title:  President

PURCHASER:

Adam David Partner I, LLC, a Delaware limited
liability company

By: _____
     Name: Adam David Lynd
     Title:  CEO

The undersigned has executed this Agreement solely to confirm its acceptance of the duties of Escrow Agent as set forth in this Agreement.

ESCROW AGENT:

SUTTON LAND TITLE AGENCY

By: _____

<u>SCHEDULE I</u>

EXHIBIT

A          Description of the Premises


D          Rent Roll of written leases and unwritten tenancies

C          Permitted Exceptions

D          Service Contracts

E          Survey

EXHIBIT A
DESCRIPTION OF PREMISES

**EXHIBIT B**
**RENT ROLL**

Exhibit D - 1

### EXHIBIT C
### PERMITTED EXCEPTIONS
### [SELLERS TO PROVIDE]

The following matters shall be deemed to be "**Permitted Exceptions**": (1) then current general and special real estate taxes and assessments which are a lien but are not due and payable at the time the Deed is filed for record, (2) covenants, restrictions, conditions, easements, reservations and rights of way of, (3) zoning, land use and other governmental laws, rules and regulations, (4) roads, highways and other public rights of way, (5) those items which would be disclosed on an accurate survey of the Property and (6) Consents by the Seller or any former owner of the Property for the erection of any structure or structures on, under or above any street or streets on which the Property may abut, (7) Unpaid installments of assessments, (8) Financing statements, chattel mortgages and liens on personally filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Property or owned by Tenants, (9) Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Property, provided that none of such rights imposes any monetary obligation on the owner of the Property, (10) Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Property over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Property, (11) Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Property, (12) Any state of facts that an accurate survey would disclose, provided that such facts do not render title unmarketable and (13) the Title Insurer's standard exceptions

EXHIBIT D
SERVICE CONTRACTS

EXHIBIT E
SURVEY