UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PITTSFIELD DEVELOPMENT, LLC, an Illinois limited liability company, PITTSFIELD RESIDENTIAL II, LLC, an Illinois limited liability company, and PITTSFIELD HOTEL HOLDINGS, LLC, an Illinois limited liability company, <br><br>Plaintiffs, <br><br>v. <br><br>ADAM DAVID LYND, <br><br>Defendant. | Case No.: 1:19-cv-01321 <br><br>Hon. Ruben Castillo <br><br>Hon. Sidney I. Schenkier Magistrate <br><br>Plaintiffs demand trial by jury |

## FIRST AMENDED COMPLAINT

Now comes the Plaintiffs Pittsfield Development, LLC ("Development"), Pittsfield Hotel Holdings, LLC ("Hotel") and Pittsfield Residential II, LLC ("Residential") (collectively, Development, Hotel and Residential shall be referred to as "Plaintiffs") by and through their attorneys Christopher Bargione and Adrian Vuckovich of Collins Bargione & Vuckovich and for their First Amended Complaint against the Defendant Adam David Lynd ("Lynd") state as follows:

### Parties, Jurisdiction and Venue

1. Development is an Illinois limited liability company that maintains its principal place of business in Miami Beach, Florida. The members of Pittsfield Development, LLC are Joseph Sabet, Michael Sabet, 2025 Holdings, LLC, RAD Mortgage Fund 2010, LLC, Robbi Holdings, LLC and Rolen Sabet. Joseph Sabet is domiciled in Israel. Michael Sabet is domiciled in the State of Florida. Rolen Sabet is domiciled in the State of New York. 2025 Holdings, LLC is a Delaware limited liability company. The sole member of 2025

1

Holdings, LLC is JEZ Holdings, LLC, a Delaware Limited Liability Company whose members are Robert Danial, Mojdeh Khaghan, Joshua Danial, Ethan Danial and Zachary Danial. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Joshua Danial is domiciled in New York. Ethan Danial is domiciled in Puerto Rico. Zachary Danial is domiciled in Puerto Rico. RAD Mortgage Fund 2010, LLC is a Delaware limited liability company. The only member of RAD Mortgage Fund 2010, LLC is Ariel Holdings LLC, a Delaware Limited Liability Company whose members are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico and Mojdeh Khaghan is domiciled in Florida. Robbi Holdings, LLC is a Delaware limited liability company. The members of Robbi Holdings, LLC are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico and Mojdeh Khaghan is domiciled in Florida.

2. Hotel is an Illinois limited liability company that maintains its principal place of business in Miami Beach, Florida. The members of Pittsfield Hotel Holdings, LLC are Ariel Holdings LLC a Delaware Limited Liability Company whose members are Robert Danial, Mojdeh Khaghan, Joshua Danial, Ethan Danial and Zachary Danial. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Joshua Danial is domiciled in New York. Ethan Danial is domiciled in Puerto Rico. Zachary Danial is domiciled in Puerto Rico. The next member of Pittsfield Hotel Holdings LLC is Rolen Sabet who is domiciled in New York. The next member is Joseph Sabet who is domiciled in Israel. The next member is Michael Sabet who is domiciled in the State of Florida. The next member of Pittsfield Hotel Holdings, LLC is JEZ Holdings, LLC a Delaware Limited Liability LLC, whose members are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. The next member of Pittsfield Hotel Holdings, LLC is Robbi Holdings, LLC, a Delaware Limited Liability LLC

whose members are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. The last member of Pittsfield Hotel Holdings, LLC, is Pittsfield Residential II, LLC, an Illinois Limited Liability Company. The members of Pittsfield Residential II, LLC are RAD Mortgage Fund 2010 LLC, Michael Sabet, Joseph Sabet, Rolen Sabet, JEZ Holdings, LLC and Robbi Holdings, LLC. The only member of RAD Mortgage Fund 2010 LLC is Ariel Holdings, LLC whose members are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Michael Sabet is domiciled in Florida. Joseph Sabet is domiciled in New York. Rolen Sabet is domiciled in Israel. The members of JEZ Holdings LLC a Delaware Limited Liability Company are Robert Danial, Mojdeh Khaghan, Joshua Danial, Ethan Danial and Zachary Danial. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Joshua Danial is domiciled in New York. Ethan Danial is domiciled in Puerto Rico. Zachary Danial is domiciled in Puerto Rico. The members of Robbi Holdings, LLC are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida.

3. Residential is an Illinois limited liability company that maintains its principal place of business in Miami Beach, Florida. The members of Pittsfield Residential II, LLC are RAD Mortgage Fund 2010 LLC, Michael Sabet, Joseph Sabet, Rolen Sabet, JEZ Holdings, LLC and Robbi Holdings, LLC. The only member of RAD Mortgage Fund 2010 LLC is Ariel Holdings, LLC whose members are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Michael Sabet is domiciled in Florida. Joseph Sabet is domiciled in New York. Rolen Sabet is domiciled in Israel. The members of JEZ Holdings LLC a Delaware Limited Liability Company are Robert Danial, Mojdeh Khaghan, Joshua Danial, Ethan Danial and Zachary Danial. Robert

Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Joshua Danial is domiciled in New York. Ethan Danial is domiciled in Puerto Rico. Zachary Danial is domiciled in Puerto Rico. The members of Robbi Holdings, LLC are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida.

4. Lynd, is an individual, who, at all times material herein, has been a citizen of San Antonio, Texas.

5. All complained of acts herein took place in the Northern District of Illinois.

6. This court has personal jurisdiction over Lynd under the provisions of ILCS 5/2-2-9 as Lynd has been transacting business in the Northern District of Illinois, Lynd committed the complained of tortious acts in the Northern District of Illinois, and this cause involves real property located within the Northern District of Illinois.

7. This court has original jurisdiction over these proceedings under the provisions of 28 U.S.C. § 1332 as the matter in controversy exceeds the sum of $75,000.00 and there is complete diversity as this dispute is between citizens of different states. All plaintiffs maintain their principal place of business in Florida and the defendant is a citizen of Texas.

8. Venue properly lies in this district under the provisions of 28 U.S.C. § 1391 because the Northern District of Illinois is where a substantial part of the events giving rise to the claim occurred, and the real property that is the subject of the action is situated in the Northern District of Illinois.

## General Allegations

### Background – the Pittsfield Building

9. The Pittsfield Building (the "Building") is an historic building purchased by Development on or about July 12, 2000 and has since been divided into four separately deeded subdivisions. At all complained of times, three of said subdivisions were owned by Plaintiffs.

10. At all material times herein, the Building was divided into several separately deeded subdivisions, with each owner of the respective subdivisions bound by obligations set forth in a Declaration of Covenants, Conditions, Restrictions and Easements.

11. Development owned and operated the ground floor and all basement and sub-basement levels of the Building along with the upper portion of the Building, consisting of portions of floor 22 and floors 23-40 (the "Tower").

12. Hotel was organized for the purpose of taking title to, constructing and operating a hotel on floors 2-9 of the Building. Hotel owned floors 2-9 of the Building (the "Hotel Property").

13. Residential owned floors 10-12 of the Building. (Collectively, all of the real property owned by all of the Plaintiffs within the Building shall hereafter be referred to as the "Properties.")

14. Development, Hotel and Residential are related entities.

15. Floors 13-21 of the Building were sold to a third party, 55 E. Washington Development, LLC, an Illinois limited liability company ("55E"). At all material times herein, 55E used its portion of the Building primarily as a student housing facility on a contract basis with various colleges and universities.

**Zoning of the Building**

16. When Development purchased the Building in 2000, the Building was zoned DX-16 Downtown Mixed Use District.

17. DX-16 Downtown Mixed Use zoning allowed for many various uses within the Properties. In particular, DX-16 Downtown Mixed Use zoning permitted Plaintiffs to build, own and operate a hotel, and also allowed for 27 additional residential units within the Building.

18. Given the landmark status of the Building and the striking views from the Tower portion of the Building, Plaintiffs planned to use the allotted 27 remaining residential units for the Tower portion of its Properties for the development of spectacular units by either Development or a third party buyer.

19. Indeed, by letter dated May 1, 2014, the City of Chicago's Department of Planning and Development advised Plaintiffs' architect that a 210 room hotel "is a permitted use in the DX-16 district and therefore would be allowed to establish as a matter by-right."

20. Prior to May 1, 2014, the Properties were occupied by numerous income generating tenants.

21. Plaintiffs, in reliance upon the DX-16 Downtown Mixed Use zoning in place for the Properties, as confirmed in the May 1, 2014 correspondence from the City, arranged to empty the Properties of remaining tenants occupying all but floors 10-12 of the Properties along with certain tenants occupying retail space on the ground floor. This was done with the intent of converting floors 2-9 in the Building to a hotel, and the Tower portion of the Building, owned by Development, into spectacular city residential dwelling units, all permitted under said zoning.

22. On December 10, 2015, the City issued a building permit (the "Permit") to Hotel to construct a hotel with up to 191 units on Floors 2 through 9 of the Building. A true and correct copy of the Permit is attached as Exhibit "A."

## Purchase and Sale Contract Followed by Downzoning

23. At all times material herein, defendant Lynd owned and controlled a single purpose entity known as Adam David Partners I, LLC ("Partners"). Partners was organized by Lynd to acquire the Properties from Plaintiffs.

24. On or about August 3, 2015, the Plaintiffs entered into a contract (the "Sales Contract") to sell all of the Properties to Partners. Lynd became aware of Plaintiffs' plans to develop a hotel on the Hotel Property and develop the Tower into 27 spectacular units during his negotiations with Plaintiffs' representatives prior to entering into the Sales Contract, and through Partners' independent investigations and due diligence. Lynd expressed his interest in converting the building to a wholly residential use. The parties to the Sales Contract, i.e. Plaintiffs and Partners, ultimately failed to close on said Sales Contract. A true and correct of the Sales Contract is attached as Exhibit "B".

25. The sales price for the Properties in the Sales Contract is $36,000,000.00. As such, said sales price set a minimum value for the Properties as of such date with DX-16 Downtown Mixed Use zoning in place, with such value to increase significantly upon approval and construction of a hotel on the Hotel Property and residential units in the Tower.

26. The Plaintiffs and Partners amended the Sales Contract, and gave Partners until November 10, 2015 to close on the sale. However, Partners breached the Sales Contract and defaulted thereunder by failing to close, and thus forfeited its $500,000 earnest money deposit to the Plaintiffs.

27. Notwithstanding the fact Partners lost its rights as Purchaser under the Sales Contract, Defendant Lynd nevertheless still desired to acquire the Properties on his own behalf.

28. Defendant Lynd caused Partners to file a frivolous five count complaint against Plaintiffs in Cook County Circuit Court in the case docketed as no. 2015-CH-17030 on or about

November 20, 2015. Lynd also caused Partners to file a lis pendens against the Properties, thereby causing a cloud on title and thus impairing Plaintiffs' ability to sell the Properties. This frivolous complaint alleged causes of action for fraud and fraud related claims along with a request for reformation of the Sales Contract. Four of the counts were dismissed against Partners with prejudice. Thereafter, Partners voluntarily dismissed the remaining two counts.

29. Defendant Lynd also engaged in a scheme to cause the Properties to be downzoned so that a hotel could no longer be developed on the Hotel Property and the amount of residential units allowed within the Building would be reduced to effectively make the Properties worthless in the hands of Plaintiffs. This (along with the filing of a lis pendens against the Properties) was all done with the intent to prevent Plaintiffs from selling the Properties to a third party, to prevent Plaintiffs from developing a hotel on the Hotel Property, to prevent development of the Tower into 27 spectacular residential units, and to acquire the Properties for himself at a price significantly lower than the purchase price of $36,000,000 in the Sales Contract. This was also done to retaliate against Plaintiffs for Partners' loss of its $500,000 earnest money deposit.

30. During this time period, to accomplish the foregoing, Defendant Lynd concocted a plan to have Alderman Reilly arrange for downzoning of the Building.

31. In furtherance of this scheme, on or about December 22, 2015, Defendant Lynd, through his company the Lynd Company, made a $1500 campaign contribution to Alderman Reilly. See Illinois Sunshine record detail attached as Exhibit "C."

32. In furtherance of his scheme to facilitate downzoning of the Building, Defendant Lynd engaged counsel to represent him with regard to the referenced zoning change. In email correspondence dated December 28, 2015, Defendant Lynd's attorney wrote back to him setting forth detailed information on the parameters of the downzoning for the Building that Defendant

Lynd sought, including stopping development of a hotel for which a permit already issued. See copy of email correspondence attached hereto as Exhibit "D."

33. Shortly thereafter, Alderman Reilly publicly expressed that he would oppose a hotel at the Hotel Property and followed by sponsoring legislation in the City of Chicago City Council to change zoning of the Building from DX-16 Downtown Mixed Use to DR-10-Downtown Residential Use District (the "Zoning Change").

34. DR-10 Downtown Residential Use District zoning is a significant downgrade from DX-16 Downtown Mixed Use zoning as DR-10 Downtown Residential Use District zoning allows for significantly less residential units in the Building than already exist within the Building. This means, *inter alia*, that no residential units could any longer be allowed to be constructed in the Tower. No hotel would any longer be permitted under such zoning, thus effectively revoking the Permit which authorized Plaintiffs to develop a hotel on the Hotel Property. In other words, this effectively required, and continues to require the Properties (other than floors 10-12 and certain retail space on the ground floor) to sit empty.

35. Shortly before the Downzoning Ordinance was approved by City Council, Alderman Reilly wrote to Daniel Solis, Chairman of the Committee on Zoning, Landmarks and Building Standards via correspondence dated March 9, 2016. In the letter, the Alderman incredulously states that he arranged to "temporarily downzone" the Building and throw it into "nonperformance" for "its own protection." A copy of the March 9, 2016 letter is attached as Exhibit "E."

36. The referenced Zoning Change was approved by Ordinance O2016-811 of the City of Chicago (the "Downzoning Ordinance"), which Downzoning Ordinance was introduced on February 10, 2016 and passed on or about March 16, 2016. A true and correct copy of the Downzoning Ordinance is attached as Exhibit "F."

9

37. The Zoning Change enacted by the Downzoning Ordinance only affects the Building and does not affect any surrounding properties.

38. The Plaintiffs engaged a broker to sell the Properties at an auction to be held on February 28, 2017 and March 1, 2017.

39. Several prospective buyers (who were willing and able to purchase the Properties at the referenced auction and who would have submitted offers to purchase the Properties but for enactment of the Downzoning Ordinance) advised Plaintiffs' representatives that they would not present offers to purchase the Properties for the reason that the Zoning Change would unreasonably restrict use of the referenced Properties.

40. Plaintiffs were unable to sell the Properties at the referenced auction because of the Zoning Change.

41. The subject Downzoning Ordinance that codified the Zoning Change effectively served to deny Plaintiffs all viable economic uses of the Properties. Indeed, at this stage, because of said Zoning Change, the Properties had become a burdensome liability to Plaintiffs and their members.

42. Unable to sustain itself as a viable going concern following the Zoning Change, Development filed for Chapter 11 bankruptcy protection with the United States Bankruptcy Court in the Northern District of Illinois on March 26, 2017 in the case docketed as no. 17-09513 (the "Development Bankruptcy").

43. Shortly after the filing of the Development Bankruptcy, the presiding bankruptcy court issued an order authorizing an auction of the Properties.

44. At an auction held on June 26, 2017, the highest bid for the Properties was $20,800,000.00.

45. The sale of the Properties closed on August 25, 2017.

46. Plaintiffs' representatives did not become aware of critical facts relating to Lynd's active participation in the downzoning scheme until after the Development Bankruptcy petition was filed, Development's bankruptcy schedules and statement of financial affairs were filed, the Bankruptcy Court ordered auction sale of the Properties closed, the disclosure statement and reorganization plan were filed by Development, and the reorganization plan was confirmed by the bankruptcy court.

47. In any event, Development's confirmed bankruptcy reorganization plan provided for prompt payment of 100% of the allowed amount of general unsecured claims and priority unsecured claims funded by proceeds of sale of the Properties at the bankruptcy auction. Indeed, Development's bankruptcy plan was confirmed by the bankruptcy court without a single objection thereto or vote against thereof. The plan did not provide for the cram down of any claims whatsoever. All allowed general unsecured claims and all priority claims have been paid in full. The allowed claims that still await distributions are the members of the debtor and a secured creditor of the debtor along with a portion of a claim of the general contractor. Allowing this case to move forward will help, not hinder these claimants - claimants who stand to receive distributions if Plaintiffs prevail. Development's claims against Lynd simply would not and could not have been a material consideration by Development's creditors in determining whether to approve or disapprove its bankruptcy reorganization plan. Said creditors in no way would have been prejudiced by a failure to list Development's claims against Lynd on its bankruptcy schedules.

48. Plaintiffs have had to retain attorneys to represent them in these proceedings and are obligated to pay said attorneys a reasonable fee.

## COUNT I
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONSHIPS

49. Plaintiffs reallege and reincorporate paragraphs 1 through 48 of this First Amended Complaint as and for their paragraph 49 of this Count I as though fully set forth herein.

50. Prior to and during the time that Lynd became aware of Plaintiffs' desire to develop a hotel on the Hotel Property, to develop the Tower into 27 spectacular residential units, and to sell the Properties, there was very active interest by both prospective purchasers of the Properties as well as prospective hotel operators and lessees. Indeed, said interest was so active, that there were advanced negotiations regarding terms of lease for the Hotel Property and terms for the purchase and sale of the Properties. Such advanced negotiations took place with third parties other than Lynd and Partners both before the date on which the Sales Contract was entered into, and after the date on which Partners defaulted on its obligations under and breached the Sales Contract.

51. At all times material herein, Plaintiffs enjoyed prospective contractual relationships with prospective third party purchasers for the Properties and prospective third party hotel operators and lessees (collectively, the "Third Parties," individually, a "Third Party").

52. Said Third Parties included, but were not limited to: Hotusa Group, Condor Partners, LLC, Metropolitan Properties, Oxford Capital, Gem Realty Capital, 55E, Mark Realty, the Yotel hotel chain, Sol Barket, along with other prospective purchasers and hotel operators and lessees working with brokers CBRE and Marcus & Millichap.

53. At all times material herein, Lynd had personal knowledge of Plaintiffs' prospective contractual relationships with said Third Parties. Indeed, Plaintiffs' representatives disclosed Plaintiffs' prospective contractual relationships with said Third Parties to Lynd prior to and during the period in which the Sales Contract was in force prior to Partners' default and

breach thereunder. Lynd's personal knowledge of Plaintiffs' prospective contractual relationships with said Third Parties also came from sources other than from communications with Plaintiffs' representatives.

54. At all times material herein, Defendant Lynd had personal knowledge that the Properties were zoned DX-16 Downtown Mixed Use zoning along with the broad spectrum of uses permitted under such zoning.

55. Defendant Lynd, with the intent to interfere with Plaintiffs' prospective contractual relationships with said Third Parties, affirmatively took steps to induce Alderman Reilly and the Chicago City Council to enact the Downzoning Ordinance so as to enable him to acquire the Properties for a price substantially lower than the price set forth in the Sales Contract. Defendant Lynd also caused Partners to file a frivolous law suit against Plaintiffs and a lis pendens against the Properties in the Circuit Court of Cook County. While four counts were dismissed with prejudice and the remaining two counts were voluntarily dismissed, Plaintiffs' ability to market and sell the Properties were impaired during the time period that said lis pendens was in place. All of these complained of acts were directed to, among others, the Third Parties, to prevent the development of a hotel on the Hotel Property and the lease of the Hotel Property to a Third Party hotelier, to prevent development of the Tower into 27 spectacular residential units, and to otherwise prevent the sale of the Properties to a Third Party or Third Parties.

56. Defendant Lynd's complained of acts were also malicious acts performed in retaliation for Partners' loss of its $500,000 security deposit under the Sales Contract and were done with the intent to cause injury to the Properties and damages to Plaintiffs.

57. Defendant Lynd was without justification to interfere with Plaintiffs' prospective contractual relationships with said Third Parties.

58. Defendant Lynd personally induced action on the part of Alderman Reilly and the Chicago City Council to enact the Downzoning Ordinance, thereby interfering with Plaintiffs' prospective contractual relationships with said Third Parties.

59. But for the aforesaid intentional and malicious acts of interference with Plaintiffs' prospective contractual relationships with the Third Parties, Plaintiffs would have entered into an agreement with a Third Party to lease and operate a hotel on the Hotel Property, thereby significantly increasing the value of all of the Properties.

60. But for the aforesaid intentional and malicious acts of interference with Plaintiffs' prospective contractual relationships with the Third Parties, Plaintiffs would have sold the Properties to a Third Party or Third Parties for a price greater than that agreed to by Partners in the Sales Contract.

61. Plaintiffs suffered significant injury to the Properties as a result of said complained of intentional and malicious interference of Lynd, thereby causing Plaintiffs to incur damages in a sum exceeding $16,000,000.00.

WHEREFORE, Plaintiffs demand judgment for damages against Defendant Lynd, an award of attorneys' fees and costs, and such other relief that the Court deems equitable and just.

## COUNT II
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

62. Plaintiffs reallege and reincorporate paragraphs 1 through 48 and 51 through 53 of this First Amended Complaint as and for their paragraph 62 of this Count II as though fully set forth herein.

63. At all times material herein, Plaintiffs had an existing contractual relationship with Chicago Hotel Partners, LLC ("CHP").

64. CHP's principal and manager at all times material herein was an experienced hotel operator.

65. CHP had an agreement in place to purchase an interest in Hotel and to be Hotel's company manager to oversee all aspects of the development of a hotel on the Hotel Property and negotiation of a lease and operations agreement with a hotelier for the Hotel Property.

66. CHP's principal and manager, acting on behalf of CHP, operated as the agent of Plaintiffs for the purpose of entering into a lease and operations agreement with a hotelier for the Hotel Property, and for the development of the Hotel Property into a hotel.

67. Defendant Lynd had personal knowledge of CHP's contractual relationship with Plaintiffs. Indeed, CHP's principal and manager personally communicated this to Lynd.

68. At all times material herein, Defendant Lynd had personal knowledge that the Properties were zoned DX-16 Downtown Mixed Use zoning along with the broad spectrum of uses permitted under such zoning, including, but not limited to, development and operation of a hotel.

69. Defendant Lynd, with the intent to interfere with Plaintiffs' existing contractual relationship with CHP, affirmatively took steps to induce Alderman Reilly and the Chicago City Council to enact the Downzoning Ordinance so as to enable him to acquire the Properties for a price substantially lower than the price set forth in the Sales Contract. Defendant Lynd also caused Partners to file a frivolous law suit against Plaintiffs and a lis pendens against the Properties in the Circuit Court of Cook County. While four counts were dismissed with prejudice and the remaining two counts were voluntarily dismissed, Plaintiffs' ability to market and sell the Properties were impaired during the time period that said lis pendens was in place. All of these complained of acts were directed to, among others, CHP, to prevent the development

of a hotel on the Hotel Property, and to otherwise prevent the sale of the Properties to a Third Party or Third Parties.

70. Defendant Lynd's complained of acts were also malicious acts performed in retaliation for Partners' loss of its $500,000 security deposit under the Sales Contract and were done with the intent to cause injury to the Properties and damages to Plaintiffs.

71. Defendant Lynd was without justification to interfere with Plaintiffs' contractual relationship with CHP.

72. Defendant Lynd personally induced action on the part of the Chicago City Council to enact the Downzoning Ordinance thereby interfering with Plaintiffs' existing contractual relationship with CHP.

73. But for the aforesaid intentional and malicious acts of interference with Plaintiffs' contractual relationship with CHP, CHP would have facilitated Plaintiffs' entry into an agreement with a Third Party to lease and operate a hotel on the Hotel Property, thereby significantly increasing the value of all of the Properties.

74. But for the aforesaid intentional and malicious acts of interference with Plaintiffs' contractual relationship with CHP, Plaintiffs would have sold the Properties to a Third Party for a price greater than that agreed to by Partners in the Sales Contract.

75. Plaintiffs suffered injury to the Properties as a result of said complained of intentional and malicious interference of Lynd, thereby causing Plaintiffs to incur damages in a sum exceeding $16,000,000.00.

WHEREFORE, Plaintiffs demand judgment for damages against Defendant Lynd, an award of attorneys' fees and costs, and such other relief that the Court deems equitable and just.

## COUNT III
## WILLFUL AND MALICIOUS INJURY TO PROPERTY

76. Plaintiffs reallege and reincorporate paragraphs 1 through 48 and 51 through 53 of this First Amended Complaint as and for their paragraph 76 of this Count III as though fully set forth herein.

77. At all times material herein, Defendant Lynd had personal knowledge that the Properties were zoned DX-16 Downtown Mixed Use zoning along with the broad spectrum of uses permitted under such zoning.

78. Defendant Lynd, with the willful and malicious intent to cause injury to the Properties, affirmatively took steps to induce Alderman Reilly and the Chicago City Council to enact the Downzoning Ordinance so as to enable him to acquire the Properties for a price substantially lower than the price set forth in the Sales Contract. Defendant Lynd also caused Partners to file a frivolous law suit against Plaintiffs and a lis pendens against the Properties in the Circuit Court of Cook County. While four counts were dismissed with prejudice and the remaining two counts were voluntarily dismissed, Plaintiffs' ability to market and sell the Properties were impaired during the time period that said lis pendens was in place.

79. Defendant Lynd's complained of acts were also malicious acts performed in retaliation for Partners' loss of its $500,000 security deposit under the Sales Contract and were done with the intent to cause injury to the Properties and damages to Plaintiffs.

80. Defendant Lynd personally induced action on the part of Alderman Reilly and the Chicago City Council to enact the Downzoning Ordinance thereby causing significant injury to the Properties.

81. Plaintiffs suffered injury to the Properties as a result of said complained willful and malicious acts, causing Plaintiffs to incur damages in a sum exceeding $16,000,000.00.

WHEREFORE, Plaintiffs demand judgment for damages against Defendant Lynd, an award of attorneys' fees and costs, and such other relief that the Court deems equitable and just.

Plaintiffs demand trial by jury.

>Pittsfield Residential II, LLC,
>Pittsfield Hotel Holdings, LLC and
>Pittsfield Development, LLC
>
>By: /s/ Christopher Bargione
>One of the Attorneys for Plaintiffs

Christopher Bargione (#6185177)
Collins Bargione & Vuckovich
One North LaSalle Street, Suite 300
Chicago, Illinois 60602
312-372-7813
chris@cb-law.com