| | | |
|---|---|---|
| PITTSFIELD DEVELOPMENT, LLC, an | ) | |
| Illinois limited liability company, | ) | |
| PITTSFIELD RESIDENTIAL II, LLC, an | ) | |
| Illinois limited liability company, and | ) | |
| PITTSFIELD HOTEL HOLDINGS, LLC, an | ) | |
| Illinois limited liability company, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 1:19-cv-01321 |
| | ) | |
| v. | ) | Hon. Franklin U. Valderrama |
| | ) | |
| ADAM DAVID LYND, | ) | Plaintiffs demand trial by jury |
| | ) | |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT

Now comes the Plaintiffs Pittsfield Development, LLC ("Development"), Pittsfield Hotel Holdings, LLC ("Hotel") and Pittsfield Residential II, LLC ("Residential") (collectively, Development, Hotel and Residential shall be referred to as "Plaintiffs") by and through their attorneys Christopher Bargione and Adrian Vuckovich of Collins Bargione & Vuckovich and for their Second Amended Complaint against the Defendant Adam David Lynd ("Lynd") state as follows:

### Parties, Jurisdiction and Venue

1.      Development is an Illinois limited liability company that maintains its principal place of business in Miami Beach, Florida.  The members of Pittsfield Development, LLC are Joseph Sabet, Michael Sabet, 2025 Holdings, LLC, RAD Mortgage Fund 2010, LLC, Robbi Holdings, LLC and Rolen Sabet.  Joseph Sabet is domiciled in Israel.  Michael Sabet is domiciled in the State of Florida.  Rolen Sabet is domiciled in the State of New York. 2025 Holdings, LLC is a Delaware limited liability company.  The sole member of 2025

1

Holdings, LLC is JEZ Holdings, LLC, a Delaware Limited Liability Company whose members are Robert Danial, Mojdeh Khaghan, Joshua Danial, Ethan Danial and Zachary Danial. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Joshua Danial is domiciled in New York. Ethan Danial is domiciled in Puerto Rico. Zachary Danial is domiciled in Puerto Rico. RAD Mortgage Fund 2010, LLC is a Delaware limited liability company. The only member of RAD Mortgage Fund 2010, LLC is Ariel Holdings LLC, a Delaware Limited Liability Company whose members are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico and Mojdeh Khaghan is domiciled in Florida. Robbi Holdings, LLC is a Delaware limited liability company. The members of Robbi Holdings, LLC are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico and Mojdeh Khaghan is domiciled in Florida.

2.     Hotel is an Illinois limited liability company that maintains its principal place of business in Miami Beach, Florida. The members of Pittsfield Hotel Holdings, LLC are Ariel Holdings LLC a Delaware Limited Liability Company whose members are Robert Danial, Mojdeh Khaghan, Joshua Danial, Ethan Danial and Zachary Danial. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Joshua Danial is domiciled in New York. Ethan Danial is domiciled in Puerto Rico. Zachary Danial is domiciled in Puerto Rico. The next member of Pittsfield Hotel Holdings LLC is Rolen Sabet who is domiciled in New York. The next member is Joseph Sabet who is domiciled in Israel. The next member is Michael Sabet who is domiciled in the State of Florida. The next member of Pittsfield Hotel Holdings, LLC is JEZ Holdings, LLC a Delaware Limited Liability LLC, whose members are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. The next member of Pittsfield Hotel Holdings, LLC is Robbi Holdings, LLC, a Delaware Limited Liability LLC whose members are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in

Puerto Rico. Mojdeh Khaghan is domiciled in Florida. The last member of Pittsfield Hotel Holdings, LLC, is Pittsfield Residential II, LLC, an Illinois Limited Liability Company. The members of Pittsfield Residential II, LLC are RAD Mortgage Fund 2010 LLC, Michael Sabet, Joseph Sabet, Rolen Sabet, JEZ Holdings, LLC and Robbi Holdings, LLC. The only member of RAD Mortgage Fund 2010 LLC is Ariel Holdings, LLC whose members are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Michael Sabet is domiciled in Florida. Joseph Sabet is domiciled in New York. Rolen Sabet is domiciled in Israel. The members of JEZ Holdings LLC a Delaware Limited Liability Company are Robert Danial, Mojdeh Khaghan, Joshua Danial, Ethan Danial and Zachary Danial. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Joshua Danial is domiciled in New York. Ethan Danial is domiciled in Puerto Rico. Zachary Danial is domiciled in Puerto Rico. The members of Robbi Holdings, LLC are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida.

3. Residential is an Illinois limited liability company that maintains its principal place of business in Miami Beach, Florida. The members of Pittsfield Residential II, LLC are RAD Mortgage Fund 2010 LLC, Michael Sabet, Joseph Sabet, Rolen Sabet, JEZ Holdings, LLC and Robbi Holdings, LLC. The only member of RAD Mortgage Fund 2010 LLC is Ariel Holdings, LLC whose members are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Michael Sabet is domiciled in Florida. Joseph Sabet is domiciled in New York. Rolen Sabet is domiciled in Israel. The members of JEZ Holdings LLC a Delaware Limited Liability Company are Robert Danial, Mojdeh Khaghan, Joshua Danial, Ethan Danial and Zachary Danial. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida. Joshua Danial is domiciled in New York. Ethan Danial is domiciled in Puerto Rico. Zachary Danial is

domiciled in Puerto Rico. The members of Robbi Holdings, LLC are Robert Danial and Mojdeh Khaghan. Robert Danial is domiciled in Puerto Rico. Mojdeh Khaghan is domiciled in Florida.

4.      Lynd, is an individual, who, at all times material herein, has been a citizen of San Antonio, Texas.

5.      All complained of acts herein took place in the Northern District of Illinois.

6.      This court has personal jurisdiction over Lynd under the provisions of ILCS 5/2-2-9 as Lynd has been transacting business in the Northern District of Illinois, Lynd committed the complained of tortious acts in the Northern District of Illinois, and this cause involves real property located within the Northern District of Illinois.

7.      This court has original jurisdiction over these proceedings under the provisions of 28 U.S.C. § 1332 as the matter in controversy exceeds the sum of $75,000.00 and there is complete diversity as this dispute is between citizens of different states.  All plaintiffs maintain their principal place of business in Florida and the defendant is a citizen of Texas.

8.      Venue properly lies in this district under the provisions of 28 U.S.C. § 1391 because the Northern District of Illinois is where a substantial part of the events giving rise to the claim occurred, and the real property that is the subject of the action is situated in the Northern District of Illinois.

<u>**General Allegations**</u>
<u>**Background – the Pittsfield Building**</u>

9.      The Pittsfield Building (the "<u>Building</u>") is an historic building purchased by Development on or about July 12, 2000 and has since been divided into four separately deeded subdivisions.  At all complained of times, three of said subdivisions were owned by Plaintiffs.

10. At all material times herein, the Building was divided into several separately deeded subdivisions, with each owner of the respective subdivisions bound by obligations set forth in a Declaration of Covenants, Conditions, Restrictions and Easements.

11. Development owned and operated the ground floor and all basement and sub-basement levels of the Building along with the upper portion of the Building, consisting of portions of floor 22 and floors 23-40 (the "Tower").

12. Hotel was organized for the purpose of taking title to, constructing and operating a hotel on floors 2-9 of the Building. Hotel owned floors 2-9 of the Building (the "Hotel Property").

13. Residential owned floors 10-12 of the Building. (Collectively, all of the real property owned by all of the Plaintiffs within the Building shall hereafter be referred to as the "Properties.")

14. Development, Hotel and Residential are related entities.

15. Floors 13-21 of the Building were sold to a third party, 55 E. Washington Development, LLC, an Illinois limited liability company ("55E"). At all material times herein, 55E used its portion of the Building primarily as a student housing facility on a contract basis with various colleges and universities.

**Zoning of the Building**

16. When Development purchased the Building in 2000, the Building was zoned DX-16 Downtown Mixed Use District.

17. DX-16 Downtown Mixed Use zoning allowed for many various uses within the Properties. In particular, DX-16 Downtown Mixed Use zoning permitted Plaintiffs to build, own and operate a hotel, and also allowed for 27 additional residential units within the Building.

18.     Given the landmark status of the Building and the striking views from the Tower portion of the Building, Plaintiffs planned to use the allotted 27 remaining residential units for the Tower portion of its Properties for the development of spectacular units by either Development or a third party buyer.

19.     Indeed, by letter dated May 1, 2014, the City of Chicago's Department of Planning and Development advised Plaintiffs' architect that a 210 room hotel "is a permitted use in the DX-16 district and therefore would be allowed to establish as a matter by-right."

20.     Prior to May 1, 2014, the Properties were occupied by numerous income generating tenants.

21.     Plaintiffs, in reliance upon the DX-16 Downtown Mixed Use zoning in place for the Properties, as confirmed in the May 1, 2014 correspondence from the City, arranged to empty the Properties of remaining tenants occupying all but floors 10-12 of the Properties along with certain tenants occupying retail space on the ground floor.  This was done with the intent of converting floors 2-9 in the Building to a hotel, and the Tower portion of the Building, owned by Development, into spectacular city residential dwelling units, all permitted under said zoning.

22.     On December 10, 2015, the City issued a building permit (the "Permit") to Hotel to construct a hotel with up to 191 units on Floors 2 through 9 of the Building.  (A true and correct copy of the Permit is attached as Exhibit "A.")

**Purchase and Sale Contract**

23.     At all times material herein, defendant Lynd owned and controlled a single purpose entity known as Adam David Partners I, LLC ("Partners").  Partners was organized by Lynd to acquire the Properties from Plaintiffs.

24.     On or about August 3, 2015, the Plaintiffs entered into a contract (the "Sales Contract") to sell all of the Properties to Partners.  Lynd became aware of Plaintiffs' plans to develop a hotel on the Hotel Property and develop the Tower into 27 spectacular units during his negotiations with Plaintiffs' representatives prior to entering into the Sales Contract, and through Partners' independent investigations and due diligence.   Lynd expressed his interest in converting the building to a wholly residential use.  The parties to the Sales Contract, i.e. Plaintiffs and Partners, ultimately failed to close on said Sales Contract.  (A true and correct of the Sales Contract is attached as Exhibit "B".)

25.     The sales price for the Properties in the Sales Contract is $36,000,000.00.   As such, said sales price set a minimum value for the Properties as of such date with DX-16 Downtown Mixed Use zoning in place, with such value to increase significantly upon approval and construction of a hotel on the Hotel Property and residential units in the Tower.

26.     The Plaintiffs and Partners amended the Sales Contract, and gave Partners until November 10, 2015 to close on the sale.  However, Partners breached the Sales Contract and defaulted thereunder by failing to close, and thus forfeited its $500,000 earnest money deposit to the Plaintiffs.

27.     Notwithstanding the fact Partners lost its rights as Purchaser under the Sales Contract, Defendant Lynd nevertheless still desired to acquire the Properties on his own behalf.

**Filing of Frivolous Lawsuit and Lis Pendens**

28.     The forfeiture of said $500,000 earnest money deposit caused significant angst on the part of Lynd along with a desire on the part of Lynd to exact revenge from Plaintiffs.

29.     With malice, and intent to cause harm to Plaintiffs, without any intent to actually close on a purchase of the Properties from Plaintiffs, and otherwise without good cause, Defendant Lynd caused Partners to file a frivolous six count complaint (the "Frivolous Complaint") against Plaintiffs in Cook County Circuit Court in the case docketed as no. 2015-CH-17030 on or about November 20, 2015.

30.     With malice, and intent to cause harm to Plaintiffs, without any intent to actually close on a purchase of the Properties from Plaintiffs, and otherwise without good cause, Lynd also caused Partners to file a lis pendens (the "Lis Pendens") which contained a legal description of the Properties, thereby causing a cloud on title and thus impairing Plaintiffs' ability to close on a sale of the Properties.  (True and correct copies of the Frivolous Complaint and the accompanying Lis Pendens are annexed as Composite Exhibit "C.")

31.     When Defendant Lynd caused the filing of the Frivolous Lawsuit and Lis Pendens, Lynd knew that Partners did not have a valid cause of action to assert a claim of interest of any sort whatsoever in the Properties or otherwise assert a valid cause of action for reformation or specific performance.

32.     While five of the causes of action set forth in the Frivolous Complaint sought damages under various theories, the operative cause of action is set forth in Count IV.  Count IV of the Frivolous Complaint sought reformation of the Sales Contract along with specific performance.

33.     However, the grounds for reformation in Count IV of the Frivolous Complaint were alleged to have been a mere unilateral mistake – not a mutual mistake.

34. The Frivolous Complaint never alleges a mistake on the part of the Plaintiffs in that case.

35. The prayer for relief set forth in Count IV of the Frivolous Complaint provides as follows:

> WHEREFORE, Plaintiff respectfully asks that the Court enter judgment ordering specific performance of the [Sales Contract] but reforming the contract closing date for 180 days from the entry of such an Order, as Plaintiff will require additional time and complete the necessary due diligence work to finalize alternative development plans, in addition to Plaintiff's costs, interest, attorney's fees, and all other such relief as the Court may deem just, equitable or appropriate under the circumstances.

36. The Lis Pendens was filed of record with the Cook County Recorder of Deeds on November 23, 2015 and recorded as Doc # 1532717039.

37. Despite the fact that Lynd caused Partners to file the Frivolous Lawsuit and Lis Pendens, neither Lynd nor Partners were ever ready, willing or able to close on the purchase of the Properties at any time prior to, during or after the filing thereof.

## Down Zoning

38. Defendant Lynd also engaged in a scheme to cause the Properties to be downzoned so that a hotel could no longer be developed on the Hotel Property and the amount of residential units allowed within the Building would be reduced to effectively make the Properties worthless in the hands of Plaintiffs. This (along with the filing of a lis pendens against the Properties) was all done with the intent to prevent Plaintiffs from selling the Properties to a third party, to prevent Plaintiffs from developing a hotel on the Hotel Property, to prevent development of the Tower into 27 spectacular residential units, and to acquire the Properties for himself at a price significantly lower than the purchase price of $36,000,000 in the Sales

Contract. This was also done to retaliate against Plaintiffs for Partners' loss of its $500,000 earnest money deposit.

39.    During this time period, to accomplish the foregoing, Defendant Lynd concocted a plan to have Alderman Reilly arrange for down zoning of the Building.

40.    In furtherance of this scheme, on or about December 22, 2015, Defendant Lynd, through his company the Lynd Company, made a $1500.00 campaign contribution to Alderman Reilly. (See Illinois Sunshine record detail attached as Exhibit "D.")

41.    In furtherance of his scheme to facilitate down zoning of the Building, Defendant Lynd engaged counsel to represent him with regard to the referenced zoning change. In email correspondence dated December 28, 2015, Defendant Lynd's attorney wrote back to him setting forth detailed information on the parameters of the down zoning for the Building that Defendant Lynd sought, including stopping development of a hotel for which a permit already issued. (See copy of email correspondence attached hereto as Exhibit "E.")

42.    Shortly thereafter, Alderman Reilly publicly expressed that he would oppose a hotel at the Hotel Property and followed by sponsoring legislation in the City of Chicago City Council to change zoning of the Building from DX-16 Downtown Mixed Use to DR-10-Downtown Residential Use District (the "Zoning Change").

43.    DR-10 Downtown Residential Use District zoning is a significant downgrade from DX-16 Downtown Mixed Use zoning as DR-10 Downtown Residential Use District zoning allows for significantly less residential units in the Building than already exist within the Building. This means, *inter alia*, that no residential units could any longer be allowed to be constructed in the Tower. No hotel would any longer be permitted under such zoning, thus effectively revoking the Permit which authorized Plaintiffs to develop a hotel on the Hotel

Property. In other words, this effectively required, and continues to require the Properties (other than floors 10-12 and certain retail space on the ground floor) to sit empty.

44.     Shortly before the Downzoning Ordinance was approved by City Council, Alderman Reilly wrote to Daniel Solis, Chairman of the Committee on Zoning, Landmarks and Building Standards via correspondence dated March 9, 2016. In the letter, the Alderman incredulously states that he arranged to "temporarily downzone" the Building and throw it into "nonperformance" for "its own protection." (A copy of the March 9, 2016 letter is attached as Exhibit "F.")

45.     The referenced Zoning Change was approved by Ordinance O2016-811 of the City of Chicago (the "Downzoning Ordinance"), which Downzoning Ordinance was introduced on February 10, 2016 and passed on or about March 16, 2016. (A true and correct copy of the Downzoning Ordinance is attached as Exhibit "G.")

46.     The Zoning Change enacted by the Downzoning Ordinance only affects the Building and does not affect any surrounding properties.

### Further Attempts to Sell and Bankruptcy

47.     The Plaintiffs engaged a broker to sell the Properties at an auction to be held on February 28, 2017 and March 1, 2017.

48.     Several prospective buyers (who were willing and able to purchase the Properties at the referenced auction and who would have submitted offers to purchase the Properties but for enactment of the Downzoning Ordinance) advised Plaintiffs' representatives that they would not present offers to purchase the Properties for the reason that the Zoning Change would unreasonably restrict use of the referenced Properties.

49.     Plaintiffs were unable to sell the Properties at the referenced auction because of the Zoning Change.

50.     The subject Downzoning Ordinance that codified the Zoning Change effectively served to deny Plaintiffs all viable economic uses of the Properties.  Indeed, at this stage, because of said Zoning Change, the Properties had become a burdensome liability to Plaintiffs and their members.

51.     Unable to sustain itself as a viable going concern following the Zoning Change, Development filed for Chapter 11 bankruptcy protection with the United States Bankruptcy Court in the Northern District of Illinois on March 26, 2017 in the case docketed as no. 17-09513 (the "Development Bankruptcy").    At all times during the Development Bankruptcy, Development was a debtor in possession under 11 U.S.C. § 1101(1).  At no time whatsoever was a trustee ever appointed.

52.     Shortly after the filing of the Development Bankruptcy, the presiding bankruptcy judge issued an order authorizing an auction of the Properties.

53.     At an auction held on June 26, 2017, the highest bid for the Properties was $20,800,000.00.

54.     The sale of the Properties closed on August 25, 2017.

55.     Plaintiffs' representatives did not become aware of critical facts relating to Lynd's active participation in the down zoning scheme until after the Development Bankruptcy petition was filed, Development's bankruptcy schedules and statement of financial affairs were filed, the Bankruptcy Court ordered auction sale of the Properties closed, the disclosure statement and reorganization plan were filed by Development, and the reorganization plan was confirmed by the bankruptcy court.

56.     In any event, Development's confirmed bankruptcy reorganization plan provided for prompt payment of 100% of the allowed amount of general unsecured claims and priority unsecured claims funded by proceeds of sale of the Properties at the bankruptcy auction.  Indeed,

Development's bankruptcy plan was confirmed by the bankruptcy court without a single objection thereto or vote against thereof. The plan did not provide for the cram down of any claims whatsoever. All allowed general unsecured claims and all priority claims have been paid in full. The allowed claims that still await distributions are the members of the debtor and a secured creditor of the debtor along with a portion of a claim of the general contractor. Allowing this case to move forward will help, not hinder these claimants - claimants who stand to receive distributions if Plaintiffs prevail. Development's claims against Lynd simply would not and could not have been a material consideration by Development's creditors in determining whether to approve or disapprove its bankruptcy reorganization plan. Said creditors in no way would have been prejudiced by a failure to list Development's claims against Lynd on its bankruptcy schedules.

57. Plaintiffs have had to retain attorneys to represent them in these proceedings and are obligated to pay said attorneys a reasonable fee.

**COUNT I**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(DeBartolo Properties, LLC)**

58. Plaintiffs reallege and reincorporate paragraphs 1 through 57 of this Second Amended Complaint as and for their paragraph 58 of this Count I as though fully set forth herein.

59. During the Fall of 2015, and continuing through the Spring of 2016, 55E engaged CBRE to sell its interest in Floors 13-21 of the Building.

60. CBRE was also in communication with the principal of Plaintiffs to facilitate a sale of their interests in the Properties in the event Lynd was unable to cause Partners to close on the Sales Contract.

61. At all times material herein, Defendant Lynd was in close communication with CBRE and was aware that CBRE was actively marketing the property interests of Plaintiffs and

55E in the Pittsfield Building to third party prospective buyers. Indeed, Defendant Lynd was communicating with Plaintiffs' manager and advised him that if Defendant Lynd was still interested in purchasing the Properties, Lynd would need to offer what the other offers coming in were at.

62.     Defendant Lynd was displeased with the fact that CBRE was marketing the interests of Plaintiffs in the Building.

63.     During this time period, and prior to the dates of filing of the Frivolous Lawsuit and Lis Pendens, Plaintiffs were engaged in negotiations with DeBartolo Development, LLC ("DeBartolo") through CBRE to sell their interest in the Properties to DeBartolo as a backup in the event that the transaction with Partners failed to close.

64.     Plaintiffs had a reasonable expectation of entering into a business relationship with DeBartolo.

65.     Prior to the filing of the Frivolous Lawsuit and Lis Pendens, Defendant Lynd had knowledge that CBRE was actively marketing the Properties.

66.     Prior to the filing of the Frivolous Lawsuit and Lis Pendens, Defendant Lynd had knowledge that Plaintiff was engaged with negotiations with prospective buyers such as DeBartolo, and that Plaintiffs had a reasonable expectation of entering into a business relationship with prospective buyers such as DeBartolo.

67.     DeBartolo expressed an intent to purchase the interests of Plaintiffs and 55E in the Building for the sum of $79,000,000.00 via a written letter of intent.

68.     DeBartolo's expression of intent to purchase was conditioned upon removal of the Lis Pendens.

69.     Defendant Lynd, with the malicious intent to cause harm to Plaintiffs and interfere with Plaintiffs caused the Frivolous Lawsuit and Lis Pendens to filed in the public record.

70.     Defendant Lynd, with the malicious intent to cause harm to Plaintiffs, helped facilitate the down zoning of the Building.

71.     Said filing of the Frivolous Lawsuit and Lis Pendens in the public record was done with the intent by Defendant Lynd to directly interfere with Plaintiffs' entering into a business relationship with prospective buyers such as DeBartolo.

72.     Said facilitation of the down zoning of the Building was done with the intent by Defendant Lynd to directly interfere with Plaintiffs' entering into a business relationship with prospective buyers such as DeBartolo.

73.     As a direct and proximate result of Defendant Lynd's filing of the Frivolous Lawsuit and Lis Pendens in the public record and failure to promptly release same, DeBartolo ultimately ceased negotiations with Plaintiffs to purchase Plaintiffs' interests in the Building.

74.     As a direct and proximate result of Defendant Lynd's facilitation of the down zoning of the Building, DeBartolo ultimately ceased negotiations with Plaintiffs to purchase Plaintiffs' interests in the Building.

75.      As a direct and proximate result of Defendant Lynd's filing of the Frivolous Lawsuit and Lis Pendens in the public record and failure to promptly release same, Plaintiffs' expectation of entering into a business relationship with DeBartolo ultimately failed to ripen and terminated.

76.     As a direct and proximate result of Defendant Lynd's facilitation of the down zoning of the Building, Plaintiffs' expectation of entering into a business relationship with DeBartolo failed to ripen and was terminated.

77.     Plaintiffs suffered damages as a result of the termination of their expectation of entering into a business relationship with DeBartolo as caused by Defendant Lynd.

WHEREFORE, Plaintiffs demand judgment for damages against Defendant Lynd, an award of attorneys' fees and costs, and such other relief that the Court deems equitable and just.

## COUNT II
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Pramana Global, LLC)

78.     Plaintiffs reallege and reincorporate paragraphs 1 through 57 of this Second Amended Complaint as and for their paragraph 78 of this Count II as though fully set forth herein.

79.     During the Fall of 2015, and continuing through the Spring of 2016, 55E engaged CBRE to sell its interest in Floors 13-21 of the Building.

80.     CBRE was also in communication with the principal of Plaintiffs to facilitate a sale of their interests in the Properties in the event Lynd was unable to cause Partners to close on the Sales Contract.

81.     At all times material herein, Defendant Lynd was in close communication with CBRE and was aware that CBRE was actively marketing the property interests of Plaintiffs and 55E in the Pittsfield Building to third party prospective buyers.  Indeed, Defendant Lynd was communicating with Plaintiffs' manager and advised him that if Defendant Lynd was still interested in purchasing the Properties, Lynd would need to offer what the other offers coming in were at.

82.     Defendant Lynd was displeased with the fact that CBRE was marketing the interests of Plaintiffs in the Building.

83.     During this time period, and prior to the dates of filing of the Frivolous Lawsuit and Lis Pendens, Plaintiffs were engaged in negotiations with Pramana Global, LLC

("Pramana") through CBRE to sell their interest in the Properties to Pramana as a backup in the event that the transaction with Partners failed to close.

84.    Plaintiffs had a reasonable expectation of entering into a business relationship with Pramana.

85.    Prior to the filing of the Frivolous Lawsuit and Lis Pendens, Defendant Lynd had knowledge that CBRE was actively marketing the Properties.

86.    Prior to the filing of the Frivolous Lawsuit and Lis Pendens, Defendant Lynd had knowledge that Plaintiff was engaged with negotiations with prospective buyers such as Pramana, and that Plaintiffs had a reasonable expectation of entering into a business relationship with prospective buyers such as Pramana.

87.    Pramana expressed an intent to purchase the interests of Plaintiffs and 55E in the Building for the sum of $83,000,000.00 via a written letter of intent.

88.    At the time Pramana conveyed said intent to purchase, a cursory review of the title to the Properties would have reflected the filing of the Lis Pendens.  Indeed, Pramana inserted a condition in its expression of intent that unacceptable title matters would need to be removed as a condition to close.

89.    Defendant Lynd, with the malicious intent to cause harm to Plaintiffs and interfere with Plaintiffs, caused the Frivolous Lawsuit and Lis Pendens to filed in the public record.

90.    Defendant Lynd, with the malicious intent to cause harm to Plaintiffs, helped facilitate the down zoning of the Building.

91.    Said filing of the Frivolous Lawsuit and Lis Pendens in the public record was done with the intent by Defendant Lynd to directly interfere with Plaintiffs' entering into a business relationship with prospective buyers such as Pramana.

92. Said facilitation of the down zoning of the Building was done with the intent by Defendant Lynd to directly interfere with Plaintiffs' entering into a business relationship with prospective buyers such as Pramana.

93. As a direct and proximate result of Defendant Lynd's filing of the Frivolous Lawsuit and Lis Pendens in the public record and failure to promptly release same, Pramana ultimately ceased negotiations with Plaintiffs to purchase Plaintiffs' interests in the Building.

94. As a direct and proximate result of Defendant Lynd's facilitation of the down zoning of the Building, Pramana ultimately ceased negotiations with Plaintiffs to purchase Plaintiffs' interests in the Building.

95. As a direct and proximate result of Defendant Lynd's filing of the Frivolous Lawsuit and Lis Pendens in the public record and failure to promptly release same, Plaintiffs' expectation of entering into a business relationship with Pramana ultimately failed to ripen and terminated.

96. As a direct and proximate result of Defendant Lynd's facilitation of the down zoning of the Building, Plaintiffs' expectation of entering into a business relationship with Pramana failed to ripen and was terminated.

97. Plaintiffs suffered damages as a result of the termination of their expectation of entering into a business relationship with Pramana as caused by Defendant Lynd.

WHEREFORE, Plaintiffs demand judgment for damages against Defendant Lynd, an award of attorneys' fees and costs, and such other relief that the Court deems equitable and just.

## COUNT III
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Brijus Capital, LLC)

98. Plaintiffs reallege and reincorporate paragraphs 1 through 57 of this Second Amended Complaint as and for their paragraph 98 of this Count III as though fully set forth herein.

99. During the Fall of 2015, and continuing through the Spring of 2016, 55E engaged CBRE to sell its interest in Floors 13-21 of the Building.

100. CBRE was also in communication with the principal of Plaintiffs to facilitate a sale of their interests in the Properties in the event Lynd was unable to cause Partners to close on the Sales Contract.

101. At all times material herein, Defendant Lynd was in close communication with CBRE and was aware that CBRE was actively marketing the property interests of Plaintiffs and 55E in the Pittsfield Building to third party prospective buyers. Indeed, Defendant Lynd was communicating with Plaintiffs' manager and advised him that if Defendant Lynd was still interested in purchasing the Properties, Lynd would need to offer what the other offers coming in were at.

102. Defendant Lynd was displeased with the fact that CBRE was marketing the interests of Plaintiffs in the Building.

103. During this time period, and prior to the dates of filing of the Frivolous Lawsuit and Lis Pendens, Plaintiffs were engaged in negotiations with Brijus Capital, LLC ("Brijus") through CBRE to sell their interest in the Properties to Brijus as a backup in the event that the transaction with Partners failed to close.

104. Plaintiffs had a reasonable expectation of entering into a business relationship with Brijus.

105. Prior to the filing of the Frivolous Lawsuit and Lis Pendens, Defendant Lynd had knowledge that CBRE was actively marketing the Properties.

106.     Prior to the filing of the Frivolous Lawsuit and Lis Pendens, Defendant Lynd had knowledge that Plaintiff was engaged with negotiations with prospective buyers such as Brijus, and that Plaintiffs had a reasonable expectation of entering into a business relationship with prospective buyers such as Brijus.

107.     Brijus expressed an intent to purchase the interests of Plaintiffs and 55E in the Building for the sum of $72,300,000.00 via a written letter of intent.

108.     Said expression of intent to purchase was expressly conditioned upon Plaintiffs being able to deliver good, marketable and clear title to the Properties – title which was clouded by the filing of the Lis Pendens.

109.     Defendant Lynd, with the malicious intent to cause harm to Plaintiffs and interfere with Plaintiffs, caused the Frivolous Lawsuit and Lis Pendens to filed in the public record.

110.     Defendant Lynd, with the malicious intent to cause harm to Plaintiffs, helped facilitate the down zoning of the Building.

111.     Said filing of the Frivolous Lawsuit and Lis Pendens in the public record was done with the intent by Defendant Lynd to directly interfere with Plaintiffs' entering into a business relationship with prospective buyers such as Brijus.

112.     Said facilitation of the down zoning of the Building was done with the intent by Defendant Lynd to directly interfere with Plaintiffs' entering into a business relationship with prospective buyers such as Brijus.

113.     As a direct and proximate result of Defendant Lynd's filing of the Frivolous Lawsuit and Lis Pendens in the public record and failure to promptly release same, Brijus ultimately ceased negotiations with Plaintiffs to purchase Plaintiffs' interests in the Building.

114. As a direct and proximate result of Defendant Lynd's facilitation of the down zoning of the Building, Brijus ultimately ceased negotiations with Plaintiffs to purchase Plaintiffs' interests in the Building.

115. As a direct and proximate result of Defendant Lynd's filing of the Frivolous Lawsuit and Lis Pendens in the public record, Plaintiffs' expectation of entering into a business relationship with Brijus ultimately failed to ripen and terminated.

116. As a direct and proximate result of Defendant Lynd's facilitation of the down zoning of the Building, Plaintiffs' expectation of entering into a business relationship with Brijus failed to ripen and was terminated.

117. Plaintiffs suffered damages as a result of the termination of their expectation of entering into a business relationship with Brijus as caused by Defendant Lynd.

WHEREFORE, Plaintiffs demand judgment for damages against Defendant Lynd, an award of attorneys' fees and costs, and such other relief that the Court deems equitable and just.

## COUNT IV
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Akara Partners, LLC)

118. Plaintiffs reallege and reincorporate paragraphs 1 through 57 of this Second Amended Complaint as and for their paragraph 118 of this Count IV as though fully set forth herein.

119. During the Fall of 2015, and continuing through the Spring of 2016, 55E engaged CBRE to sell its interest in Floors 13-21 of the Building.

120. CBRE was also in communication with the principal of Plaintiffs to facilitate a sale of their interests in the Properties in the event Lynd was unable to cause Partners to close on the Sales Contract.

121.    At all times material herein, Defendant Lynd was in close communication with CBRE and was aware that CBRE was actively marketing the property interests of Plaintiffs and 55E in the Pittsfield Building to third party prospective buyers.  Indeed, Defendant Lynd was communicating with Plaintiffs' manager and advised him that if Defendant Lynd was still interested in purchasing the Properties, Lynd would need to offer what the other offers coming in were at.

122.    Defendant Lynd was displeased with the fact that CBRE was marketing the interests of Plaintiffs in the Building.

123.    During this time period, and prior to the dates of filing of the Frivolous Lawsuit and Lis Pendens, Plaintiffs were engaged in negotiations with Akara Parnters, LLC ("Akara") through CBRE to sell their interest in the Properties to Akara as a backup in the event that the transaction with Partners failed to close.

124.    Plaintiffs had a reasonable expectation of entering into a business relationship with Akara.

125.    Prior to the filing of the Frivolous Lawsuit and Lis Pendens, Defendant Lynd had knowledge that CBRE was actively marketing the Properties.

126.    Prior to the filing of the Frivolous Lawsuit and Lis Pendens, Defendant Lynd had knowledge that Plaintiff was engaged with negotiations with prospective buyers such as Akara, and that Plaintiffs had a reasonable expectation of entering into a business relationship with prospective buyers such as Akara.

127.    Akara expressed an intent to purchase the interests of Plaintiffs and 55E in the Building for the sum of $83,500,000.00 via a written letter of intent.  Said expression of intent was expressly conditioned upon satisfactory review by the purchaser during a due diligence period – review that would have required release of the Lis Pendens.

128.     Defendant Lynd, with the malicious intent to cause harm to Plaintiffs and interfere with Plaintiffs, caused the Frivolous Lawsuit and Lis Pendens to filed in the public record.

129.     Defendant Lynd, with the malicious intent to cause harm to Plaintiffs, helped facilitate the down zoning of the Building.

130.     Said filing of the Frivolous Lawsuit and Lis Pendens in the public record was done with the intent by Defendant Lynd to directly interfere with Plaintiffs' entering into a business relationship with prospective buyers such as Akara.

131.     Said facilitation of the down zoning of the Building was done with the intent by Defendant Lynd to directly interfere with Plaintiffs' entering into a business relationship with prospective buyers such as Akara.

132.     As a direct and proximate result of Defendant Lynd's filing of the Frivolous Lawsuit and Lis Pendens in the public record and failure to promptly release same, Akara ultimately ceased negotiations with Plaintiffs to purchase Plaintiffs' interests in the Building.

133.     As a direct and proximate result of Defendant Lynd's facilitation of the down zoning of the Building, Akara ultimately ceased negotiations with Plaintiffs to purchase Plaintiffs' interests in the Building.

134.      As a direct and proximate result of Defendant Lynd's filing of the Frivolous Lawsuit and Lis Pendens in the public record, Plaintiffs' expectation of entering into a business relationship with Akara ultimately failed to ripen and terminated.

135.     As a direct and proximate result of Defendant Lynd's facilitation of the down zoning of the Building, Plaintiffs' expectation of entering into a business relationship with Akara failed to ripen and was terminated.

136.    Plaintiffs suffered damages as a result of the termination of their expectation of entering into a business relationship with Akara as caused by Defendant Lynd.

WHEREFORE, Plaintiffs demand judgment for damages against Defendant Lynd, an award of attorneys' fees and costs, and such other relief that the Court deems equitable and just.

## COUNT V
## SLANDER OF TITLE

137.    Plaintiffs reallege and reincorporate paragraphs 1 through 57, 59 through 77, 79 through 97, 99 through 117, and 119 through 136 of this Second Amended Complaint as and for their paragraph 137 of this Count V as though fully set forth herein.

138.    Defendant Lynd acted with malice toward Plaintiffs when he caused Partners to file the Frivolous Lawsuit and Lis Pendens.

139.    The filing of the Lis Pendens disparaged Plaintiffs' title to the Properties.

140.    Following the filing of the Lis Pendens, a reputable title insurance company would not issue title insurance to a prospective buyer of the Properties as a direct and proximate result of the filing of said Lis Pendens.

141.    Plaintiffs suffered damages as a result of said disparagement to their title to the Properties.

WHEREFORE, Plaintiffs demand judgment for damages against Defendant Lynd, an award of attorneys' fees and costs, and such other relief that the Court deems equitable and just.

## COUNT VI
## MALICIOUS AND WRONGFUL IMPAIRMENT OF PROPERTY

142.    Plaintiffs reallege and reincorporate paragraphs 1 through 57, 59 through 77, 79 through 97, 99 through 117, 119 through 136 and 138 through 141 of this Second Amended Complaint as and for their paragraph 142 of this Count VI as though fully set forth herein.

143.    At all times material herein, Defendant Lynd had personal knowledge that the Properties were zoned DX-16 Downtown Mixed Use zoning along with the broad spectrum of uses permitted under such zoning.

144.    Defendant Lynd, with the willful and malicious intent to cause injury to the Properties, affirmatively took steps to induce Alderman Reilly and the Chicago City Council to enact the Downzoning Ordinance so as to enable him to acquire the Properties for a price substantially lower than the price set forth in the Sales Contract.

145.    Defendant Lynd personally induced action on the part of Alderman Reilly and the Chicago City Council to enact the Downzoning Ordinance thereby causing significant injury to the Properties.

146.    Defendant Lynd's collective actions with regard to the down zoning of the Building constituted an unlawful civil wrong.

147.    Defendant Lynd also with willful and malicious intent, caused Partners to file the Frivolous Law Suit and Lis Pendens.

148.    The filing of the Frivolous Law Suit and Lis Pendens were unlawful civil wrongs.

149.    Defendant Lynd's complained of acts were also malicious acts performed in retaliation for Partners' loss of its $500,000 security deposit under the Sales Contract.

150.    Defendant Lynd's complained of acts were performed with the design and intent to cause injury and damage to the Properties and damages to Plaintiffs.

151.    Plaintiffs suffered injury to the Properties as a result of said complained willful and malicious acts, causing Plaintiffs to incur damages in a sum exceeding $16,000,000.00.

WHEREFORE, Plaintiffs demand judgment for damages against Defendant Lynd, an award of attorneys' fees and costs, and such other relief that the Court deems equitable and just.

Plaintiffs demand trial by jury.

Respectfully submitted,

Pittsfield Residential II, LLC,
Pittsfield Hotel Holdings, LLC and
Pittsfield Development, LLC

By:    /s/   Christopher Bargione
          One of the Attorneys for Plaintiffs

Christopher Bargione (#6185177)
Collins Bargione & Vuckovich
One North LaSalle Street, Suite 300
Chicago, Illinois 60602
312-372-7813; 312-372-7840 (Fax)
chris@cb-law.com

**STATE OF ILLINOIS**     )
                         ) SS
**COUNTY OF COOK**     )

## V E R I F I C A T I O N

       Subject to the penalties of perjury, the undersigned states that I have knowledge of the matters alleged in the foregoing document and that the statements contained therein are true to the best of my knowledge and belief.

_____
ROBERT DANIAL, Manager of Pittsfield
Development, LLC, Pittsfield Residential II, LLC
and Pittsfield Hotel Holdings, LLC

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 4, 2020, I caused the appended document to be served

via CM/ECF, the Court's electronic notification system, upon all counsel of record, including:


        Richard M. Scherer, Jr.
        Lippes Mathias Wexler Friedman LLP
        50 Fountain Plaza, Suite 1700
        Buffalo, NY 14202-2216
        rscherer@lippes.com

# EXHIBIT A

City of Chicago
Building Permit




# City of Chicago

## Department of Buildings - Permits

# Building Permit

**Permit:** 100627025

**Issued:** 12/10/15

**For Work at:** 55 E WASHINGTON ST

### Description of permitted work:

Convert eight floors (2 through 9) from E-Business to A-2 Multiple Dwellings (Hotel) at 55 E. Washington Street.The hotel will have a maximum of 191 rooms with ancillary services, no banquet rooms will be provided.55 EAST WASHINGTON STREET

**In an Emergency Contact:** PITTSFIELD HOTEL  HOLDINGS, LLC (786)368-3733 x

| **Owner:** | **Contractor:** |
|---|---|
| PITTSFIELD HOTEL  HOLDINGS, LLC | SPARTAN CONTRACTORS, INC. |
| 55 EAST WASHINGTON STREET  SUITE 309 | 1538 ELLIOT STREET |
| CHICAGO IL 60602 | PARK RIDGE IL 60068 |
| (786)368-3733 x | (847)309-8508 |



Rahm Emanuel
Rahm Emanuel
Mayor

Judith Frydland
Commissioner

Permit must be displayed on job site at all times.  Permit is NOT transferable.  Plans must be kept on site during construction.  Any changes in contractor or deviation from approved plans must be authorized by the Department of Buildings.  Permit may be revoked for violation of any of the above provisions and/or all other applicable laws.

017772



**EXHIBIT**

A

# EXHIBIT B

Purchase and Sale Agreement





## PURCHASE AND SALE AGREEMENT

PURCHASE AND SALE AGREEMENT ("Agreement"), made as of August 3, 2015 ("Effective Date"), between PITTSFIELD RESIDENTIAL II LLC, an Illinois limited liability company having a mailing address at 5151 Collins Avenue, Suite 1727, Miami Beach, PITTSFIELD HOTEL HOLDINGS, LLC AND Florida 33140 and PITTSFIELD DEVELOPMENT, LLC, an Illinois limited liability company having a mailing address at 5151 Collins Avenue, Suite 1727, Miami Beach, Florida 33140 (collectively, the "Sellers") and Adam David Partners I, LLC, a Delaware limited liability company, having a mailing address at 8000 IH 10 West, Suite 1200, San Antonio, Tx, 78230, (the "Purchaser") (collectively, the "Parties").

### W I T N E S S E T H:

WHEREAS, Sellers are the owners of the Premises described in Section 1 hereof and related assets hereafter described; and

WHEREAS, Sellers desire to sell to Purchaser, and Purchaser desires to purchase from Sellers, the Premises on the terms and conditions hereafter set forth.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereafter set forth and subject to the terms and conditions hereof, Sellers and Purchaser hereby covenant and agree as follows:

1    Premises Purchased. Sellers agree to sell to Purchaser, and Purchaser agrees to purchase from Sellers, the following property (hereafter collectively referred to as "Premises");

A.    All of Sellers' right, title and interest in the building now known by the street address 55 East Washington, Chicago, Illinois (the "Building") as specifically described in the description attached hereto as Exhibit A



B.     All fixtures, equipment, furnishings and other personal property owned by Sellers, located in the Premises and used exclusively in connection therewith, including, without limitation, all right, title, and interest of Sellers, if any, in all tangible and intangible which are located on and used in connection with the operation of the Premises as opposed to the Building in general which items are set forth in Exhibit C, attached hereto and made a part hereof.

2.     **Purchase Price.** [MONETARY TERMS SUBJECT TO SELLER REVIEW]The consideration for the sale shall be THIRTY SIX MILLION AND 00/100 ($36,00,000.00) DOLLARS (the "**Purchase Price**") payable as follows:

A.     Within three (2) business days after the Effective Date, Purchaser shall deposit and deliver the sum of Five Hundred Thousand and 00/100 Dollars ($500,000.00) (hereafter "**Initial Deposit**") to Sutton Land Title Agency, 515 Rockaway Avenue, Valley Stream, N.Y. 11581; Tel: 516.837.6107; Fax: 516 837 6407; Email: mnoskovits@suttonalliance.com (the "**Escrow Agent**"), to be held in accordance with the terms and conditions of Section 13 hereunder. If the Initial Deposit is not timely received by the Escrow Agent, then after the expiration of any applicable notice and cure periods provided for in this Agreement, this Agreement shall automatically terminate and be deemed null and void and without any force and effect without the obligation of either party giving notice to the other.

B.     If Purchaser does not terminate this Agreement pursuant to Section 9 hereof, an additional sum of One Million Seven Hundred Fifty Thousand and 00/100 Dollars ($1,750,000.00) (the "**Additional Deposit**") shall be delivered to Escrow Agent within three (3) business days after the expiration of the Due Diligence Period (as hereafter defined), to be held in accordance with the terms and conditions of Section 13 hereunder (the Initial Deposit and the Additional Deposit shall hereafter collectively be referred to as the "**Deposit**") If the Additional

Deposit is not timely received by Escrow Agent, then after the expiration of any applicable notice and cure periods provided for in this Agreement, this Agreement shall automatically terminate and be deemed null and void and without any force and effect without the obligation of either party giving notice to the other except that, upon request by Sellers, Escrow Agent shall immediately release to Sellers the Initial Deposit which Purchaser shall be deemed to waive and forfeit to Sellers to compensate Sellers for its damages. At the closing of the transactions contemplated by this Agreement (the "**Closing**"), which shall occur on the Closing Date (as hereafter defined), Purchaser shall receive a credit against the Purchase Price for the Deposit, provided that the Deposit is made by Purchaser to Escrow Agent.

        C.    On the Closing Date, Purchaser shall wire transfer to the Escrow Agent in immediately available funds (in United States currency) in accordance with wiring instructions to be supplied by Escrow Agent to Purchaser the amount of THIRTY THREE MILLION SEVEN HUNDRED FIFTY THOUSAND AND 00/100 ($33,750,000.00) DOLLARS, plus or minus all prorations and other adjustments ("**Purchase Price Balance**") (Any net prorations and adjustments chargeable against Sellers shall be a credit against said sum; otherwise said amount shall be increased by the amounts chargeable against Purchaser).

        D.    Escrow Agent, by signing on the space indicated at the end of this Agreement, agrees to be bound by the terms and conditions herein set forth with respect to its obligations contained herein

        E.    Any interest earned on the Deposit shall not be applied towards the Purchase Price and shall be paid to the Purchaser.

   3      **Permitted Exceptions to Title**.

A.     The Premises shall be conveyed to Purchaser subject only to (i) the Leases (defined below), (ii) the matters set forth on <u>Exhibit E</u> attached hereto and made a part hereof, and (iii) the Declaration of Covenants, Conditions, Restrictions and Easements for the Pittsfield Building, 55 East Washington Street, Chicago, Illinois (the "<u>Current REA</u>") (collectively referred to as the "<u>Permitted Exceptions</u>"). Within five (5) business days after the Effective Date, Sellers shall provide Purchaser with true, correct and complete copies of all Leases (defined hereinafter), and amendments thereto, and a recorded copy of the Current REA, which are in Sellers' possession.

B.     Purchaser shall accept the Premises at Closing subject all leases and tenancies (written and unwritten) of those tenants listed on <u>Exhibit B</u> annexed hereto (collectively, the "<u>Leases</u>") and all other persons and entities, if any, that occupy the Premises without Sellers' knowledge or consent ("<u>Unauthorized Occupants</u>").

4.     <u>Closing</u>.  The Closing shall take place at the offices of Sellers or at the option of either party via escrow through the offices of the Escrow Agent at a time mutually acceptable to Sellers and Purchaser. The Closing shall take place on a date which is within 60 days following the expiration of the Due Diligence Period (the "<u>Closing Date</u>").

5.     <u>Representations and Warranties</u>.   Sellers represent, warrant, and agree, as of the date hereof (which representations, warrants and agreements shall NOT survive the Closing unless expressly stated otherwise in this Agreement), that:

A     Sellers are duly organized validly existing limited liability companies in good standing under the laws of the State of their formation, with corporate powers adequate for the making and performing of this Agreement and for carrying on the business now conducted or proposed to be conducted by it   Sellers have taken all company action required to execute,

deliver and perform this Agreement, and have caused this Agreement to be executed by a duly authorized officer or member;

B.      There are no leases, licenses, occupancy or use, or other rental agreements (written or unwritten) to which Sellers are a party or are bound affecting any portion of the Premises, other than the Leases and Unauthorized Occupants.

C.      There are no service contracts, management contracts, and union contracts, which are in effect with respect to the Premises ("Service Contracts") other than those set forth on Exhibit D annexed hereto.    Purchaser shall give notice to Sellers thirty (30) days before the Closing Date of which Service Contracts Purchaser elects to assume a pro-rata share.  At the Closing, Sellers shall terminate, to the extent that they affect the Premises, those Service Contracts that may be terminated and for which Purchaser did not give Sellers notice that Purchaser elects to assume; Sellers shall assign to Purchaser, to the extent that such contracts are assignable and affect the Premises, those Service Contracts that Purchaser gave notice that it elects to assume or which may not be terminated.  Notwithstanding the foregoing, the elevator contract listed on Exhibit D which serves the Premises shall not be terminated.

D.      Sellers are not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended;

E.      There are no pending or, to Sellers' knowledge, threatened condemnation or similar proceedings affecting the Premises or any part thereof;

F.      Sellers are not: (i) an "employee benefit plan" (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to the provisions of Title I of ERISA, (ii) a "plan" that is subject to the prohibited transaction provisions of Section 4975 of the Internal Revenue Code of 1986 (the "Code") or

(iii) an entity whose assets are treated as "plan assets" under ERISA by reason of an employee benefit plan or plan's investment in such entity.

G.    To the best of Sellers' knowledge, Sellers are in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the office of Foreign Assets Control, Department of the Treasury ("OFAC") and in any enabling legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "Orders").

H.    To the best of Sellers' knowledge, neither Sellers nor any beneficial owner of Sellers:

(i)    is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists");

(ii)    is a person who has been determined by competent authority to be subject to the prohibitions contained in the Orders;

(iii)    is owned or controlled by, nor acts for or on behalf of, any person or entity on the Lists or any other person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders; or

(iv)    shall transfer or permit the transfer of any interest in Sellers or any beneficial owner in Sellers to any person or entity who is, or any of whose beneficial owners are, listed on the Lists.

I. There is no action, suit or proceeding pending except

Pittsfield Development vs 55 East Washington, LLC , or, to Sellers' knowledge, threatened against Sellers or the Premises, nor are any outstanding judgments, arbitration awards, decrees, or orders of any kind pending against Sellers or the Premises.

J. Sellers have not received any written notices of default from any mortgagee of the Premises.

K. Sellers have not entered into any agreement to sell the Premises to any third party or which gives any right of first refusal to purchase the Premises or option to purchase the Premises to a third party, which shall prevent it from completing the sale of the Premises to Purchaser under the terms of this Agreement or which would bind Purchaser in any manner subsequent to the consummation of this Agreement.

L. This Agreement and all documents to be executed pursuant hereto by Sellers are and shall be binding upon and enforceable against Sellers in accordance with their respective terms.

M. Except as otherwise set forth in this Agreement, there are no written agreements, easements, licenses, operating agreements, development agreements or other agreements regarding the operation, use or development of the Premises that would not appear on the public records of Cook County and that Sellers are parties thereto and would bind Purchaser in any manner subsequent to the consummation of this Agreement.

The continued validity in all respects of the foregoing representations and warranties through the date of Closing shall be a condition precedent to the obligation of Purchaser to close the transaction contemplated herein. If at any time on or before the Closing whether not true and

correct as of the date of this Agreement (i) any of Sellers' representations and warranties shall not be materially true and correct, or (ii) any change in facts or circumstances has made the applicable representation and warranty no longer materially true and correct, then Purchaser may, at Purchaser's option, exercised by written notice to Sellers (and as Purchaser's sole and exclusive remedy), either (y) proceed with this transaction, accepting the applicable representation and warranty as being modified by such subsequent matters or knowledge and waiving any right relating thereto, if any, or (z) terminate this Agreement and declare this Agreement of no further force and effect, in which event the Deposit shall be immediately returned to Purchaser and Sellers shall have no further liability hereunder by reason thereof.

The representations and warranties of Sellers herein shall NOT survive the Closing.

6.      **Prorations and Adjustments.**

A.      The following shall be adjusted between Sellers and Purchaser to be added or credited (as the case may be) the Purchase Price to be paid by Purchaser to Sellers on the Closing Date; all adjustments are to be made as of the Closing Date:

(i)      All real estate taxes, personal property taxes, sewer rents and charges and other state, county, school, district, municipal and other governmental and quasi-governmental taxes and charges assessed against the Premises, due and owing as of the Closing Date, and all penalties and interest thereon, and all special assessments affecting the Premises, whether payable in installments or not, shall be paid in full by Sellers at Closing. Real estate taxes applicable to the Premises for the year in which the Closing occurs shall be prorated as of the Closing Date based on 105% of the most recently ascertainable real estate taxes and Sellers shall provide Purchaser with a credit for same. By way of illustration, if closing occurs on August 1, 2015, then Sellers shall pay the 1st installment 2014 tax bill prior to Closing and

provide Purchaser with a 105% credit for the second installment 2015 tax bill and a 105% credit for the 2015 taxes up to the Closing Date, on a pro rata basis. Notwithstanding the foregoing, in the event a subdivision has not been accomplished to the effect of establishing separate tax lots, then, in that event, the foregoing adjustments shall be based on a pro-rata share (based on the square footage of the Premises and the square footage of the entire Building) of the applicable taxes based on one hundred percent (100%) of the prior year's tax bill.

        (ii)    Charges and payments under the Service Contracts set forth on Exhibit _F_ for those contracts which will not be terminated under Section 5C above and based on the Premises percentage share of same pursuant to the Current REA.

        (iii)    All charges for utilities servicing the Premises, including, without limitation, charges for gas, electricity, water and sewerage, provided Sellers shall use reasonable efforts to obtain final meter readings of such utilities on or within three (3) days prior to the Closing Date. Notwithstanding the foregoing, to the extent final readings are obtained for the Premises on or within three (3) days prior to the Closing Date, Seller shall pay said final bills and no prorations shall be made; and

        (iv)    all other income and ordinary operating expenses for or pertaining to the Premises shall be prorated on a customary basis to the extent that the prorations reflect the Premises and the portion of the Building excluding the Premises (the "**Building Remainder**"), the parties shall act in good faith to accomplish a fair and equitable proration.

        (v)    collected rents from any tenants still in possession.

    In the event that the amount of any prorated item is not known at Closing, the Parties agree that such items shall be prorated at Closing upon the basis of the best information available, and shall be adjusted when the actual amount(s) of such items are known, with

appropriate charges and credits to be made. In the event any adjustment, subsequent to the Closing Date, shall be necessitated, then either party hereto who is entitled to additional monies shall invoice the other party for such additional amounts as may be owing, and such amount shall be paid within ten (10) days from receipt of the invoice.

At Sellers' option, the security deposits held by Sellers pursuant to the Leases shall, at Sellers' option at Closing, be transferred to Purchaser or credited towards the Purchase Price.

The provisions of this Section shall survive the Closing Date for a period of six (6) months.

B.    <u>Special Assessments</u>.  If, on the Closing Date, the Premises or the Building of which it is a part, shall be or shall have been affected by assessments which are, or which may become payable in annual installments, of which the first installment is then a charge or lien, or has been paid, then for the purposes of this Agreement, Sellers shall pay all installments through the day of closing and Purchaser shall pay the proportionate share of all installments subsequent to the Closing Date.

C.    <u>Expenses</u>.

(i)    Title insurance premiums for the extended coverage Title Policy (other than the costs of the endorsements to such Title Policy other than extended coverage), one-half (½) of the escrow fee, and all costs of obtaining the surveys attached hereto as <u>Exhibit E</u> (collectively, the "<u>Survey</u>"), for judgment searches relating to the selling entities, and the cost to record releases of Seller's financing documents, all costs for judgments and lien searches, shall be borne and paid by Sellers at or prior to Closing.

(ii)    The costs of the endorsements to the Title Policy, City of Chicago transfer taxes (excluding the portion of City of Chicago transfer taxes that are Seller's obligation pursuant to

the City of Chicago ordnance, which shall be paid by Sellers)], for updating and/or revising the Survey, one-half (½) of the escrow fee and all recording fees respecting the Deeds and Purchaser's financing documents, if any, shall be borne and paid by Purchaser at or prior to Closing.

(iii)   All other costs, charges, and expenses shall be borne and paid at Closing as provided in this Agreement, or in the absence of such provision, in accordance with applicable law or local custom.

7.   <u>Procedure for Closing</u>.

A.   At the Closing, Sellers shall deliver to Purchaser or the Escrow Agent, as the case may be:

(i)   Good and sufficient Special Warranty Deeds for the Premises (the "<u>Deed</u>"), duly executed and acknowledged by Sellers and in form for recording, containing all customary covenants free of all liens and encumbrances other than "Permitted Exceptions." Sellers shall provide to the Title Insurer original copies of any required real estate transfer tax excise or documentary stamp tax declarations executed by Sellers or any other similar documentation required to evidence the payment of any tax imposed by the state, county and city on the transaction contemplated hereby. Sellers may utilize closing proceeds to pay same.

(ii)   Bill of sale transferring and selling all right, title and interest in and to the personal property.

(iii)   An executed counterpart of the Assignment of Service Contracts assigning to Purchaser all of the liabilities and obligations thereunder accruing from and after the Closing Date for those Service Contracts affecting the Premises which will not be terminated under Section 5C above.

(iv)    Resolutions of Sellers authorizing the sale of the Premises pursuant to this Agreement and the authority of the officer executing the closing documents on behalf of Sellers.

(v)    Affidavit of Title reasonably acceptable to Sellers' and Purchaser's Title Insurer.

(vi)    Affidavits that Sellers are not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

(vii) All keys to the Premises, to the extent the same are in Sellers' possession or control.

(viii) All of the Leases.

(ix)    A certificate of Sellers dated as of the Closing Date certifying that the representations and warranties of Sellers set forth in Section 5 of this Agreement, as applicable, remain true and correct in all material respects as of the Closing Date.

(x)    The Bulk Sales Indemnity (hereafter defined), if applicable.

(xi)    An executed counterpart of the Assignment of Leases assigning to Purchaser all of the liabilities and obligations thereunder accruing from and after the Closing Date.

(xii)    Clean estoppel certificates from (i) the following retail tenants of the Premises: JPMorgan Chase Bank, Toni Sweets Chicago LLC and Fiancee Jewelry Mfg., Inc. and (ii) at least 50% of the office tenants under the Leases, the form of which shall be as provided in the Leases, of if there is no form required under the Leases, as reasonably approved by Purchaser.

(xiii)    Seller's executed counterpart of a settlement statement prepared by the Title Insurer;

(xiv)    Any additional documents reasonably required by the Title Insurer.

B    At Closing, Purchaser shall deliver to Sellers or the Escrow Agent, as the case may be:

(i)    The Purchase Price Balance required pursuant to Section 2C above, together with all adjustments, if any, in favor of Sellers.

(ii)    An executed counterpart of the Assignment of Service Contracts assuming all of the liabilities and obligations thereunder accruing from and after the Closing Date.

(iii)    An executed counterpart of the Assignment of Leases assuming all of the liabilities and obligations thereunder accruing from and after the Closing Date.

(iv)    Purchaser's counterpart of any applicable state, county or local realty transfer tax declarations;

(v)    Purchaser's executed counterpart of a settlement statement provided by the Title Insurer;

(vi)    Any additional documents reasonably required to effectuate the intents and purposes of this Agreement.

8.    **Title Objections; Survey and Permitted Exceptions**

A.    Sellers, within 15 business days after the full execution of this Agreement, shall order and request the delivery of a title insurance commitment (the "**Title Commitment**") from Stewart Title Insurance Company (the "**Title Insurer**") together with copies of all documents shown as exceptions therein to each of the attorneys for Sellers and Purchaser. Except as otherwise set forth in this Agreement, the cost of the Title Commitment shall be borne by Sellers..

B.    Subject to the Permitted Exceptions, if the Title Commitment or the Survey discloses any lien, encumbrance, easement, restrictive covenant, security interest, judgment, tax lien or any other exception to title other than Permitted Exceptions (collectively "**Objections**"), Purchaser shall have ten (10) business days following its receipt of the Title

Commitment ("**Title Review Period**") to disclose in writing to Seller the Objections, if any ("**Objection Notice**"). If Sellers do not notify Purchaser in writing within five (5) business days after receiving Purchaser's Objection Notice that Seller will, prior to Closing, remove or cure the defects giving rise to the Objections, then, Sellers shall conclusively be deemed to have refused to remove all said Objections at or before Closing. If Sellers notify Purchaser in writing within five (5) business days after receipt of Purchaser's Objection Notice that they have elected not to cure one or more of said Objections ("**Sellers' Notice**") or upon Seller's deemed refusal, Purchaser shall have the right to terminate this Agreement by delivering written notice within five (5) business days after Sellers' deemed refusal or receipt of such Sellers' Notice, in which event, the Deposit shall be returned to Purchaser and neither party shall have any further rights or obligations under the Agreement. If Purchaser fails to terminate this Agreement within such timeframe, the time being of the essence, Purchaser shall be deemed to have waived its right to terminate as a result thereof and shall be obligated to consummate the transaction contemplated by this Agreement in accordance with the terms hereof, in which event, all those Objections that Sellers have so elected (or has been deemed to elect) not to cure as well as all other matters shown in the Title Commitment and/or Survey which were not objected to by Purchasers shall conclusively be deemed to constitute "Permitted Exceptions"; provided however that Sellers shall be obligated to pay off the lien or encumbrance of a definite or ascertainable amount that affects the Premises and was voluntarily incurred or created by Sellers

      C.     If a search of the title discloses judgments, bankruptcies or other returns against other persons having names the same or similar to that of Sellers, Sellers will, on request, deliver to the Title Insurer an affidavit showing that such judgments, bankruptcies or other returns are not against Sellers. Sellers shall deliver such affidavits and/or documentary evidence

required by the Title Insurer to eliminate or modify standard exceptions for matters of survey and mechanics liens and parties in possession.

D.  Sellers, at their sole expense except as otherwise set forth in this Agreement, shall request to be delivered to Purchaser at Closing an owner's title insurance policy with extended coverage (the "Title Policy") issued by the Title Insurer, dated the day of Closing, in the full amount of the Purchase Price, subject only to the Permitted Exceptions. The Title Policy may contain any endorsements requested by Purchaser; provided that, Purchaser shall satisfy itself as to the availability of any such endorsements prior to the expiration of the Due Diligence Period. The costs of any such endorsements shall be paid for by Purchaser.

E.  At Sellers' request, Sellers shall be given a reasonable adjournment (not to exceed 15 days) of the Closing Date to permit Sellers to endeavor to eliminate any Title Objections. The fact that Sellers at Sellers' option may proceed to dispose of any of said alleged objections to title shall not deemed an admission of the validity of any of such objections or an admission of Sellers' obligation to cure/correct.

F.  Notwithstanding anything to the contrary, Purchaser shall not refuse title (and Seller shall have no obligation, if any, to incur any expense to cure an Objection or the title defect) if the Title Insurer is willing to insure (without the payment of an additional premium) against the enforcement of any Objection of defect in title provided the intended use of the Property is not affected.

9  Due Diligence Period. At any time prior to the date which is twenty one (21) days after the Effective Date (the "Due Diligence Period"), Purchaser shall have the right, in its sole and absolute discretion, and for any or no reason whatsoever, to terminate this Agreement by written notice to Sellers delivered by Purchaser on or prior to Due Diligence Period

expiration, in which case the Deposit paid to date shall be promptly returned to Purchaser and, thereupon, neither party shall have any further rights, duties, liabilities or obligations under this Agreement, except as otherwise expressly set forth herein. If Purchaser does not give Sellers such notice as and when required in this Section, the time being of the essence, the right given to Purchaser in this Section to terminate this Agreement shall be deemed to have been waived by Purchaser.

Within five (5) business days after the full execution of this Agreement, Seller shall deliver to Purchaser copies of any environmental, engineering, structural and/or roof reports of the Premises in the Seller's possession; copies of old or current plans and specifications (including site plans) of the Premises in the Seller's possession; income and expense statements for the Premises for the last three (3) calendar years and the calendar year to date.

A.    Right to Inspect.  Purchaser, and Purchaser's agents and representatives, shall have, subject to the rights of tenants and other occupants, reasonable access to the Premises during normal business hours, from time to time, prior to the Closing Date or earlier termination of this Agreement, for the purpose of conducting, surveys, architectural, engineering, geo-technical and environmental inspections and tests, and any other inspections, studies, or tests reasonably required by Purchaser subject to the terms hereof; *provided, however,* that Purchaser shall (i) give Sellers reasonable prior written notice of the time and place of such entry, in order to permit a representative of Sellers to accompany Purchaser; (ii) not unreasonably interfere with the operations of the Premises or any tenant thereof; (iii) restore/repair any damage to the Premises, Building or any adjacent property caused by such actions; (iv) indemnify, defend and save Sellers and, as the case may be, its partners, trustees, shareholders, directors, members, officers, employees and agents harmless of and from any and all claims and/or liabilities which

Sellers and its partners, trustees, shareholders, directors, members, officers, employees and agents may suffer or be subject by reason of or in any manner relating to such entry and such activities, including, without limitation, any claims by tenants and/or invitees of the Premises; (v) not enter into any tenant's leased premises or communicate with any tenant unless Sellers gives Purchaser written consent to do so and Purchaser is accompanied by Sellers or Sellers' agent in each instance, and (vi) prior to entry onto the Premises, furnish Sellers with a certificate of general liability and property damage insurance maintained by Purchaser with single occurrence coverage of at least $1,000,000 (and aggregate coverage of $3,000,000) and naming Sellers and its property manager as additional insureds. Such examination of the physical condition of the Premises may include an examination for the presence or absence of hazardous or toxic materials, substances or wastes (collectively, "**Hazardous Materials**"), which shall be performed or arranged by Purchaser at Purchaser's sole expense, provided Purchaser may not conduct any invasive or destructive testing or borings without Sellers' prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. The foregoing and the results thereof are not intended to, and shall not grant Purchaser any right to, modify this Agreement or entitle Purchaser to any abatement or offset against the Purchase Price.

Upon request of Seller, Purchaser shall promptly deliver to Sellers copies of all of the reports generated as a result of Purchaser's inspections of the Property. Purchaser agrees to promptly repair any damage caused to the Premises/Building in connection with the exercise of its inspections hereunder, and further hereby indemnifies and agrees to defend and hold harmless the Sellers from and against all liability, loss, damage and expense (including attorney's fees) arising from the inspection of the Premises/Building by Purchaser or its agents or consultants. In the event Purchaser discovers a preexisting condition at the Premises or Building, Purchaser

hereby covenants that it shall not disclose such condition to any person or entity other than its attorneys, agents and/or consultants in connection with the evaluation of the Premises or Building unless (a) required to disclose the discovery of such existing conditions to a governmental authority pursuant to applicable law or (b) in connection with its financing of the Premises. The provisions of this Section shall survive the Closing and the delivery of the Deed hereunder or the termination of this Agreement without the occurrence of Closing, as the case may be.

B.    No Liens Permitted.    Nothing contained in this Agreement shall be deemed or construed in any way as constituting the consent or request of Sellers, express or implied by inference or otherwise, to any party for the performance of any labor or the furnishing of any materials to the Premises or any part thereof, nor as giving Purchaser any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials that would give rise to the filing of any liens against the Premises or any part thereof. Purchaser agrees to promptly cause the removal of, and indemnify, defend and hold Sellers harmless with respect to, any mechanic's or similar lien filed against the Premises or any part thereof by any party performing any labor or services at the Premises or supplying any materials to the Premises at Purchaser's request.

C.    Survival.    The provisions of this Section 9 shall survive termination of this Agreement and/or the Closing and delivery of the Deeds.

10.    Broker's Commission.    Each of the parties hereto agrees that it has not dealt with any broker in connection with ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ At Closing, Sellers shall pay Broker a commission pursuant to separate written agreement between Sellers and Broker. Sellers and Purchaser hereby each agree to indemnify and hold harmless

each other from and against any cost, expenses, claim, liability or damage resulting from a breach of the representation and warranty contained herein and from any claim by any broker in connection with this transaction. The party whose actions or alleged commitment for, the basis of such claim shall bear all expenses, costs, etc. referred to in this Section. The provisions of this Section 10 shall survive the Closing Date and delivery of the Deeds.

11. _Casualty._ If, between the date hereof and the Closing, there shall occur a fire or other casualty affecting the Premises which would cost in excess of $250,000.00 to repair, then Purchaser shall have the right to terminate this Agreement and receive a refund of the Deposit via notice received within ten (10) days after Purchaser receives notice of the casualty, and, if necessary, the time of Closing shall be extended to permit such election. In the event Purchaser does not timely elect to terminate the Agreement, the time being of the essence, then to the extent that the insurance proceeds are allocated specifically to the Premises, Sellers shall pay to Purchaser an amount equal to the deductible under Sellers' policy of casualty insurance and Sellers shall execute and deliver to Purchaser all required proofs of loss, to the extent available, assignments of claims and other similar items. In no event shall Sellers have any obligation to repair any damage or destruction to any portion of the Premises, but Sellers shall have the right to do so and utilize insurance proceeds for such purpose.

If, prior to Closing, any of the improvements on the Premises are damaged or destroyed and such damage which would cost less than $250,000.00 to repair, Purchaser shall remain obligated to close hereunder with no abatement in the Purchase Price. At Closing, Sellers shall assign to Purchaser Sellers' rights in any insurance proceeds to be paid to Sellers in connection with such damage or destruction, and Purchaser shall receive a credit against the Purchase Price from Sellers in an amount equal to the deductible amount under Sellers' casualty

insurance policy and Sellers shall execute and deliver to Purchaser all required proofs of loss to the extent available, assignments of claims and other similar items.

12. **Condemnation.** If between the date hereof and the Closing, any condemnation or eminent domain proceedings are initiated which would result in the taking of any portion of the Premises, then Purchaser may terminate this Agreement and receive a refund of the Deposit, to the extent not heretofore released. In no event shall Sellers have any obligation to repair or restore any portion of the Premises.

13. **Duties of Escrow Agent.**

A.     The Deposit shall be held by the Escrow Agent, in trust, on the terms hereafter set forth:

B.     The Escrow Agent shall deposit the Deposit in an interest-bearing commercial bank account in the State of New York. Upon receipt of a W-9 executed by Purchaser, the Escrow Agent shall deposit the Deposit in an interest-bearing bank account.

C.     The Escrow Agent shall deliver the Deposit to Sellers or to Purchaser, as the case may be, under the following conditions:

(i)     To Sellers on the Closing Date, provided, Closing shall occur pursuant to this Agreement; or

(ii)     To Sellers upon receipt of written demand therefor ("<u>Sellers' Demand for Deposit</u>") stating that Purchaser has defaulted in the performance of Purchaser's obligation to close under this Agreement and the facts and circumstances underlying such default; provided, however, that the Escrow Agent shall not honor such demand until more than ten (10) business days after the Escrow Agent shall have sent a copy of such demand to Purchaser in accordance with the provisions of Section 13C of this Agreement

if the Escrow Agent shall have received a Notice of Objection (as hereafter defined) from Purchaser within such ten (10) business day period; or

        (iii)     To Purchaser upon receipt of written demand therefor ("**Purchaser's Demand for Deposit**") stating that this Agreement has been terminated in accordance with the provisions hereof, or that Sellers have defaulted in the performance of any of Sellers' obligations under this Agreement, and the facts and circumstances underlying the same; provided, however, that the Escrow Agent shall not honor such demand until more than ten (10) business days after the Escrow Agent shall have sent a copy of such demand to Sellers in accordance with the provisions of Section 13D of this Agreement nor thereafter, if the Escrow Agent shall have received a Notice of Objection from Sellers within such ten (10) business day period.

       D,     Within two (2) business days of the receipt by the Escrow Agent of a Sellers' Demand for Deposit or a Purchaser's Demand for Deposit, the Escrow Agent shall send a copy thereof to the other party by overnight mail via a recognized courier service such as Federal Express, with a signature required for delivery, and otherwise as provided in Section 20 of this Agreement. The other party shall have the right to object to the delivery of the Deposit by sending written notice (the "**Notice of Objection**") of such objection to the Escrow Agent by overnight mail via a recognized courier service such as Federal Express, with a signature required for delivery, and otherwise as provided in Section 20 of this Agreement which Notice of Objection shall be deemed null and void and ineffective if such Notice of Objection is not received by the Escrow Agent within the time periods prescribed in Section 13B of this Agreement. Such notice shall set forth the basis for objecting to the delivery of the Deposit.

Upon receipt of a Notice of Objection, the Escrow Agent shall promptly send a copy thereto to the party who sent the written demand.

E.    In the event the Escrow Agent shall have received the Notice of Objection within the time periods prescribed in Section 13B of this Agreement, the Escrow Agent shall continue to hold the Deposit until (i) the Escrow Agent receives written notice from Sellers and Purchaser directing the disbursement of the Deposit, in which case the Escrow Agent shall then disburse the Deposit in accordance with such direction, or (ii) in the event of litigation between Sellers and Purchaser, the Escrow Agent shall deliver the Deposit to the clerk of the court in which said litigation is pending, or (iii) the Escrow Agent takes such affirmative steps as the Escrow Agent may, at the Escrow Agent's option, elect in order to terminate the Escrow Agent's duties including, but not limited to, depositing the Deposit in any court within the judicial jurisdiction of where the Premises are located and bring an action for interpleader, the costs thereof to be borne by whichever of Sellers or Purchaser is the losing party.

F.    It is agreed that the duties of the Escrow Agent are only as herein specifically provided, and subject to the provisions of this Section, are purely ministerial in nature, and that the Escrow Agent shall incur no liability whatever except for willful misconduct or gross negligence, as long as the Escrow Agent has acted in good faith   Sellers and Purchaser each release the Escrow Agent from any act done or omitted to be done by the Escrow Agent in good faith in the performance of its duties hereunder.

G.    The Escrow Agent is acting as a stakeholder only with respect to the Deposit. Upon making delivery of the Deposit in the manner herein provided, the Escrow Agent shall have no further liability hereunder.

H.     The Escrow Agent shall either execute this Agreement or indicate in writing that it has accepted the role of Escrow Agent pursuant to Agreement which in either case will confirm that the Escrow Agent is holding and will hold the Deposit in escrow, pursuant to the provisions of this Agreement.

I.     Upon Closing of title, any interest earned on the Deposit shall be credited to Purchaser at closing. Upon delivery of the Deposit to Sellers under Section 13B, interest shall be delivered to Sellers, and upon delivery of the Deposit to Purchaser under Section 13B, interest shall be delivered to Purchaser.

J.     On the Closing Date, if the Deposit, the Purchase Price Balance, the Adjustments and all the documents set forth in Section 7B have been received by the Title Insurer and if the Title Insurer is in a position to issue and will issue the Title Policy as provided hereunder, the Title Insurer shall:

(a)     Cause Deposit and Purchase Price Balance to be immediately released to Seller, together with the Adjustments (collectively, the "Closing Funds").

(b)     Cause the following to be filed for record: the Deed;

(c)     Cause the issuance and delivery to Purchaser of the Title Policy, as provided hereunder;

(d)     Charge to the account of Purchaser all sums properly chargeable against Purchaser hereunder;

(e)     Charge to the account of Seller all sums properly chargeable against Seller hereunder; and

(f)     Deliver (i) to Seller (1) a copy of the recorded Deed; (2) original executed counterparts of all other documents delivered by Seller, Purchaser or any other

party into the Closing Escrow; and (3) its settlement statement in duplicate showing all the charges and credits affecting the account of Seller (the "Seller Documents"); and (ii) to Purchaser: (1) the original recorded Deed; (2) original executed counterparts of all other documents delivered by Seller, Purchaser or any other party into the Closing Escrow; (3) copies of any recorded mortgage deposited by Purchaser; (4) the Title Policy; (5) the balance, if any, of the funds deposited by Purchaser remaining after disbursement in accordance with these directions; and (6) its settlement statement in duplicate showing all charges and credits affecting the account of Purchaser.

K. Survival. The provisions of this Article shall survive the Closing or any termination of this Agreement.

14. "AS IS" CONDITION. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES OF SELLERS SET FORTH IN THIS AGREEMENT AND THE CLOSING DOCUMENTS (AS DEFINED BELOW), PURCHASER UNDERSTANDS AND AGREES THAT SELLERS ARE NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE PREMISES OR THE BUILDING OR THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY SELLERS TO PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY. PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLERS SHALL TRANSFER AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PREMISES "AS IS, WHERE IS, WITH ALL

FAULTS", EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT.

PURCHASER REPRESENTS TO SELLERS THAT PURCHASER HAS CONDUCTED, OR WILL CONDUCT PRIOR TO CLOSING, SUCH INVESTIGATIONS OF THE PREMISES AND THE BUILDING, INCLUDING BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS PURCHASER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE PREMISES AND THE BUILDING, AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLERS OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLERS AS ARE EXPRESSLY SET FORTH IN THIS AGREEMENT.

PURCHASER ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS THE "AS IS, WHERE IS" NATURE OF THIS SALE AND ANY FAULTS, LIABILITIES, DEFECTS OR OTHER ADVERSE MATTERS THAT MAY BE ASSOCIATED WITH THE PROPERTY. PURCHASER, WITH PURCHASER'S COUNSEL, HAS FULLY REVIEWED THE DISCLAIMERS AND WAIVERS SET FORTH IN THIS AGREEMENT, AND UNDERSTANDS THE SIGNIFICANCE AND EFFECT THEREOF. PURCHASER ACKNOWLEDGES AND AGREES THAT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH HEREIN ARE AN INTEGRAL PART OF THIS AGREEMENT, AND THAT SELLERS WOULD NOT HAVE AGREED TO SELL THE PROPERTY TO PURCHASER FOR THE PURCHASE

PRICE WITHOUT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH IN THIS AGREEMENT. THE TERMS AND CONDITIONS OF THIS PARAGRAPH EXPRESSLY SURVIVE THE CLOSING, WILL NOT MERGE WITH THE PROVISIONS OF ANY CLOSING DOCUMENTS AND WILL BE INCORPORATED INTO THE DEED.

15.    <u>Reserved.</u>

16.    <u>Purchaser's Remedies.</u>  If Sellers default in closing hereunder, Purchaser may, at its sole election, either: (i) terminate this Agreement, whereupon the Deposit shall be immediately returned to Purchaser and neither party shall have any further liability or obligation to the other, except for any other provision of this Agreement that is expressly intended to survive the termination of this Agreement; or (ii) assert and seek judgment against Sellers for specific performance, provided that such suit is initiated within 90 days of the Closing Date.

17.    <u>Sellers' Remedies.</u>  If Purchaser shall fail to close title as required by the terms of this Agreement, or if Purchaser otherwise defaults hereunder, Sellers shall have the right, as its sole remedy, to have the Deposit paid to Sellers by the Escrow Agent as liquidated damages for Purchaser's default. Notwithstanding anything to the contrary herein, in the event that Purchaser breaches its obligations under Section 21 herein, Sellers may seek its remedies as are available at law and/or equity

18.    <u>Default Notice.</u>  Except as otherwise set forth herein, no party shall be in default of this Agreement, nor shall any party have the right to exercise any remedy available to it under this Agreement until after the service on the non-performing party of written notice of said default and the expiration of ten (10) business days from the non-performing party receipt of said written notice.

19. **Assignment.** This Agreement may not be assigned by Purchaser without Sellers' prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, provided that this Agreement may be assigned by Purchaser to a legal entity that controls, is controlled by, or is under common control with Purchaser and/or its principals, provided that, such assignment shall not release Purchaser from its obligations under this Agreement and Seller reasonably approves the form and content of the assignment and assumption agreement.

20. **Notices.** All notices, demands or requests made pursuant to, under or by virtue of this Agreement must be in writing and delivered to the party to which the notice, demand or request is being made by overnight courier service, such as Federal Express, with a signature required for delivery, by hand, or by e-mail or facsimile transmission as long as a copy is sent with one of the other methods within two days, as follows:

|  | |
|---|---|
| To Sellers: | Pittsfield Development LLC<br>5151 Collins Avenue<br>Suite 1727<br>Miami Beach, Florida, 33140<br>Fax No.: (305) 867-0047 |
|  | Pittsfield Residential II, LLC<br>5151 Collins Avenue<br>Suite 1727<br>Miami Beach, Florida, 33140<br>Fax No.: (305) 867-0047 |
| With a copy to | Eric Rosenberg, Esq.<br>Rosenberg & Pittinsky, LLP<br>232 Madison Avenue, Suite 906<br>New York, New York 10016<br>Fax No. 212-286-6818<br>e-mail: eric@rpllplaw.com |
| To Purchaser: | Adam David Lynd<br>Adam David Partners 1, LLC<br>8000 IH 10 West, Suite 1200<br>San Antonio, Texas 78230 |

With a copy to:

Escrow Agent:          Sutton Land Title Agency
515 Rockaway Avenue
Valley Stream, New York 11581
Fax No.: (516) 837-6407

Notices, demands and requests which shall be served upon either party in the manner aforesaid shall be deemed sufficiently served or given for all purposes hereunder at the time such notice, demand, or request shall be received.

21.    **Confidentiality.**  Purchaser and its respective representatives shall hold in strictest confidence all data and information obtained with respect to the operation and management of the Building and Premises and the terms and conditions of this Agreement, whether obtained before or after the execution and delivery hereof, and shall not use such data or information for purposes unrelated to this Agreement or disclose the same to others except as expressly permitted hereunder; provided that nothing shall prohibit the Purchaser from advising third parties that it has executed a contract to purchase the Premises. The preceding sentence shall not be construed to prevent Purchaser from disclosing to: (y) its lenders or investors, or to its officers, directors, attorneys, accountants, architects, engineers and consultants to perform their designated tasks in connection with the transaction contemplated by this Agreement; provided that such disclosing party advises any such third party of the confidential nature of the information disclosed, or (z) the Title Insurer. However, neither party shall have this obligation concerning information which: (a) is published or becomes publicly available through no fault of either Purchaser or Sellers; (b) is rightfully received from a third party; or (c) is required to be disclosed by law.

22. **Entire Agreement.** This Agreement together with Exhibits annexed hereto and made a part hereof contains all of the terms agreed upon between the Parties with respect to the subject matter hereof.

23. **Modification.** This Agreement may not be changed, modified or terminated, except by an instrument executed by both Parties.

24. **Waiver.** No waiver by either party of any failure or refusal to comply with its obligations shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

25. **Successors and Assigns.** The provisions of this Agreement shall inure to the benefit of, and shall bind the administrators, successors and assigns of the respective parties.

26. **Severability.** If any term or provisions of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

27. **Recordation Not Permitted.** In no event shall this Agreement, or any memorandum hereof be recorded in the official or public records where the Premises are located, and any such recordation or attempted recordation shall constitute a default under this Agreement by the party responsible for such recordation or attempted recordation.

28. **Counterparts.** This Agreement may be executed in two or more counterparts each of which when executed and delivered as prescribed shall constitute an original. Delivery of counterparts of this Agreement via e-mail or fax transmission shall constitute valid delivery of this Agreement and shall be binding as an original

29.     **Applicable Law.**     The provisions of this Agreement shall be construed in accordance with the laws of the State of Illinois. If Illinois statutory or case law would hold that this Agreement is illusory or is otherwise unenforceable due to a right of termination granted to Purchaser hereunder (whether it be the right to terminate during the Due diligence Period, or otherwise), then if Purchaser elects to terminate pursuant to such right, then following such termination Seller will have the right to invoice Purchaser the sum of One Hundred Dollars (the "**Termination Right Consideration**") and Purchaser agrees to pay the Termination Right Consideration to Seller within thirty (30) days immediately following Purchaser's receipt of such invoice and the obligation to pay will survive the termination and the disbursement of the Deposit.

30.     **Covenants of Seller.**     During the pendency of this Agreement, Seller shall (a) intentionally omitted; (b) not grant or convey (or modify any existing) any easement, license, permit or any other legal or beneficial interest in or to the Premises, without the prior written consent of Purchaser which shall not be unreasonably be withheld, delayed or conditioned; (c) operate and maintain the Premises in accordance with Seller's normal maintenance and management practices utilized in the ordinary course of Seller's business; (d) not make any material alterations or changes to the Premises, except in the ordinary course of business, (e) not (except as otherwise set forth below), without Purchaser's prior written consent, which consent shall not be unreasonably withheld: (i) amend, renew or extend any Lease in any respect, unless required by law; (ii) grant a written lease to any tenant occupying space pursuant to an unwritten tenancy; (iii) terminate any Lease or unwritten tenancy except by reason of a default by the tenant thereunder (which shall not require any consent of the Purchaser); or (iv) permit

occupancy of, or enter into any new lease for, space in the Premises which is presently vacant or which may hereafter become vacant.

If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Sellers in violation of any restrictions contained in this contract. Sellers shall not grant any concessions or rent abatements for any period following the closing without Purchaser's prior written consent. Sellers shall not apply all or any part of the security deposit of any tenant unless such tenant has vacated the Premises.

Sellers do not warrant that any particular Lease or tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this contract in any manner or entitle Purchaser to an abatement of or credit against the Purchase Price or give rise to any other claim on the part of Purchaser.

31. **Business Day** In the event a date of performance of either party under this Agreement falls on a federal or State of Illinois holiday or a weekend, the date of such performance shall be automatically expended until the next business day. A "business day" shall mean any day when national banks located in Chicago, Illinois, are open for business.

32. **Counterparts** This Agreement may be executed in multiple counterparts all of which taken together shall constitute one executed original. For purposes of executing this Agreement, any signed document transmitted by facsimile machine or a PDF document transmitted by email transmission shall be considered as an original signature and shall be considered to have the same binding legal effect as an original document. At the request of any party, any document transmitted by facsimile or email shall be re-executed by the applicable

parties in an original form, it being agreed that the failure by any part to so re-execute such document shall not affect the binding legal effect of such document.

33. **Preconditions to Obligation to Close.**

A.    Purchaser shall not be obligated to proceed with the Closing unless and until each of the following conditions has been either fulfilled or waived in writing by Purchaser:

(i)    Sellers shall be prepared to deliver or cause to be delivered to Purchaser all instruments and documents to be delivered to Purchaser at the Closing pursuant to Section 7A of this Agreement;

(ii)    Sellers shall have received bulk sales releases from the City of Chicago, Cook County and State of Illinois or in the event that a request for bulk sale release has been submitted by Sellers and a bulk sales release not yet issued, then an indemnification from Sellers indemnifying Purchaser for bulk sales liability of Sellers accruing prior to the Closing in form and substance reasonably acceptable to Purchaser ("**Bulk Sales Indemnity**"). Upon request, Purchaser shall promptly deliver to Seller such information relating to Purchaser as may be necessary for Seller to obtain a bulk sales release.

B.    Sellers shall not be obligated to proceed with the Closing unless and until each of the following conditions has been fulfilled or waived in writing by Sellers:

(i)    (x) Sellers receive from Purchaser the Purchase Price Balance and all other amounts to be paid to Seller at Closing under this Agreement together with written confirmation that Escrow Agent shall deliver to Seller on the Closing Date the Deposit and all adjustments or, as the case may be, (y) if the Deposit, the Purchase Price Balance, the adjustments have been received by the Escrow Agent and Escrow Agent confirms to

Seller in writing that it shall deliver to Seller on the Closing Date Deposit, the Purchase Price Balance and the adjustments;

(ii)     (x) Sellers receive from Purchaser all instruments and documents to be delivered to Sellers at the Closing pursuant to this Agreement or, as the case may be (y) if the documents to be delivered to Sellers under this Agreement have been received by Escrow Agent and Escrow Agent confirms to Seller in writing that it shall deliver to Seller on the Closing Date such documents; and

(iii)     However, with the consent of a Party, each acting in its sole discretion, a Party may agree to waive a condition precedent and proceed to Closing. In no event other than pursuant to a writing mutually executed by Sellers and Purchaser shall the Closing Date be extended.

34.     **Like-Kind Exchange.** Sellers and Purchaser confirm and agree that the transfer of the Premises to Purchaser may be a part of a deferred like-kind exchange of properties pursuant to which Sellers will receive like-kind property ("**Exchange Property**") in exchange for its transfer of the Premises to Purchaser. Purchaser agrees that Sellers' rights, interests and obligations under this agreement may be assigned to a qualified intermediary ("**Intermediary**"), in accordance with Treasury Regulation Section 26 C.F.R. § 1.1032(K)-1(g) to effect such exchange.

Purchaser agrees to cooperate with Sellers and Intermediary in a manner reasonably necessary to complete the like-kind exchange. Purchaser's sole obligation under this Agreement with regard to the like-kind exchange shall be the payment of all amounts and costs that are required to be paid by Purchaser pursuant to this Agreement and execution of an acknowledgement form. Any funds paid to Intermediary under this Agreement shall be held in

escrow in accordance with the terms and conditions of an exchange agreement entered into by Sellers and Intermediary.

35. **Further Assurances.** The parties each agree to do, execute, acknowledge and deliver all such reasonable further acts, instruments and assurances and to take all such reasonable further action before or after the Closing as shall be reasonably necessary or desirable to fully carry out this Agreement and to fully consummate and effect the transactions contemplated hereby.

36. **No Contingency.** It is further understood that this Agreement and the sale contemplated herein are not conditioned nor contingent on the sale or closing of any other property, whether real or personal, nor upon Purchaser obtaining a loan/mortgage or loan/mortgage commitment. Purchaser waives any such condition as an inducement to Seller to enter into this Agreement.

37. **Miscellaneous.**

    (a)    Time is of the essence of this Agreement.

    (b)    Neither this Agreement nor any interest hereunder shall be assigned or transferred by Purchaser without the Seller's consent, which shall not be unreasonably withheld or delayed; provided that nothing shall prohibit Purchaser from identifying a nominee to take title to the Premises at Closing so long as the nominee is owned or controlled by principals of the Purchaser Subject to the foregoing, this Agreement shall inure to the benefit of and shall be binding upon Seller and Purchaser and their respective successors and permitted assigns.

    (c)    In the event any term or provision of this Agreement shall be held illegal, invalid, unenforceable or inoperative as a matter of law, the remaining terms and

provisions of this Agreement shall not be affected thereby, but each such term and provision shall be valid and shall remain in full force and effect.

(d)    All actions required pursuant to this Agreement necessary to effectuate the transaction contemplated herein has been or will be taken promptly and in good faith by Purchaser and Seller and their representatives, employees and agents.

(e)    In the event any litigation is undertaken to enforce the provisions of this Agreement, the party obtaining a judgment in its favor in connection therewith shall also receive, as part of the judgment, an amount equal to its reasonable attorneys' fees and other costs incurred in connection with such litigation, including without limitation post-closing and appellate proceedings.

(f)    The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

(g)    The introductory provisions on the first page of this Agreement are incorporated into this Agreement and made a part hereof

NO FURTHER TEXT ON THIS PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement the day and year first written above.

SELLERS:

**PITTSFIELD RESIDENTIAL II, LLC, an Illinois limited liability company**

By:_____

    Name: Robert A. Danial
    Title:   Manager

**PITTSFIELD HOTEL HOLDINGS, LLC and PITTSFIELD DEVELOPMENT LLC, an Illinois limited liability company**

By:     55 Pittsfield Corp., a Delaware corporation

    By:_____

        Name: Robert Danial
        Title:   President

PURCHASER:

Adam David Partner 1, LLC, a Delaware limited liability company

By:_____

    Name: Adam David Lynd
    Title:   CEO

The undersigned has executed this Agreement solely to confirm its acceptance of the duties of Escrow Agent as set forth in this Agreement.

ESCROW AGENT:

SUTTON LAND TITLE AGENCY

By:_____

## SCHEDULE I

EXHIBIT

A       Description of the Premises

D       Rent Roll of written leases and unwritten tenancies

C       Permitted Exceptions

D       Service Contracts

E       Survey

EXHIBIT A
DESCRIPTION OF PREMISES

**EXHIBIT B**
**RENT ROLL**

**EXHIBIT C**
**PERMITTED EXCEPTIONS**
**[SELLERS TO PROVIDE]**

The following matters shall be deemed to be "Permitted Exceptions": (1) then current general and special real estate taxes and assessments which are a lien but are not due and payable at the time the Deed is filed for record, (2) covenants, restrictions, conditions, easements, reservations and rights of way of, (3) zoning, land use and other governmental laws, rules and regulations, (4) roads, highways and other public rights of way, (5) those items which would be disclosed on an accurate survey of the Property and (6) Consents by the Seller or any former owner of the Property for the erection of any structure or structures on, under or above any street or streets on which the Property may abut, (7) Unpaid installments of assessments, (8) Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Property or owned by Tenants, (9) Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Property, provided that none of such rights imposes any monetary obligation on the owner of the Property, (10) Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Property over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Property, (11) Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Property, (12) Any state of facts that an accurate survey would disclose, provided that such facts do not render title unmarketable and (13) the Title Insurer's standard exceptions.

EXHIBIT D
SERVICE CONTRACTS

EXHIBIT E
SURVEY

# EXHIBIT C

Adam Lynd Complaint and
Lis Pendens Notice



ADAM DAVID PARTNERS 1, LLC,
a Delaware limited liability company,

        Plaintiff,

        v.

PITTSFIELD RESIDENTIAL II,
LLC, an Illinois limited liability company;
PITTSFIELD DEVELOPMENT, LLC, an
Illinois limited liability company; and
PITTSFIELD HOTEL HOLDINGS, LLC,
an Illinois limited liability company,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.

2015CH17030
CALENDAR/ROOM 16
TIME 00:00
Pet Reformation

**JURY TRIAL DEMANDED**

## COMPLAINT

    Plaintiff, Adam David Partners 1, LLC, by its undersigned attorneys, for its Complaint against Defendants Pittsfield Residential II, LLC ("Pittsfield Residential"), Pittsfield Development, LLC ("Pittsfield Development"), and Pittsfield Hotel Holdings, LLC ("Pittsfield Hotel") states as follows:

## PARTIES

    1.    Plaintiff is a Delaware limited liability company with its principal offices in Texas.

    2.    On information and belief, each Defendant is an Illinois limited liability company which owns a portion of or has an interest in certain real property located at 55 E. Washington Street in Chicago, Illinois, commonly known as the *Pittsfield Building* (the entirety of the Pittsfield building shall be referred to herein as the "Building" and the portion in which Defendants have an interest shall be referred to as the "Pittsfield").



## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action and the Defendants because, inter alia, the Defendants are located and/or transact business within Illinois, and the Pittsfield is located in Cook County, Illinois.

4.      Venue is proper in this Court pursuant to 735 ILCS 5/2-101 because the facts from which this action arises, or some part thereof, occurred in Cook County, Illinois and Defendants are located in Cook County, Illinois.

## FACTUAL BACKGROUND

5.      On or about June 2015, the owners of a certain portion of the Building known as Fornelli Tower ("Fornelli Tower"), prepared and caused an Offering Memorandum to be circulated amongst the Chicago real estate community. The Offering Memorandum was presented by CB Richard Ellis ("CBRE") to the market. Mr. Lewis Borsellino, subsequently an agent of Plaintiff, came to review the Offering Memorandum around that time.

6.      Mr. Borsellino met with principals of Plaintiff on July 24, 2015 and discussed the opportunity to purchase Fornelli Tower from Fornelli. On such date, Plaintiff received a copy of the Offering Memorandum for review together with various calculations, findings and other financial materials prepared in reliance upon the information presented in the Offering Memorandum.

7.      The next week, representatives from Plaintiff were given a tour of Fornelli Tower by Fornelli representatives. The Fornelli representatives also gave Plaintiff's representatives a tour of the other portions of the Building owned by Defendants. Defendants had had plans to develop its portion of the Building into a hotel and residential housing. Fornelli suggested that Defendants would be interested in selling their portion of the Building. Fornelli

provided to Plaintiff's representatives the phone number of Mr. Robert Danial ("Danial"), a principal of Defendants.

8.      Soon after the tour of the Building, principals of Plaintiff and Danial met to discuss a potential sale of Defendants' portion of the Building and the terms of such a transaction. Defendants had previously performed significant investigation and due diligence in furtherance of its efforts to develop the Pittsfield (or portions thereof) as a hotel, and had delivered to Plaintiff a package consisting of due diligence materials regarding such purported hotel development and specific contact and other information relating to Defendant's partner whom specialized in hotel development. Defendants represented that the Pittsfield could be redeveloped as a hotel as of right and Plaintiff relied on these representations.

9.      Plaintiff continued to diligently move forward with the anticipated purchase of the Pittsfield and the parties, on August 3, 2015, entered into a purchase agreement regarding the Pittsfield for a purchase price of $36,000,000.00. The purchase contract is attached hereto as Exhibit 1.

10.     Pursuant to the terms of the purchase agreement, Plaintiff promptly deposited $500,000 in an escrow account at Sutton Land Title Agency as earnest money.

11.     Pursuant to the terms of the purchase agreement, Defendant was required to provide numerous due diligence items to Plaintiff within five days of execution of the purchase agreement. However, Defendants failed to provide a number of these required due diligence items until weeks later, thereby causing Plaintiff to not be able to properly conduct its due diligence and prepare its investor offering packages. *See* Exhibit 2.

11.     On August 24, 2015 the parties entered into an extension of the due diligence period and $300,000 of the initial escrow amount was released to Defendants. *See*

Exhibit 3. During this time, Plaintiff had been conducting extensive due diligence and had been preparing its financial models, underwriting assumptions and packages to attract investor financing for the anticipated purchase. During this time, Defendants continually represented to Plaintiff that the Pittsfield property could be developed as a hotel property. Indeed, on August 21, 2015, Brian Schienbaum, an agent of Defendants, conducted a tour of the property with A.J. Manaseer, Lewis Borsellino, Adam David Lynd, and Peter Glatzer, among other individuals, and stated that he was holding hotel permits before the transaction closed. Mr. Scheinbaum repeatedly represented that the Pittsfield property could be developed as a hotel as of right both orally and in written documentation. *See* Exhibit 4.

13.    Since early August, Plaintiff had instructed its architectural firm to create plans and specifications regarding developing the Pittsfield property as a hotel. Starting around August 14th, Plaintiff had been contacting the Getty's Group, Inc., with regard to specific hotel design ideas and with an interest to retaining that firm to assist with the redevelopment project.

14.    On September 16, 2015, the parties entered into another extension of the due diligence period until October 9, 2015, and the remaining $200,000 of the initial escrow deposit was released to Defendants. *See* Exhibit 5.

15.    In mid-September, Plaintiff and its attorney met with Alderman Brendan Reilly to discuss the planned redevelopment of the Pittsfield building as a hotel. Contrary to Defendant's repeated and many representations that the property was ready to be developed as a hotel, Plaintiff first discovered at its meeting with Alderman Reilly that this was not the case. There were no permits, issued or pending, that allowed for such a development and Alderman Reilly stated that he would oppose any such rezoning requests. Furthermore, Alderman Reilly informed Plaintiff that it would have to go through a very length Planned Development process

before Plaintiff could begin work on any redevelopment project.

16.     After this meeting with Alderman Reilly, representatives of Plaintiff contacted Danial and informed him that, contrary to Defendants' representations, the Pittsfield property could not be developed as a hotel. Despite multiple attempts by Plaintiff to amicably resolve this matter, the parties have been unable to do so. This lawsuit followed.

## COUNT I: FRAUDULENT INDUCEMENT

17.     Plaintiff reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1-16 as if fully set forth herein.

18.     Plaintiff alleges that Defendants made material misrepresentations and false promises to Plaintiff, as detailed herein.

19.     On information and belief, Defendants knew that their representations and promises were false at the time such representations and promises were made to Plaintiff and such misrepresentations and false promises were part of a pattern of fraudulent conduct by Defendants against Plaintiff.

20.     By making these false misrepresentations and false promises to Plaintiff, Defendants intended to induce Plaintiff to enter into a contract as described herein.

21.     Plaintiff reasonably relied upon the misrepresentations and false promises by Defendants and entered into a contract based on these material misrepresentations.

22.     By making these material false and misleading statements, Defendants acted with reckless indifference and with willful and wanton disregard to Plaintiff's interests. An award of exemplary damages against Defendants is appropriate based on Defendants' actions.

23.     As a direct and proximate result of Defendants' fraudulent

misrepresentations and false promises, and Plaintiff's reasonable reliance on the same, Plaintiff has suffered damages in an amount to be determined at trial, but which are not less than $1,000,000.00.

WHEREFORE, Plaintiff respectfully requests that a judgment be entered in its favor and against Defendants, jointly and severally, in an amount to be determined at trial, but which is not less than $1,000,000.00, for exemplary damages, its costs, interest and attorney fees, an Order by the Court rescinding the contract, and for all such other and further relief as the Court may deem just, equitable, or appropriate under the circumstances.

## COUNT II: FRAUD

24.     Plaintiff reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1-16 as if fully set forth herein.

25.     Plaintiff alleges that Defendants made material misrepresentations to Plaintiff and fraudulently concealed their knowledge that Pittsfield could not be developed as a hotel property and did not have express or even tacit government approval to do so. Plaintiff alleges that Defendants made such material misrepresentations and fraudulent concealments in a scheme to induce Plaintiff to sign the purchase contract and release $500,000 of earnest money to Defendants.

26.     By making these false misrepresentations and due to Defendants' fraudulent concealment, Plaintiff entered into a purchase contract with Defendants and several extensions thereof, whereby Plaintiff released significant amounts of money to Defendants.

27.     Plaintiff reasonably relied upon the misrepresentations and false promises by Defendants and entered into the contract and extensions based on said material misrepresentations.

28.    By making these material false and misleading statements, and because of Defendants' fraudulent concealment, Defendants acted with reckless indifference and with willful and wanton disregard to Plaintiff's interests. An award of exemplary damages against Defendants is appropriate based on Defendants' actions.

29.    As a direct and proximate result of Defendants' fraudulent misrepresentations and false promises, and Plaintiff's reasonable reliance on the same, Plaintiff has suffered damages in an amount to be determined at trial, but which are not less than $1,000,000.00.

WHEREFORE, Plaintiff respectfully requests that a judgment be entered in its favor and against Defendants, jointly and severally, in an amount to be determined at trial, but which is not less than $1,000,000.00, for exemplary damages, its costs, interest and attorney fees, an Order by the Court rescinding the contract, and for all such other and further relief as the Court may deem just, equitable, or appropriate under the circumstances.

## COUNT III:  VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

30.    Plaintiff reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1-16 as if fully set forth herein.

31.    The above-referenced purchase contract was entered into by Plaintiff, a consumer, and Defendants based on the misrepresentations made by Defendants, as detailed herein.

32.    Defendants falsely represented to Plaintiff that Pittsfield could be developed into a hotel property, among other misrepresentations and concealments.

33.    Plaintiff reasonably relied on these representations of Defendants and Defendants intended that Plaintiff would rely on its misrepresentations and concealments to enter

the purchase agreement and extensions.

34.    Defendants' misrepresentations and fraudulent concealments occurred in a course of conduct involving trade or commerce.

35.    As such, Defendant "use[d] or employ[ed] ... deception [sic] fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of [a] material fact, with intent that [Plaintiff would] rely upon the concealment, suppression or omission of such material fact, ... in the conduct of ... trade or commerce" in violation of 815 ILCS 505/2.

36.    Plaintiff, a consumer, has suffered actual damages as a direct result of Defendants' misrepresentations and false promises.

37.    Defendants' conduct was willful and/or intentional and/or done with evil motive and/or reckless indifference to the rights and interests of Plaintiff.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendants, jointly and severally, in an amount to be determined at trial, but not less than $1,000,000.00, in addition to an award of exemplary damages, costs, interest, and attorney's fees, and all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

## COUNT IV:  REFORMATION OF CONTRACT AND SPECIFIC PERFORMANCE

38.    Plaintiff reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1-16 as if fully set forth herein.

39.    On August 3, 2015 the parties entered into a purchase agreement. Certain extensions of this purchase agreement were executed on August 24, 2015 and September 16, 2015, respectively.  The purchase agreement and extensions are legally enforceable contracts

between the parties upon proper consideration, whereby the parties were mutually obligated to one another and there was a mutuality of agreement, and the parties were competent to enter such a contract.

40.     Plaintiff performed its obligations under the parties' contracts.

41.     Plaintiff mistakenly and in good faith relied on Defendants' representations as to the ability to develop Pittsfield as a hotel as of right. Defendants committed fraud on the Plaintiff by misrepresenting that Pittsfield could be developed as a hotel.

42.     Plaintiff does not have an adequate remedy at law and has been damaged as a direct consequence of Defendants' actions.

WHEREFORE, Plaintiff respectfully asks that the Court enter judgment ordering specific performance of the contract but reforming the contract closing date for 180 days from the entry of such an Order, as Plaintiff will require additional time to raise financing and complete the necessary due diligence work to finalize alternative development plans, in addition to Plaintiff's costs, interest, attorney's fees, and all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

## COUNT V:  NEGLIGENT MISREPRESENTATION

43.     Plaintiff reasserts and incorporates by reference the allegations of its Complaint at paragraphs 1-16 as if fully set forth herein.

44.     Plaintiff alleges that Defendants made material misrepresentations and false promises to Plaintiff, as detailed herein.

45.     Defendants were careless and/or negligent with regard to the truth of these misrepresentations made to Plaintiff.

46.     By making these false misrepresentations and false promises to Plaintiff,

Defendants intended to induce Plaintiff to enter into a contract as described herein.

47.    Plaintiff reasonably relied upon the misrepresentations and false promises by Defendants and entered into a contract based on these material misrepresentations.

48.    As a direct and proximate consequence of Defendants' negligent and/or careless representations, Plaintiff has suffered actual damages.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendants, jointly and severally, in an amount to be determined at trial, but not less than $1,000,000.00, in addition to an award of costs, interest, and attorney's fees, and all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

## COUNT VI:  UNJUST ENRICHMENT

49.    Plaintiff pleads this Count expressly in the alternative to all of its other Counts.

50.    Defendants made numerous false representations to induce Plaintiff into entering a contract to purchase the Pittsfield building, located at 55 E. Washington, Chicago, Illinois.  Defendants repeatedly represented that the Pittsfield building could be developed as a hotel property and that there were no obstacles from any governmental body to doing so. Plaintiff released $500,000 to Defendants as a result of these misrepresentations.  On information and belief, Defendants knew that the representations and promises to Plaintiff were false.

51.    Plaintiff fulfilled any and all obligations or duties it had or may have had to Defendants.

52.    Defendants have been unjustly enriched.

53.    It would violate the principles of justice, equity and good conscience for Defendants to retain this benefit.

54. To avoid an unjust enrichment, Plaintiff should be awarded damages reflecting Defendants' enrichment, among other relief.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendants, jointly and severally, in an amount to be determined at trial, but not less than $500,000.00, in addition to an award of exemplary damages, costs, interest, and attorney's fees, and all such other relief as the Court may deem just, equitable, or appropriate under the circumstances.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Respectfully submitted,

ADAM DAVID PARTNERS 1, LLC


Dated: November 19, 2015                By: _____
                                              One of Its Attorneys

Robert S. Grabemann
Timothy M. Schaum
DASPIN & AUMENT, LLP
227 West Monroe Street
Suite 3500
Chicago, Illinois 60606
(312) 258-1600
Attorney No. 41627

1 — Purchase
Agreement

2

Connie,

The package that Dave Lynd signed off on yesterday, August 12th did not have an income and expense report.

In the contract, we were supposed to receive our due diligence information that we need within 5 business days.

Can we get the income and expense report for the last 3 calendar years?

Thanks!

---------- Forwarded message ----------
From: **Connie Rasmussen** <connie@pittsfield55.com>
Date: Mon, Sep 21, 2015 at 12:43 PM
Subject: RE: Pittsfield
To: <lb@theenv.com>

I am not waiting..I've attached it.


Constance Rasmussen

General Manager, The Pittsfield Building

55 East Washington St. Suite 309

Chicago IL 60602


(312) 236-5393

(312) 236-2219  Fax

connie@pittsfield55.com


**From:** Lewis Borsellino Jr [mailto:lb@theenv.com]
**Sent:** Monday, September 21, 2015 12:41 PM
**To:** Connie Rasmussen <connie@pittsfield55.com>
**Subject:** Re: Pittsfield


no


On Mon, Sep 21, 2015 at 12:40 PM, Connie Rasmussen <connie@pittsfield55.com> wrote:

Did Robert send you the YTD cash flow that you requested that I passed on to him.  Just following up

Constance Rasmussen

General Manager, The Pittsfield Building

55 East Washington St. Suite 309

Chicago IL 60602

(312) 236-5393

(312) 236-2219  Fax

connie@pittsfield55.com

# Cash Flow (Cash)
## Pittsfield Development, LLC - (pittsfld)
### August 2015

| | Month to Date | % | Year to Date | % |
|---|---|---|---|---|
| **INCOME** | | | | |
| | | | | |
| **RENTAL REVENUE** | | | | |
| Rental Income | 66,903.65 | 27.15 | 714,760.69 | 48.81 |
| Storage Revenue | 361.25 | 0.15 | 9,053.08 | 0.62 |
| Rent Concessions | 0.00 | 0.00 | -7,871.63 | -0.54 |
| Escalation Revenue | 127,110.87 | 51.59 | 326,777.76 | 22.32 |
| Real Estate Tax Revenue | 26,427.83 | 10.73 | 109,701.94 | 7.49 |
| Lease Cancellation Fees | 0.00 | 0.00 | -30,000.00 | -2.05 |
| TOTAL RENTAL REVENUE | 220,803.60 | 89.62 | 1,122,421.84 | 76.65 |
| | | | | |
| **OTHER REVENUE** | | | | |
| Electric Reimbursement | 6,832.39 | 2.77 | 109,717.17 | 7.49 |
| Midrise Electric Reim | 11,693.61 | 4.75 | 89,303.06 | 6.10 |
| Water/Sewer Reimbursement | 468.71 | 0.19 | 1,708.10 | 0.12 |
| Midrise Water/Sewer Reimb | 5,300.25 | 2.15 | 24,594.60 | 1.68 |
| Cleaning Income | 0.00 | 0.00 | 88.00 | 0.01 |
| Gas Reimbursement | 0.00 | 0.00 | 31.20 | 0.00 |
| Midrise Gas Reimb | 1,166.53 | 0.47 | 15,442.12 | 1.05 |
| Midrise Reimb Income | 121.43 | 0.05 | 2,437.23 | 0.17 |
| Miscellaneous Income | 0.00 | 0.00 | 98,633.00 | 6.74 |
| TOTAL OTHER REVENUE | 25,582.92 | 10.38 | 341,954.48 | 23.35 |
| | | | | |
| TOTAL REVENUE | 246,386.52 | 100.00 | 1,464,376.32 | 100.00 |
| | | | | |
| **OPERATING EXPENSES** | | | | |
| | | | | |
| **ESCALATABLE EXPENSES** | | | | |
| | | | | |
| **ENGINEERING EXPENSES** | | | | |
| Engineer Salaries | 27,575.50 | 11.19 | 222,981.39 | 15.23 |
| Uniforms | 147.75 | 0.06 | 1,522.86 | 0.10 |
| TOTAL ENGINEERING EXPENSE | 27,723.25 | 11.25 | 224,504.25 | 15.33 |
| | | | | |
| **HVAC / BOILER** | | | | |
| HVAC - Repairs & Maintenance | 0.00 | 0.00 | 10,661.00 | 0.73 |
| Permits & Inspections | 0.00 | 0.00 | 1,190.00 | 0.08 |
| HVAC Supplies & Materials | 724.96 | 0.29 | 3,095.44 | 0.21 |
| Water Treatment | 0.00 | 0.00 | 2,813.76 | 0.19 |
| TOTAL HVAC / BOILER | 724.96 | 0.29 | 17,760.20 | 1.21 |
| | | | | |
| **PLUMBING** | | | | |
| Plumbing Repairs | 1,790.00 | 0.73 | 3,208.00 | 0.22 |
| Plumbing Supplies & Materials | 0.00 | 0.00 | 401.24 | 0.03 |
| Fire Protection | 0.00 | 0.00 | 1,887.10 | 0.13 |
| Permits and Inspections | 0.00 | 0.00 | -1,000.00 | -0.07 |
| TOTAL PLUMBING | 1,790.00 | 0.73 | 4,496.34 | 0.31 |
| | | | | |
| **ELECTRICAL** | | | | |
| Lighting Supplies | 0.00 | 0.00 | 939.05 | 0.06 |
| TOTAL ELECTRICAL | 0.00 | 0.00 | 939.05 | 0.06 |
| | | | | |
| **ELEVATOR EXPENSE** | | | | |
| Elevator Contract | 6,769.34 | 2.75 | 54,249.22 | 3.70 |
| Elevator Repairs & Supplies | 1,567.50 | 0.64 | 2,554.10 | 0.17 |

Cash Flow (Cash)
Pittsfield Development, LLC - (pittsfld)
August 2015

Page 2
9/16/2015
11:56 AM

| | Month to Date | % | Year to Date | % |
|---|---|---|---|---|
| Other Elevator Expense | 0.00 | 0.00 | 1,126.93 | 0.08 |
| **TOTAL ELEVATOR EXPENSE** | 8,336.84 | 3.38 | 57,930.25 | 3.96 |
| | | | | |
| **BUILDING REPAIRS & MAINT** | | | | |
| Locks & Keys | 286.47 | 0.12 | 5,374.13 | 0.37 |
| Doors & Windows | 0.00 | 0.00 | 7,348.25 | 0.50 |
| Pest Control | 226.27 | 0.09 | 1,583.89 | 0.11 |
| Trash Removal | 2,085.42 | 0.85 | 15,284.65 | 1.04 |
| General Maintenance Supplies | 434.44 | 0.18 | 6,430.58 | 0.44 |
| Other Building Repairs & Maint | 0.00 | 0.00 | 31,060.28 | 2.12 |
| **TOTAL REPAIRS & MAINT** | 3,032.60 | 1.23 | 67,081.78 | 4.58 |
| | | | | |
| **UTILITIES** | | | | |
| Electricity | 37,931.39 | 15.40 | 301,535.79 | 20.59 |
| Electric Meter Reading | 500.00 | 0.20 | 3,036.00 | 0.21 |
| Gas | 4,738.92 | 1.92 | 222,873.58 | 15.22 |
| Water | 6,950.36 | 2.82 | 53,230.34 | 3.64 |
| Sewer | 6,950.36 | 2.82 | 52,608.89 | 3.59 |
| **TOTAL UTILITIES** | 57,071.03 | 23.16 | 633,284.60 | 43.25 |
| | | | | |
| **CLEANING EXPENSES** | | | | |
| Cleaning Contract | 7,215.10 | 2.93 | 61,802.51 | 4.22 |
| Other Cleaning Expenses | 0.00 | 0.00 | 184.80 | 0.01 |
| Cleaning Supplies & Materials | 874.88 | 0.36 | 2,681.39 | 0.18 |
| **TOTAL CLEANING EXPENSES** | 8,089.98 | 3.28 | 64,668.70 | 4.42 |
| | | | | |
| **OTHER OUTSIDE CONTRACTS** | | | | |
| Security Contract | 21,914.60 | 8.89 | 145,181.63 | 9.91 |
| **TOTAL OTHER OUTSIDE CONTR** | 21,914.60 | 8.89 | 145,181.63 | 9.91 |
| | | | | |
| **ADMINISTRATIVE EXPENSES** | | | | |
| Management Payroll | 4,890.90 | 1.99 | 41,572.64 | 2.84 |
| Payroll Tax Expense | 2,743.96 | 1.11 | 23,436.94 | 1.60 |
| Payroll Service | 216.92 | 0.09 | 1,837.97 | 0.13 |
| Telephone Expense | 376.56 | 0.15 | 2,524.97 | 0.17 |
| Bank Charges | 26.51 | 0.01 | 1,002.83 | 0.07 |
| Accounting Fees | 1,035.00 | 0.42 | 9,013.12 | 0.62 |
| Building Office Expenses | 113.74 | 0.05 | 2,860.13 | 0.20 |
| Computer Expense | 366.59 | 0.15 | 3,114.46 | 0.21 |
| Computer Consulting | 0.00 | 0.00 | 658.75 | 0.04 |
| Dues and Subscriptions | 0.00 | 0.00 | 79.00 | 0.01 |
| Postage and Delivery | 391.21 | 0.16 | 1,419.88 | 0.10 |
| Travel Expenses | 1,707.03 | 0.69 | 3,381.50 | 0.23 |
| **TOTAL ADMINISTRATIVE** | 11,868.42 | 4.82 | 90,902.19 | 6.21 |
| | | | | |
| **PROFESSIONAL FEES** | | | | |
| Professional Fees | 0.00 | 0.00 | 2,000.00 | 0.14 |
| Legal Fees | 3,055.00 | 1.24 | 77,259.62 | 5.28 |
| Licenses, Permits & Fees | 0.00 | 0.00 | 250.00 | 0.02 |
| **TOTAL PROFESSIONAL FEES** | 3,055.00 | 1.24 | 79,509.62 | 5.43 |
| | | | | |
| **INSURANCE** | | | | |
| Property Insurance | 3,536.53 | 1.44 | 81,918.21 | 5.59 |
| Other Insurance | 1,790.50 | 0.73 | 9,706.50 | 0.66 |
| **TOTAL INSURANCE** | 5,327.03 | 2.16 | 91,624.71 | 6.26 |

Cash Flow (Cash)
Pittsfield Development, LLC - (pittsfld)
August 2015

Page 3
9/16/2015
11:56 AM

| | Month to Date | % | Year to Date | % |
|---|---|---|---|---|
| **TOTAL ESCALATABLE EXPENSE** | 148,933.71 | 60.45 | 1,477,883.32 | 100.92 |
| **NON ESCALATABLE EXPENSES** | | | | |
| 55E Wash (Midrise) Specific Exp | 683.73 | 0.28 | 1,986.11 | 0.14 |
| TOTAL NON-ESCALATABLE EXP | 683.73 | 0.28 | 1,986.11 | 0.14 |
| **TOTAL OPERATING EXPENSES** | 149,617.44 | 60.72 | 1,479,869.43 | 101.06 |
| **NET OPERATING INCOME** | 96,769.08 | 39.28 | -15,493.11 | -1.06 |
| **FINANCIAL EXPENSES** | | | | |
| Interest Expense | 13,376.71 | 5.43 | 104,856.16 | 7.16 |
| TOTAL FINANCIAL EXPENSE | 13,376.71 | 5.43 | 104,856.16 | 7.16 |
| **PARTNERSHIP EXPENSE** | | | | |
| Settlement Fees | 0.00 | 0.00 | 76,350.50 | 5.21 |
| TOTAL PARTNERSHIP EXPENSE | 0.00 | 0.00 | 76,350.50 | 5.21 |
| **NET INCOME** | 83,392.37 | 33.85 | -196,699.77 | -13.43 |
| **ADJUSTMENTS** | | | | |
| Due from Pittsfield Residential II, LLC | -35,419.51 | | 186,532.18 | |
| Building Improvements | -25,000.00 | | -120,063.32 | |
| Tenant Improvements | 0.00 | | -3,864.00 | |
| Hotel Project | -5,800.00 | | -230,158.35 | |
| Tenant Security Deposits | 0.00 | | -29,297.74 | |
| Clearing-Tenant Deposits | 0.00 | | -2,318.62 | |
| Owner Contribution | 0.00 | | 1,915,050.00 | |
| Member Distributions | 0.00 | | -1,480,000.00 | |
| TOTAL ADJUSTMENTS | -66,219.51 | | 235,880.15 | |
| **CASH FLOW** | 17,172.86 | | 39,180.38 | |
| Beginning Cash | -127,957.27 | | | |
| Ending Balance | -110,784.41 | | | |

---------- Forwarded message ----------
From: **Kaminski, David** <dkaminski@daspinaument.com>
Date: Thu, Sep 17, 2015 at 7:59 AM
Subject: RE: Pittsfield to Adam David 2nd Amendment to PSA
To: Robert Danial <rad@morganreed.com>, Eric Rosenberg <eric@rpllplaw.com>, "adl@theenv.com"
<adl@theenv.com>, "Lewis Borsellino Jr (lb@theenv.com)" <lb@theenv.com>

Robert,

Lewis can chime in, but last I heard the leases delivered did not have expiration/term dates included. Maybe that info is on a page other than first or last? Lewis, can you shed some light here??

I know I am just a lowly lawyer, but I have been involved in countless development deals (on all sides of the table – seller, developer, lender, equity) and I am really befuddled about your partners' lack of understanding about timing constraints. The proposed timing (closing in December) is quite honestly the fastest-track development deal that I have ever seen in 15 plus years of playing in this sandbox. The seller is getting a premium for this underutilized and underperforming property due to the fact that the buyer is interested in taking the risk and infusing a massive amount of money, time and energy in order to repurpose the property. Putting all those pieces together takes time. Everyone will win in the end, but we simply have to be sensitive to the reality that deals like this don't close on the same timeframe as a fully-leased performing asset. I say this in all due respect and not intending to overstep my bounds but... somebody needs to give the partners a reality check!  Even assuming you could find an alternative buyer in the near future, that buyer would have the same timing, due diligence and other hurdles as David Lynd and his team. That's just the reality.

I am all for hard negotiating, but can't we stop the posturing and needless wheel spinning (not to mention legal fee meter) and focus on getting the deal done?? We have a lot of work to accomplish, and every day spent haggling over impossible-to-achieve hard dates and unnecessary escrow funds is a day that is <u>not</u> spent getting us closer to an actual closing.

David P. Kaminski

*Partner*

Daspin & Aument, LLP
227 W. Monroe Street, Suite 3500
Chicago, IL  60606
Phone: 312.258.3765

Cell: 312.203.4523
Fax: 312.258.1955
E-Mail: dkaminski@daspinaument.com

This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law.  If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address.  Thank You.

>NOTICE TO PERSONS SUBJECT TO UNITED STATES TAXATION:
>DISCLOSURE UNDER TREASURY CIRCULAR 230: Any advice contained herein (and any attachments hereto) relating to U.S. federal taxation may not be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties. Advice that complies with Treasury Circular 230's "covered opinion" requirements (and thus, may be relied on to avoid tax penalties) may be obtained by contacting the author of this document.

---

**From:** Robert Danial [mailto:rad@morganreed.com]
**Sent:** Thursday, September 17, 2015 7:11 AM
**To:** Kaminski, David; 'Eric Rosenberg'; adl@theenv.com; Lewis Borsellino Jr (lb@theenv.com)
**Subject:** Re: Pittsfield to Adam David 2nd Amendment to PSA


We have given first and last pages of all residential leases so I do not understand what you wany they are all standard


NO DEC 10 this will kill the deal




Thank you

Robert Danial

2

<u>(305) 867-8484</u>

 *Please consider the environment before printing this e-mail*

---

**From:** "Kaminski, David" <<u>dkaminski@daspinaument.com</u>>
**Date:** Thursday, September 17, 2015 at 12:28 AM
**To:** Eric Rosenberg <<u>eric@rpllplaw.com</u>>, Rob Dan <<u>rad@morganreed.com</u>>, "<u>adl@theenv.com</u>"
<<u>adl@theenv.com</u>>, "Lewis Borsellino Jr (<u>lb@theenv.com</u>)" <<u>lb@theenv.com</u>>
**Subject:** RE: Pittsfield to Adam David 2nd Amendment to PSA

Attached is a revised draft of the PSA (clean and blackline to Eric's version circulated earlier this evening).

As I have mentioned a number of times, Buyer's equity is putting up the additional funds and is mandating that in order to proceed past the due diligence period, Buyer must provide notice (instead of not providing notice). This is customary (and had I been involved in the original PSA negotiations I would have pushed for this provision to be in the doc from the beginning). It does not materially change the deal or escrow, but it makes equity feel good.

The $1,000,000 closing date extension to 12/10 was not in Eric's draft, so I added it. That term has been part of the discussion all along so I presume it was inadvertently overlooked in the redraft.

The language regarding the $184K escrow to pay vendors needed to be revised to contemplate the reality that Buyer has already paid a substantial portion of the outstanding vendor bills and likely will have invoices current before the escrow has to step in. Also, as long as seller gets the reports and waivers, seller does not need to be involved in the vendor payment process. Buyer either delivers reports + waivers OR buyer's escrow funds are used to buy the reports and waivers. Simple Simon.

I will be out of the office beginning mid-morning tomorrow.

David P. Kaminski

*Partner*

Daspin & Aument, LLP
227 W. Monroe Street, Suite 3500
Chicago, IL  60606
Phone:  312.258.3765

Cell:  312.203.4523
Fax:  312.258.1955
E-Mail:  dkaminski@daspinaument.com

This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law.  If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address.  Thank You.

>NOTICE TO PERSONS SUBJECT TO UNITED STATES TAXATION:
>DISCLOSURE UNDER TREASURY CIRCULAR 230: Any advice contained herein (and any attachments hereto) relating to U.S. federal taxation may not be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties. Advice that complies with Treasury Circular 230's "covered opinion" requirements (and thus, may be relied on to avoid tax penalties) may be obtained by contacting the author of this document.

**From:** Eric Rosenberg [mailto:eric@rpllplaw.com]
**Sent:** Wednesday, September 16, 2015 4:46 PM
**To:** Kaminski, David
**Cc:** rad@morganreed.com; adl@theenv.com
**Subject:** Pittsfield to Adam David

David,

Attached is my redlined redraft of my proposed Second Amendment of Purchase and Sale Agreement that I e-mailed you yesterday and a clean version of same (all of which remain subject to the seller's review and approval).

Please review and provide me with your comments.

Thank you.


Sincerely,


Eric Rosenberg, Esq.
eric@rpllplaw.com>
Rosenberg & Pittinsky, LLP
232 Madison Avenue, Suite 906
New York, New York 10016
Tel. (212) 286-6100

NOTICE: This e-mail message and any attachments hereto are for the exclusive use of the intended recipient(s) and may contain confidential, privileged and non-disclosable information..Any unauthorized review, use, disclosure or distribution of this message and/or any attachment(s) is prohibited. If you are not the intended recipient, or believe that you received this e-mail in error, please contact our firm by reply e-mail or by telephone at (212) 286-6100, and absent instructions to the contrary, you are directed to destroy any and all copies of this message and the attachment(s), if any. Thank you.

---------- Forwarded message ----------
From: <lb@theenv.com>
Date: Wed, Sep 16, 2015 at 8:42 PM
Subject: YTD Cash Flows
To: Connie Rasmussen <connie@pittsfield55.com>

Connie,
Do you have a 2015 YTD Cash flow?

---------- Forwarded message ----------
From: **Jaeger, John @ Chicago-Downtown** <John.Jaeger@cbre.com>
Date: Thu, Oct 1, 2015 at 10:11 AM
Subject: RE: Fornelli Tower Rent Roll
To: "lb@theenv.com" <lb@theenv.com>, "Zaring, Martha Jane @ Chicago-Downtown"
<MarthaJane.Zaring@cbre.com>
Cc: "David Lynd (adl@theenv.com)" <adl@theenv.com>, "A.J. Manaseer (aj@theenv.com)"
<aj@theenv.com>

John Jaeger | Executive Vice President

Institutional Properties | Multifamily

CBRE | Capital Markets

321 North Clark Street, Suite 3400 | Chicago, IL 60654

T 1+ 312 935 1037 | F 1+ 312 935 1880 | C 1+ 630 915 7580

john.jaeger@cbre.com | www.cbre.com/instchicagomultifamily

---------------------------------------------
**From:** lb@theenv.com [mailto:lb@theenv.com]
**Sent:** Wednesday, September 30, 2015 9:55 AM
**To:** Zaring, Martha Jane @ Chicago-Downtown; Jaeger, John @ Chicago-Downtown
**Cc:** David Lynd (adl@theenv.com); A.J. Manaseer (aj@theenv.com)
**Subject:** Re: Fornelli Tower Rent Roll

This deal is not going anywhere without an updated financial statement.

Lewis Borsellino Jr.

847.417.0031

On Sep 29, 2015, at 11:31 AM, Zaring, Martha Jane @ Chicago-Downtown <MarthaJane.Zaring@cbre.com> wrote:

> All,
>
> We sorted and formatted the rent roll that I sent over yesterday, so I've attached it here in case its helpful.
>
>
> Updated financials in process...
>
>
> Thanks
>
> MJ
>
>
> MJ Zaring | Senior Associate
>
> Institutional Properties | Multifamily
>
> CBRE Inc. | Capital Markets
>
> T +1 312 935 1407   C +1 202 341 2221
>
>
> <Fornelli Tower Rent Roll 092415w.xlsx>

--
**A.J. Manaseer, MBA**
Development Analyst
IL Licensed Broker
The EnV Group
312.945.9193
www.theenv.com

# 55 First Washington Development, LLC
## Profit & Loss
### April 2014 through March 2015

|  | Sep 14 | Oct 14 | Nov 14 | Dec 14 |
|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | |
| **Income** | | | | |
| Interest Income | 1.39 | 1.43 | 1.39 | 1.43 |
| Laundry Income | 1,881.60 | 0.00 | 4,844.77 | 0.00 |
| **Other Income** | | | | |
| Application Fee Income | 505.30 | 445.00 | 425.00 | 975.00 |
| Convenience Fee | 1,995.19 | 404.50 | 1,193.75 | 549.63 |
| Late Fee Income | 665.27 | 684.18 | 557.37 | 675.75 |
| Move-In Fee | 3,575.00 | 600.00 | 900.00 | 300.00 |
| Other Income - Other | 50.00 | 25.00 | 75.00 | 0.00 |
| **Total Other Income** | 6,790.76 | 2,158.68 | 3,151.12 | 2,500.38 |
| | | | | |
| Rental Income | 332,623.79 | 335,855.00 | 340,145.77 | 348,693.89 |
| Turnover/Damage Income | 111.13 | 475.00 | 65.22 | 25.00 |
| Utility Fee Income | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Income** | 341,408.67 | 338,490.11 | 348,208.27 | 351,220.70 |
| | | | | |
| **Gross Profit** | 341,408.67 | 338,490.11 | 348,208.27 | 351,220.70 |
| | | | | |
| **Expense** | | | | |
| **Property Operating Expenses** | | | | |
| Administrative | 7,607.27 | 9,747.02 | 8,081.17 | 7,485.42 |
| Janitorial | 5,216.36 | 3,888.00 | 3,954.40 | 4,282.40 |
| Management Fees | 14,500.00 | 14,500.00 | 14,500.00 | 14,500.00 |
| Marketing and Advertising | 1,312.39 | 4,995.07 | 526.64 | 703.51 |
| Payroll - Management & Eng. | 26,926.32 | 30,235.39 | 31,639.20 | 17,985.92 |
| Property Insurance | 14,374.50 | 0.00 | 4,634.65 | 11,137.65 |
| Real Estate Taxes | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 |
| Repairs and Maintenance | 25,393.26 | 18,806.23 | 21,935.49 | 16,898.06 |
| Security | 11,014.07 | 10,643.18 | 10,200.10 | 11,449.84 |
| Unit Turnovers | 3,190.00 | 1,320.00 | 845.00 | 1,110.00 |
| Utilities | 24,025.00 | 28,739.02 | 24,592.33 | 27,833.00 |
| **Total Property Operating Expenses** | 158,559.17 | 147,873.91 | 145,908.98 | 138,385.80 |
| | | | | |
| **Total Expense** | 158,559.17 | 147,873.91 | 145,908.98 | 138,385.80 |
| | | | | |
| **Net Ordinary Income** | 182,849.50 | 190,616.20 | 202,299.29 | 212,834.90 |

# 55 East Washington Development, LLC
## Profit & Loss
### April 2014 through March 2015

| | Jan 15 | Feb 15 | Mar 15 | Apr 15 |
|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | |
| **Income** | | | | |
| Interest Income | 0.88 | 1.19 | 3.01 | 3.78 |
| Laundry Income | 727.42 | 1,246.24 | 877.31 | 1,436.80 |
| **Other Income** | | | | |
| Application Fee Income | 1,432.60 | 150.00 | 1,128.75 | 975.00 |
| Convenience Fee | 481.44 | 582.50 | 692.40 | 984.00 |
| Late Fee Income | 734.99 | 258.73 | 245.35 | 978.79 |
| Move-In Fee | 2,100.00 | 1,200.00 | 750.00 | 1,350.00 |
| Other Income - Other | 0.00 | 50.00 | 300.00 | 350.00 |
| **Total Other Income** | 4,749.03 | 2,241.23 | 3,116.50 | 4,637.79 |
| | | | | |
| Rental Income | 340,821.59 | 342,895.50 | 349,211.50 | 338,443.75 |
| Turnover/Damage Income | 0.00 | 1,005.00 | 1,053.00 | 0.00 |
| Utility Fee Income | 200.00 | 500.00 | 650.00 | 650.00 |
| **Total Income** | 346,498.92 | 347,889.16 | 354,911.32 | 345,172.12 |
| | | | | |
| **Gross Profit** | 346,498.92 | 347,889.16 | 354,911.32 | 345,172.12 |
| | | | | |
| **Expense** | | | | |
| **Property Operating Expenses** | | | | |
| Administrative | 6,300.32 | 7,816.10 | 5,844.52 | 9,726.55 |
| Janitorial | 1,795.38 | 2,774.00 | 2,679.00 | 4,120.40 |
| Management Fees | 14,500.00 | 14,500.00 | 14,500.00 | 14,500.00 |
| Marketing and Advertising | 3,006.84 | 375.00 | 375.00 | 2,468.00 |
| Payroll - Management & Eng. | 30,074.91 | 27,836.87 | 28,611.03 | 34,806.96 |
| Property Insurance | 5,882.65 | 6,114.13 | 6,114.13 | 6,114.13 |
| Real Estate Taxes | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 |
| Repairs and Maintenance | 21,035.27 | 15,645.99 | 21,515.96 | 15,736.71 |
| Security | 13,534.97 | 9,113.59 | 9,617.99 | 9,089.66 |
| Unit Turnovers | 1,207.50 | 615.00 | 635.00 | 730.00 |
| Utilities | 29,676.20 | 32,639.29 | 25,677.28 | 23,204.10 |
| **Total Property Operating Expenses** | 152,014.04 | 142,429.97 | 140,569.91 | 145,496.51 |
| | | | | |
| **Total Expense** | 152,014.04 | 142,429.97 | 140,569.91 | 145,496.51 |
| | | | | |
| **Net Ordinary Income** | 194,484.88 | 205,459.19 | 214,341.41 | 199,675.61 |

# 55 East Washington Development, LLC
## Profit & Loss
### April 2014 through March 2015

| | May 15 | Jun 15 | Jul 15 |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| **Income** | | | |
| Interest Income | 4.31 | 4.80 | 4.18 |
| Laundry Income | 1,586.08 | 2,489.21 | 0.00 |
| **Other Income** | | | |
| Application Fee Income | 300.00 | 900.00 | 750.00 |
| Convenience Fee | 312.50 | 198.23 | 140.00 |
| Late Fee Income | 376.46 | 955.95 | 346.33 |
| Move-In Fee | 600.00 | 1,200.00 | 700.00 |
| Other Income - Other | 328.39 | 850.00 | 50.00 |
| **Total Other Income** | 1,917.35 | 4,104.18 | 1,986.33 |
| | | | |
| Rental Income | 340,458.50 | 329,594.83 | 322,185.50 |
| Turnover/Damage Income | 2,001.63 | 1,815.00 | 1,281.66 |
| Utility Fee Income | 1,075.00 | 1,210.00 | 1,725.00 |
| **Total Income** | 347,042.87 | 339,218.02 | 327,182.67 |
| | | | |
| **Gross Profit** | 347,042.87 | 339,218.02 | 327,182.67 |
| | | | |
| **Expense** | | | |
| **Property Operating Expenses** | | | |
| Administrative | 5,739.14 | 6,268.73 | 7,077.34 |
| Janitorial | 4,129.90 | 4,224.90 | 4,234.40 |
| Management Fees | 14,500.00 | 14,500.00 | 14,500.00 |
| Marketing and Advertising | 472.00 | 375.00 | 3,225.05 |
| Payroll - Management & Eng. | 24,670.84 | 27,551.54 | 24,386.65 |
| Property Insurance | 5,882.65 | 6,114.13 | 6,114.13 |
| Real Estate Taxes | 25,000.00 | 25,000.00 | 25,000.00 |
| Repairs and Maintenance | 12,668.05 | 25,412.42 | 30,185.29 |
| Security | 11,952.51 | 12,346.39 | 6,072.00 |
| Unit Turnovers | 1,460.00 | 2,190.00 | 1,065.00 |
| Utilities | 22,958.00 | 28,397.27 | 26,376.18 |
| **Total Property Operating Expenses** | 129,433.09 | 152,380.38 | 148,236.04 |
| | | | |
| **Total Expense** | 129,433.09 | 152,380.38 | 148,236.04 |
| | | | |
| **Net Ordinary Income** | 217,609.78 | 186,837.64 | 178,946.63 |

# 55 East Washington Development, LLC
## Profit & Loss
### April 2014 through March 2015

|  | Aug 15 | TOTAL |
|---|---|---|
| **Ordinary Income/Expense** |  |  |
| **Income** |  |  |
| Interest Income | 3.42 | 31.21 |
| Laundry Income | 1,148.80 | 16,238.23 |
| **Other Income** |  |  |
| Application Fee Income | 1,275.00 | 9,261.65 |
| Convenience Fee | 163.75 | 7,697.89 |
| Late Fee Income | 152.04 | 6,631.21 |
| Move-In Fee | 2,200.00 | 15,475.00 |
| Other Income - Other | 0.00 | 2,078.39 |
| **Total Other Income** | 3,790.79 | 41,144.14 |
|  |  |  |
| Rental Income | 326,934.71 | 4,047,864.33 |
| Turnover/Damage Income | 1,622.09 | 9,454.73 |
| Utility Fee Income | 3,872.58 | 9,882.58 |
| **Total Income** | 337,372.39 | 4,124,615.22 |
|  |  |  |
| **Gross Profit** | 337,372.39 | 4,124,615.22 |
|  |  |  |
| **Expense** |  |  |
| **Property Operating Expenses** |  |  |
| Administrative | 5,763.08 | 87,456.66 |
| Janitorial | 4,351.67 | 45,650.81 |
| Management Fees | 14,500.00 | 174,000.00 |
| Marketing and Advertising | 551.97 | 18,386.47 |
| Payroll - Management & Eng. | 28,552.38 | 333,278.01 |
| Property Insurance | 1,247.00 | 73,729.75 |
| Real Estate Taxes | 25,000.00 | 300,000.00 |
| Repairs and Maintenance | 22,884.77 | 248,117.50 |
| Security | 9,459.86 | 124,494.16 |
| Unit Turnovers | 2,425.00 | 16,792.50 |
| Utilities | 27,065.83 | 321,183.50 |
| **Total Property Operating Expenses** | 141,801.56 | 1,743,089.36 |
|  |  |  |
| **Total Expense** | 141,801.56 | 1,743,089.36 |
|  |  |  |
| **Net Ordinary Income** | 195,570.83 | 2,381,525.86 |

---------- Forwarded message ----------
From: **Connie Rasmussen** <connie@pittsfield55.com>
Date: Wed, Sep 16, 2015 at 4:46 PM
Subject: Pittsfield Residential
To: "Lewis Borsellino Jr." <lb@theenv.com>, "A.J. Manaseer" <aj@theenv.com>

Hi:

The attached is my excel sheet that I keep for me that has the most up to date info. Our accounting system is still working out the new changes.

This has the units, tenants , current rent , and expiration ...I have noted the two units that currently have leases and lease amendments pending.


This should include the information you need...


Constance Rasmussen

General Manager, The Pittsfield Building

55 East Washington St. Suite 309

Chicago IL 60602


(312) 236-5393

(312) 236-2219  Fax

connie@pittsfield55.com

# 12TH FLOOR



| SUITE | APT # | RESIDENT | NEW RENT | NEW U | EXPIR | Sec Dep | | | |
|-------|-------|----------|----------|-------|-------|---------|---|---|---|
| 2 Bdrm | 1201 | Grace Kwon | 1,880.00 | 120.00 | 08/31/16 | | | | |
| | | Stephanie Su | | | | | | | |
| | | | | | | | | | |
| 3 Bdrm | 1202 | | 2,600.00 | 175.00 | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| 2 Bdrm | 1203 | Wallendael A | 1,900.00 | 120.00 | 07/31/16 | 2,020.00 | | | |
| | | Emberchts A | | | | | | | |
| | | | | | | | | | |
| 2 Bdrm | 1204 | Xueji Wan | 1,930.00 | 120.00 | 08/31/16 | 2,050.00 | | | |
| | | Yugi Wang | | | | | | | |
| | | Mingjing Zhong | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| 2 Bdrm | 1205 | Ana Kim | 1,880.00 | 100.00 | 11/30/15 | | | | |
| | | Eunha Known | | | | | | | |
| | | | | | | | | | |
| 2 Bdrm | 1206 | Gutierrez Samantha | 1,930.00 | 120.00 | 06/30/16 | 2,050.00 | | | |
| | | Levitt Rachel | | | | | | | |
| | | | | | | | | | |
| 2 Bdrm | 1207 | Mary Catherine Campbell | 1,880.00 | 100.00 | 08/31/15 | | | | |
| | | Rebecca Soderholm | 1,930.00 | 120.00 | 08/31/16 | | | | |
| 3 Bdrm | 1208 | | 2,600.00 | 175.00 | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| 3 Bdrm | 1209 | | 2,600.00 | 175.00 | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| 2 Bdrm | 1210 | | 1,880.00 | 120.00 | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| 2 Bdrm | 1211 | Hyun Wook Lee | 1,850.00 | 120.00 | 08/31/16 | | | | |
| | | Haneui Park | | | | | | | |
| 2 Bdrm | 1212 | | 1,850.00 | 120.00 | | | | | |
| | | | | | | | | | |
| Studio | 1213 | Dhruv Rajesh Chadha | 1,060.00 | 60.00 | 06/30/16 | | | | |
| | | | | | | | | | |
| 1 Bdrm | 1214 | Sang Woo Nam | 1,380.00 | 80.00 | 08/31/16 | 1,460.00 | | | |
| | | | | | | | | | |
| Studio | 1215 | lease Pending-Coriale | 1,060.00 | 60.00 | 09/30/16 | | | | |
| | | discussing an early expiration- like June | | | | | | | |
| 2 Bdrm | 1216 | Yaeji Lee | 1,880.00 | 120.00 | 08/15/16 | 2,000.00 | | | |
| | | Rachel Cho | | | | | | | |
| 2 Bdrm | 1217 | Ken Cross | 1,850.00 | 120.00 | 03/31/16 | | | | |
| | | Alex Bandukwala | | | | | | | |

3.

Amendment to
PSA



**From:** Brian Scheinblum <brian.scheinblum@gmail.com>
**Date:** September 1, 2015 at 11:11:36 AM CDT
**To:** Adam Lynd <adl@env.com>
**Subject:** Re: Follow up re Pittsfield Hold

David

I look forward to your proposal.

We can discuss and see how we can negotiate an agreement once you send me a framework of what you think is fair.

Brian Scheinblum

Ph. 786-368-3733

Fax 305-675-9221

brian.scheinblum@gmail.com

 *Please consider the environment before printing this e-mail*

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail at brian.scheinblum@gmail.com or by telephone at (786) 368-3733 and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

On Tue, Sep 1, 2015 at 12:07 PM, Adam Lynd <adl@env.com> wrote:

See my comments in all CAPS I think we can reach a deal here however there are some major sticking points that are principles I won't budge on. They revolve around control and if we are putting our name and reputation behind an investment we must have it.

On Friday, August 28, 2015, Adam David <adl@theenv.com> wrote:

Brian,

Thanks for the notes. I will review and comment.

...

On Aug 28, 2015, at 8:44 AM, Brian Scheinblum <brian.scheinblum@gmail.com> wrote:

David

Thank you for taking the time to meet with me for dinner on Tuesday and on Wednesday afternoon to discuss the project.

It was a pleasure getting to know you and Peter a little bit and hearing some of your thoughts regarding the overall project and SHFT's involvement.

I was hoping to have the opportunity to follow up with Peter yesterday as he had indicated that he would be forwarding me his contact information, but I have not received it.

In reference to the overall project, I understand that you would like to have me participate with an equity contribution and be involved as part of the entire project - and understands your desire to have cohesiveness between the hotel and the upscale rental apartments you are contemplating.

I believe I can achieve, and am comfortable committing to, that cohesiveness between the two separate but intertwined projects.

The project that I have designed for the hotel over the past 2 years will meet those goals. My branding plans will achieve that goal.

I am comfortable, based on the limited conversation with Peter, that he will also be comfortable with my abilities to achieve SHFT's overall goals on sustainability and lifestyle.

But, that being said, I am not comfortable committing to involvement on the apartment development and purchase for 2 reasons:

1) I do not have the experience in upscale rental apartment operations (although I would have to think it is less involved and easier to manage than a hotel.) My larger concern is the financial aspect.

2) I do not have any information (and no details) on your financial plans for the apartment project. How many apartments, construction budget, pro-forma P&L, etc... Although I am very familiar with the apartments on 10-12, I have no information at all about the Fornelli operation cash flow or expenses.

BUT, I would propose the following with regards to the hotel:

1) Hotel floors 2-9 (and portion of lobby) are setup as a separate entity (as it is currently setup).

2) I would be the managing member for that entity (this is my setup with Robert currently) THIS IS A PROBLEM GIVEN OUR CAPITAL RISK ON THE ENTIRE BUILDING THIS PART IS THE TAIL WAGGING THE DOG. WE MUST BE IN CONTOL. YOU WILL RUN OPERATIONS HOWEVER

3) I would control development of the project - but, consult with Peter and SHFT (assuming you put a final agreement in place with him). This would include any decision on brand relationship. NO THIS WOULD BE PART OF OUR OVERALL RENOVATIONS PROJECT AND YOU WOULS HAVE INPUT BUT CANT HAVE TWO PEOPLE RUNNING $56m rehab.

4) The Hotel Component on Floors 2-9 would carry an as-is basis of $10m at the time of closing. WE WILL DETERMINE THE BASIS ONCE OUR FINANCING IS IN PLACE AJD A RELEASE PRICE IS ESTABLISHED.

5) I would invest directly in the hotel component $2m cash. THIS SEEMS FAIR

6) I would control the exit scenario on the hotel component. (We can discuss how that would work with the overall positioning of the building - and the SHFT brand if you finalize an agreement with them. My interest would be to protect that relationship to keep your "flagship" if that is your eventual goal. NO YOU ARE HOT GOING TO CONTROL OUR CAPITALS EXIT THIS IS OUR MONEY OUR REPUTATION AND OUR RELATIONSHIPS AT RISK. WE SIMPLY CANNOT HAND THAT OVER TO SOMEONE ELSE. SORRY.

7) $10m basis in the Hotel Component would receive a 20% annualized return on investment - which will accrue - at the time of Exit. All capital $2m/$8m would be treated on a pari-passu basis. THIS SEEMS FAIR

8) After the 20% return to partners, I would receive a promote of 50% of all excess capital with the remaining 50% distributed pari-passu. ABSOLUTELY WAY TOO HIGH AND OUT OF MARKET. SO YOUR TAKING 100% of the promote value giving us zero laying off the operations on another group and over seeing the rehab for 50% of cash after a 20% IRR. Nope I will propose something fair.

9) I would arrange financing - non-recourse - for the hotel project or piggy back on your financing. We can discuss how that would work. THIS HAS TO BE UNDER OUR OVERALL DEAL

I am prepared to start pulling permits and begin demolition for floors 2-9 hotel as soon as you are HARD and completed DD on the contract with Robert. Even before closing in mid-October.

I anticipate a construction schedule of under 1 year. I WOULD AGREE

I am confident that there is nobody who knows as much about the building, the hotel opportunity, and the development process as I do. I have spent 2 years working on this. AGREED

I believe that you will achieve a significant return on your investment for this component by working with me and the time savings alone will be a tremendous asset. AGREED BUT NOT ALL THE PROMOTE

My understanding and experience in the hospitality field, knowledge of the green space, my relationships, and my team - all provide a head start that nobody else has in respect to the Pittsfield.

I look forward to hearing back from you and hope to finalize an agreement shortly.

Thanks

Brian Scheinblum

Ph. 786-368-3733

Fax 305-675-9221

brian.scheinblum@gmail.com

 *Please consider the environment before printing this e-mail*

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents,
files or previous e-mail messages attached to it, may contain confidential
information that is legally privileged. If you are not the intended recipient, or a
person responsible for delivering it to the intended recipient, you are hereby
notified that any disclosure, copying, distribution or use of any of the
information contained in or attached to this message is STRICTLY
PROHIBITED. If you have received this transmission in error, please
immediately notify us by reply e-mail at brian.scheinblum@gmail.com or by
telephone at (786) 368-3733 and destroy the original transmission and its
attachments without reading them or saving them to disk. Thank you.

--

**EnV Group**
**P 210-819-7493**
**17806 IH-10W**
**Suite 300**
**San Antonio, TX 78257**

## SECOND AMENDMENT OF PURCHASE AND SALE AGREEMENT

This **SECOND AMENDMENT OF PURCHASE AND SALE AGREEMENT** (this "Amendment") is made as of the 16th day of September, 2015 by and between Pittsfield Residential II LLC, Pittsfield Hotel Holdings, LLC and Pittsfield Development, LLC (collectively, "Seller") and Adam David Partners I, LLC ("Purchaser").

**WHEREAS**, Seller, as seller and Purchaser, as purchaser entered into Purchase and Sale Agreement dated August 3, 2015 (the "Original Agreement"), as amended by that certain Amendment of Purchase and Sale Agreement dated as of August 24, 2015 (the "First Amendment", and collectively with the Original Agreement, the "Purchase Agreement") regarding Seller's right, title and interest in the building located at 55 East Washington Street, Chicago, Illinois as more specifically described in the Purchase Agreement; and,

**WHEREAS**, the parties desire to further modify the Purchase Agreement solely to the extent set forth in this Amendment.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      The above recitals are incorporated herein and made a part hereof.

2.      All capitalized terms used herein which are not otherwise defined herein shall have the respective meanings ascribed to them in the Purchase Agreement.

3.      Notwithstanding anything to the contrary contained in the Original Agreement or First Amendment, the Due Diligence Period is extended through and including October 9, 2015 at 5:00 p.m. Chicago time (the "DD Expiration Date"); unless Purchaser provides written notice (email notice is acceptable) to Seller on or before the DD Expiration Date that Seller is waving its right to terminate the Purchase Agreement, then, the Purchase Agreement will be cancelled and other than those obligations which specifically survive termination as set forth in the Purchase Agreement, the Purchase Agreement will be cancelled.

4.      The parties shall direct and instruct Sutton Land Title Agency ("Sutton") to, and Sutton shall, immediately release to the Seller on September 17, 2015 the remaining portion of the Initial Deposit held by Sutton in the amount of $200,000 (the "Second Amendment Released Deposit") via wire transfer pursuant to the following wiring instructions:

> Pittsfield Residential II, LLC
> 5151 Collins Ave, Suite 1727
> Miami Beach, Florida 33140
> Account # 1501 565 098
> Signature Bank, ABA #026013576
> 300 Park Avenue, New York, New York

5.      Notwithstanding anything to the contrary contained herein or in the Purchase Agreement, no portion of the Second Amendment Released Deposit is refundable to Purchaser at any time for any reason but shall be applied towards the Purchase Price at closing, if any.

6. Simultaneously upon the signing of this Amendment by Chicago Title Insurance Company ("CT"), the Escrow Agent shall be deemed to be CT in place and instead of Sutton and, CT will assume and comply with all obligations of the Escrow Agent set forth in the Purchase Agreement arising on or after the date of execution by CT. Notwithstanding the foregoing, the obligations of Escrow Agent set forth in paragraph 4 above are those of Sutton.

7. Notwithstanding anything to the contrary contained in the Purchase Agreement, the Closing Date shall be extended to November 10, 2015, provided that Purchaser shall cause to be deposited by October 15, 2015 (the time being of the essence) into escrow with CT, as escrow agent, the amount of $500,000 (and thus increase the Additional Deposit thereby).

8. In consideration for, among other things, Seller entering into this Amendment, the Purchase Price is increased from Thirty Six Million Dollars ($36,000,000) to Thirty Six Million Five Hundred Thousand Dollars ($36,500,000) and, the Purchase Price Balance shall be adjusted based on whether or not the deposit(s) set forth in paragraph 7 above made by Purchaser.

9. Purchaser represents and warrants the following: (a) it has received from Seller all information and documentation that it has requested from Seller, (b) Seller has satisfied all its obligations under the Purchase Agreement to date, (c) Seller has produced all due diligence materials requested by Purchaser and (d) Purchaser has no objections regarding any of the information and materials provided by Seller to date.

10. Promptly after demand is made therefore by Seller, Purchaser will provide to Seller copies of all plans and reports relating to the Premises prepared by, or at the request of, Purchaser; these obligations shall survive termination of the Purchase Agreement or Closing, whichever is sooner.

11. In addition to all other monies deposited or to be deposited into escrow with Escrow Agent, Purchaser shall cause to be deposited by September 21, 2015 (the time being of the essence) into escrow with Escrow Agent, the amount of $184,000.00 (the "Provider Funds") the sole purpose of which is to pay service providers, vendors, contractors and subcontractors who rendered services at the Premises at the request of, or on behalf of, Purchaser or with the knowledge and consent of Purchaser (the "Providers"). If and to the extent such Providers have not previously been paid in full by Purchaser and copies of their applicable reports and other work product and original signed unconditional lien waivers relating to such work have been delivered to Seller, then, Escrow Agent shall release so much of the Provider Funds to the Providers as jointly instructed by Seller and Purchaser. Payment to the Providers shall be made pursuant to unpaid dated invoices received by Seller and Escrow Agent from the Providers together with the original signed unconditional lien waivers relating thereto (which are approved by Seller and Escrow Agent) and their applicable reports and other work product. Notwithstanding the foregoing, if it appears that the Provider Funds are insufficient to pay all the Providers in full (as determined by Seller in its reasonable discretion) then, the Provider Funds shall be allocated among the Providers pursuant to Seller's instructions as determined by Seller in its sole discretion. Any Provider Funds remaining in the escrow with CT on the earlier of (x) the Closing Date and (y) after all Providers have been paid in full and delivered their respective unconditional lien waivers, shall be delivered to Purchaser. Purchaser's failure to timely deposit the Provider Funds with Escrow Agent shall be a material default under the Purchase Agreement.

2

12. The Released Deposit (as defined in the First Amendment shall be credited toward the Purchase Price at closing, if any.

13. In the first sentence of paragraph 10 of the Original Agreement, "this transaction" is inserted after "in connection with".

14. Within 1 business day after the date hereof, Purchaser's counsel will cause title to be order through CT's national commercial services department located in Chicago, Illinois. Purchaser's counsel will use commercially reasonable efforts to cause a title report from CT to be delivered to Seller's counsel within ten (10) days of the date hereof. Purchaser represents that neither Purchaser nor Purchaser's counsel will receive any remuneration for placing such title order with CT.

15. Except as modified by this Amendment, the Purchase Agreement and all covenants, agreements, terms and conditions thereof shall remain in full force and effect and are hereby in all respects ratified and confirmed. All references to the Purchase Agreement shall mean the Purchase Agreement as amended herein.

16. This Amendment may be executed in one or more counterparts, which, when taken together, shall constitute the original and any signatures on this Amendment by facsimile/electronic transmission shall be deemed as originals. Copies of this Amendment including the signatures thereon shall be deemed and may be used as an original for all purposes.

[SIGNATURE PAGE FOLLOWS]

3

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the date first written above.

**Seller:**

Pittsfield Residential II, LLC

By: _____
   Robert Danial, Manager

Pittsfield Hotel Holdings, LLC and
Pittsfield Development LLC

   By:     55 Pittsfield Corp.

By: _____
   Robert Danial, President

**Purchaser:**

Adam David Partners I, LLC

By: _____
   Adam David Lynd, CEO

Outgoing
Escrow Agent:

Sutton Land Title Agency

By:_____
Raizy Moskovits, Vice President

Incoming
Escrow Agent:

Chicago Title Insurance Company

By: _____
Name:
Title:

ER9-17clean

4

Doc#: 1532717039 Fee: $46.00
RHSP Fee:$9.00 RPRF Fee: $1.00
Karen A.Yarbrough
Cook County Recorder of Deeds
Date: 11/23/2015 03:22 PM Pg: 1 of 5

Lis Pendens Notice     (Rev. 2/09/04)
CCG 0066

**IN THE CIRCUIT COURT OF
COOK COUNTY, ILLINOIS**

Adam David Partners 1, LLC,

a Delaware limited liability company    **Plaintiff**

v.

Pittsfield Residential II, LLC, an

Illinois limited liability company;    **Defendant**

Pittsfield Development, LLC, an

Illinois limited liability company;

and Pittsfield Hotel Holdings, LLC,

an Illinois limited liability company

No. 2015 CH17030

## LIS PENDENS NOTICE

I, the undersigned, do hereby certify that the above entitled cause was filed in the Circuit Court of Cook County on the

_____20th_____ day of November _____, 2015 _____ and is now pending in the Court and that the

property affected by the cause is described as follows:

See Attached Legal Description

55 E. WASHINGTON

PIN: 17-10-312-001; 17-10-312-018; 17-10-312-019

in Cook County, Illinois.

Atty. No.: 41627

Name: Daspin & Aument LLP

Atty. for: Plaintiff

Address: 227 W. Monroe Street, Suite 3500

City/State/Zip: Chicago, IL 60606

Telephone: 312-258-1600

P 5
Bm

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Legal Description of the Total Parcel

LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION IN THE SOUTHWEST FRACTIONAL ¼ OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.

Property Address: 55 East Washington Street, Chicago, Illinois

P.I.N.: 17-10-312-001-0000

A-1

## Legal Description of the Retail/Office Parcel

LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION IN THE SOUTHWEST FRACTIONAL ¼ OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.

## EXCLUDING THE FOLLOWING:

PARCEL 1 (LOBBY AND ELEVATORS):

THAT PART OF LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION OF THE SOUTHWEST FRACTIONAL 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE FOLLOWING PARCEL OF LAND LYING ABOVE A HORIZONTAL PLANE AT ELEVATION +15.10 FEET (CHICAGO CITY DATUM) AND LYING BELOW A HORIZONTAL PLANE AT ELEVATION +29.10 FEET (CHICAGO CITY DATUM) DESCRIBED AS FOLLOWS::

BEGINNING AT THE POINT 28.67 FEET WEST OF THE NORTHEAST CORNER OF BUILDING; THENCE SOUTH, A DISTANCE OF 42.42 FEET; THENCE WEST, A DISTANCE OF 38.58 FEET; THENCE NORTH, A DISTANCE OF 17.17 FEET; THENCE EAST, A DISTANCE OF 5.83 FEET; THENCE NORTH, A DISTANCE OF 2.42 FEET; THENCE WEST, A DISTANCE OF 1.83 FEET; THENCE NORTH, A DISTANCE OF 22.83 FEET; THENCE EAST, A DISTANCE OF 34.58 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

PARCEL 2 (13TH FLOOR):

THAT PART OF LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION OF THE SOUTHWEST FRACTIONAL 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS.

THE FOLLOWING PARCEL OF LAND LYING ABOVE A HORIZONTAL PLANE AT ELEVATION +162.97 FEET FFFT (CHICAGO CITY DATUM) AND LYING BELOW A HORIZONTAL PLANE AT ELEVATION +175.14 FEET (CHICAGO CITY DATUM) IN COOK COUNTY, ILLINOIS.

PARCEL 3 (14TH FLOOR):

THAT PART OF LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION OF THE SOUTHWEST FRACTIONAL 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE FOLLOWING PARCEL OF LAND LYING ABOVE A HORIZONTAL PLANE AT ELEVATION +175.14 FEET (CHICAGO CITY DATUM) AND LYING BELOW A HORIZONTAL PLANE AT ELEVATION +187.31 FEET (CHICAGO CITY DATUM) IN COOK COUNTY, ILLINOIS.

PARCEL 4 (15TH FLOOR):

THAT PART OF LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION OF THE SOUTHWEST FRACTIONAL 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE FOLLOWING PARCEL OF LAND LYING ABOVE A HORIZONTAL PLANE AT ELEVATION +187.31 FEET FEET (CHICAGO CITY DATUM) AND LYING BELOW A HORIZONTAL PLANE AT ELEVATION

+199.48 FEET (CHICAGO CITY DATUM) IN COOK COUNTY, ILLINOIS.

PARCEL 5 (16TH FLOOR):

THAT PART OF LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION OF THE SOUTHWEST FRACTIONAL 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE FOLLOWING PARCEL OF LAND LYING ABOVE A HORIZONTAL PLANE AT ELEVATION +199.48 FEET FEET (CHICAGO CITY DATUM) AND LYING BELOW A HORIZONTAL PLANE AT ELEVATION +211.65 FEET (CHICAGO CITY DATUM) IN COOK COUNTY, ILLINOIS.

PARCEL 6 (17TH FLOOR):

THAT PART OF LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION OF THE SOUTHWEST FRACTIONAL 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE FOLLOWING PARCEL OF LAND LYING ABOVE A HORIZONTAL PLANE AT ELEVATION +211.65 FEET FEET (CHICAGO CITY DATUM) AND LYING BELOW A HORIZONTAL PLANE AT ELEVATION +223.82 FEET (CHICAGO CITY DATUM) IN COOK COUNTY, ILLINOIS.

PARCEL 7 (18TH FLOOR):

THAT PART OF LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION OF THE SOUTHWEST FRACTIONAL 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE FOLLOWING PARCEL OF LAND LYING ABOVE A HORIZONTAL PLANE AT ELEVATION +223.82 FEET FEET (CHICAGO CITY DATUM) AND LYING BELOW A HORIZONTAL PLANE AT ELEVATION +235.99 FEET (CHICAGO CITY DATUM) IN COOK COUNTY, ILLINOIS.

PARCEL 8 (19TH FLOOR):

THAT PART OF LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION OF THE SOUTHWEST FRACTIONAL 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE FOLLOWING PARCEL OF LAND LYING ABOVE A HORIZONTAL PLANE AT ELEVATION +235.99 FEET FEET (CHICAGO CITY DATUM) AND LYING BELOW A HORIZONTAL PLANE AT ELEVATION +248.16 FEET (CHICAGO CITY DATUM) IN COOK COUNTY, ILLINOIS.

PARCEL 9 (20TH FLOOR):

THAT PART OF LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION OF THE SOUTHWEST FRACTIONAL 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE FOLLOWING PARCEL OF LAND LYING ABOVE A HORIZONTAL PLANE AT ELEVATION +246.16 FEET FEET (CHICAGO CITY DATUM) AND LYING BELOW A HORIZONTAL PLANE AT ELEVATION +260.33 FEET (CHICAGO CITY DATUM) IN COOK COUNTY, ILLINOIS.

PARCEL 10 (21TH FLOOR):

THAT PART OF LOTS 13 AND 14 AND THE NORTH 24 FEET OF LOT 12 IN BLOCK 15 IN FORT DEARBORN ADDITION TO CHICAGO, A SUBDIVISION OF THE SOUTHWEST FRACTIONAL 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE FOLLOWING PARCEL OF LAND LYING ABOVE A HORIZONTAL PLANE AT ELEVATION +260.33 FEET FEET (CHICAGO CITY DATUM) AND LYING BELOW A HORIZONTAL PLANE AT ELEVATION +272.50 FEET (CHICAGO CITY DATUM) IN COOK COUNTY, ILLINOIS.

# EXHIBIT D

## Illinois Sunshine Record

Donation to Citizens for Alderman Reilly - Illinois Sunshine

https://illinoissunshine.org/contributions/4389604/

# The Lynd Company donated $1,500.00 to Citizens for Alderman Reilly on Dec 22, 2015

**Donor**

The Lynd Company (/search/?term= The Lynd Company&table_name=candidates&table_name=committees&table_name=officers&table_name=receipts)

**Address**  8000 IH 10 W Suite 1200 - 78230, TX None



By Reform for Illinois (http://www.reformforillinois.org/)

**Recipient**  Citizens for Alderman Reilly (/committees/citizens-for-alderman-reilly-19263/)

**Address**  PO Box 10939 - Chicago, IL 60610-0939

**donated**

**$1,500.00**

**Donation**

| | |
|---|---|
| Date | Dec 22, 2015 |
| Contribution type | Donation |
| Amount | $1,500.00 |
| Donation ID | 4389604 |

✿ ABOUT US (HTTP://WWW.REFORMFORILLINOIS.ORG/ABOUT/WHO-WE-ARE/)

✉ CONTACT US (HTTP://WWW.REFORMFORILLINOIS.ORG/CONTACT/)

⚙ ADMIN (/ADMIN/DASHBOARD/)

↻ DONATE TO RFI'S CAUSE! (HTTP://WWW.REFORMFORILLINOIS.ORG/DONATE/)



**EXHIBIT**

D

1 of 1

1/29/2016, 10:17 AM

# EXHIBIT E

Email Correspondence
Dated December 28, 2015

**Anthony Casaccio** <acasaccio@schainbanks.com>                                    Mon, Dec 28, 2015 at 8:40 AM
To: Adam David Lynd <adl@theenv.com>, "A.J. Manaseer" <aj@theenv.com>
Cc: Lewis Borsellino Jr <lewis.borsellino.jr@gmail.com>, Steve Droll <SDroll@buildordie.com>, David Kaminski <dkaminski@daspinaument.com>, Tim
Schaum <TSchaum@daspinaument.com>, Lesley Magnabosco <lmagnabosco@schainbanks.com>, Jonathan <jdavino1@gmail.com>, Anthony Casaccio
<acasaccio@schainbanks.com>

Adam –

I am at the airport now headed out of town for a funeral/memorial for my wife's grandmother in Philadelphia.  I will be working on the flight but I
am not sure when I will be able to access my computer again after I land.

What time is your meeting with Robert tomorrow, I will work with Lesley to get you guys a response as soon as possible.

To summarize, you are looking for an email with respect to:

- Permissible use(s) of the building under the current DX-16 zoning, i.e.

    ○ What happens if the owner wants to change floors 2-9 from the currently vacant residential use, into a hotel

    ○ Since the hotel use is permitted under the current DX-16 zoning classification, is there anything the Alderman can do to stop
    someone from converting floors 2-9 to a hotel.

    ○ If Sellers actually pursue construction/renovation work to convert 2-9 into a hotel, how long is the process, what else is
    required by the city (i.e. city department approvals from zoning, landmarks, etc), what effect does that have (if any) on the
    remaining units in the building

- What changes in the current building's use would trigger the necessity of a PD?

    ○ From the information we have seen online, the city recognizes 253 dwelling units (DU), however the attached unit breakdown
    shows 368 units.

Please add any other questions you would like for us to answer for you.

Best,

ANTHONY V. CASACCIO

acasaccio@schainbanks.com

D. 312.345.5739

P. 312.345.5700

F. 312.345.5701



**SCHAIN BANKS**
SCHAIN BANKS KENNY & SCHWARTZ LTC

**EXHIBIT**

E

**From:** Adam David Lynd [mailto:adl@theenv.com]
**Sent:** Sunday, December 27, 2015 10:39 PM
**To:** A.J. Manaseer
**Cc:** Anthony Casaccio; Lewis Borsellino Jr; Steve Droll; David Kaminski; Tim Schaum; Lesley Magnabosco; Jonathan
**Subject:** Re: Pittsfield Hotel Permits

VDTA000391

[Quoted text hidden]

 **Unit Breakout Pittsfield Building.pdf**
307K

**Adam David Lynd** <adl@theenv.com>          Mon, Dec 28, 2015 at 9:00 AM
To: Anthony Casaccio <acasaccio@schainbanks.com>
Cc: "A.J. Manaseer" <aj@theenv.com>, Lewis Borsellino Jr <lewis.borsellino.jr@gmail.com>, Steve Droll <SDroll@buildordie.com>, David Kaminski <dkaminski@daspinaument.com>, Tim Schaum <TSchaum@daspinaument.com>, Lesley Magnabosco <lmagnabosco@schainbanks.com>, Jonathan <jdavino1@gmail.com>

Anthony,

Answer all these and the main focus is that he says on January 31 they will have permits pulled to start construction on hotel from 2-9. Which means they are converting from
Office to hotel. What do I tell him as far as what is left for us to do in the process if we buy it that he doesn't understand.

When we are done and go to get the c of o what happens to us

On Dec 28, 2015, at 7:40 AM, Anthony Casaccio <acasaccio@schainbanks.com> wrote:

> Adam –
>
> I am at the airport now headed out of town for a funeral/memorial for my wife's grandmother in Philadelphia. I will be working on the flight but I am not sure when I will be able to access my computer again after I land.
>
> What time is your meeting with Robert tomorrow, I will work with Lesley to get you guys a response as soon as possible.
>
> To summarize, you are looking for an email with respect to:
>
> * Permissible use(s) of the building under the current DX-16 zoning, i.e.
>
>   o What happens if the owner wants to change floors 2-9 from the currently vacant residential use, into a hotel
>
>   o Since the hotel use is permitted under the current DX-16 zoning classification, is there anything the Alderman can do to stop someone from converting floors 2-9 to a hotel.
>
>   o If Sellers actually pursue construction/renovation work to convert 2-9 into a hotel, how long is the process, what else is required by the city (i.e. city department approvals from zoning, landmarks, etc), what effect does that have (if any) on the remaining units in the building
>
> * What changes in the current building's use would trigger the necessity of a PD?
>
>   o From the information we have seen online, the city recognizes 253 dwelling units (DU), however the attached unit breakdown shows 368 units.
>
> Please add any other questions you would like for us to answer for you.
>
> Best,
>
> ANTHONY V. CASACCIO
>
> acasaccio@schainbanks.com
>
> D. 312.345.5739

VDTA000392

P. 312.345.5700

F. 312.345.5701

\<image001.jpg\>

[Quoted text hidden]

\<Unit Breakout Pittsfield Building.pdf\>

---

**Steve Droll** <sdroll@buildordie.com>                                           Mon, Dec 28, 2015 at 9:40 AM
To: Anthony Casaccio <acasaccio@schainbanks.com>
Cc: Adam David Lynd <adl@theenv.com>, "A.J. Manaseer" <aj@theenv.com>, Lewis Borsellino Jr <lewis.borsellino.jr@gmail.com>, David Kaminski
<dkaminski@daspinaument.com>, Tim Schaum <TSchaum@daspinaument.com>, Lesley Magnabosco <lmagnabosco@schainbanks.com>, Jonathan
<jdavino1@gmail.com>

Anthony-

I recall from our first meeting in your office that a certain scope of work requires review and approval from the Plan Commission since the building is
located within the Public Lakefront Zone.  In addition to the PD triggers, I think it would be important to identify the  threshold of work that triggers Plan
Commission review and approval as the time frame for that approval is essentially the same as a PD.

I am out of the office this week but can be available via email or cell if anyone needs anything from VDTA.

Thanks,

Stephen Droll
Principal
Valerio Dewalt Train
847.366.8360 mobile
312.260.7349 direct office

On Dec 28, 2015, at 8:40 AM, Anthony Casaccio <acasaccio@schainbanks.com> wrote:

Adam –

I am at the airport now headed out of town for a funeral/memorial for my wife's grandmother in Philadelphia.  I will be working on
the flight but I am not sure when I will be able to access my computer again after I land.

What time is your meeting with Robert tomorrow, I will work with Lesley to get you guys a response as soon as possible.

To summarize, you are looking for an email with respect to:

- Permissible use(s) of the building under the current DX-16 zoning, i.e.
    - What happens if the owner wants to change floors 2-9 from the currently vacant residential use, into a hotel
    - Since the hotel use is permitted under the current DX-16 zoning classification, is there anything the Alderman can
    do to stop someone from converting floors 2-9 to a hotel
    - If Sellers actually pursue construction/renovation work to convert 2-9 into a hotel, how long is the process, what
    else is required by the city (i.e. city department approvals from zoning, landmarks, etc), what effect does that have
    (if any) on the remaining units in the building

- What changes in the current building's use would trigger the necessity of a PD?
    - From the information we have seen online, the city recognizes 253 dwelling units (DU), however the attached unit
    breakdown shows 368 units.

Please add any other questions you would like for us to answer for you.

Best,

ANTHONY V. CASACCIO

acasaccio@schainbanks.com

D. 312.345.5739

P. 312.345.5700

F. 312.345.5701

&lt;image001.jpg&gt;

[Quoted text hidden]

&lt;Unit Breakout Pittsfield Building.pdf&gt;

---

**Adam David Lynd** &lt;adl@theenv.com&gt;            Mon, Dec 28, 2015 at 12:32 PM
To: Steve Droll &lt;sdroll@buildordie.com&gt;
Cc: Anthony Casaccio &lt;acasaccio@schainbanks.com&gt;, "A.J. Manaseer" &lt;aj@theenv.com&gt;, Lewis Borsellino Jr &lt;lewis.borsellino.jr@gmail.com&gt;, David Kaminski &lt;dkaminski@daspinaument.com&gt;, Tim Schaum &lt;TSchaum@daspinaument.com&gt;, Lesley Magnabosco &lt;lmagnabosco@schainbanks.com&gt;, Jonathan &lt;jdavino1@gmail.com&gt;

Thanks Steve
[Quoted text hidden]

---

**Anthony Casaccio** &lt;acasaccio@schainbanks.com&gt;            Mon, Dec 28, 2015 at 12:43 PM
To: Adam David Lynd &lt;adl@theenv.com&gt;, "Tim Schaum (TSchaum@daspinaument.com)" &lt;TSchaum@daspinaument.com&gt;, Lesley Magnabosco &lt;lmagnabosco@schainbanks.com&gt;, "lb@theenv.com" &lt;lb@theenv.com&gt;, "Aj Manseer (aj@theenv.com)" &lt;aj@theenv.com&gt;
Cc: "David Kaminski (dkaminski@daspinaument.com)" &lt;dkaminski@daspinaument.com&gt;, "Steve Droll (SDroll@buildordie.com)" &lt;SDroll@buildordie.com&gt;, Anthony Casaccio &lt;acasaccio@schainbanks.com&gt;

Adam –

FYI...below is a brief response I sent to David earlier today upon my review of both complaints.

As I mentioned this morning, I am tied up today with the memorial but I'll do my best to respond to or provide additional information for your meeting with Robert. Lesley has been tied up this morning as well but we will get back to you with the information provided in the attached email.

Best,

ANTHONY V. CASACCIO

acasaccio@schainbanks.com

D. 312.345.5739

P. 312.345.5700

F. 312.345.5701

**SCHAIN BANKS**
SCHAIN BANKS KENNY & SCHWARTZ LTD

**From:** Anthony Casaccio
**Sent:** Monday, December 28, 2015 10:57 AM
**To:** Kaminski, David
**Cc:** Schaum,Tim; Lesley Magnabosco; Anthony Casaccio
**Subject:** RE: Pittsfield Hotel Permits

David –

In reviewing your Pittsfield complaint, please note the following:

- Line 8

  o A hotel use is permissible as of right under the current DX-16 zoning designation

- Line 12 – you bring up a good point here given the fact that the building permit applications were not submitted until December 9th (see attached)

  o If possible, try to request/demand a complete copy of the documents/plans they submitted with their building permit application.

  o That said, please review the 4th attachment, specifically, application #100521398 with respect to the April 2014 application to building permits to "CONVERT EXISTING DWELLING UNITS TO HOTEL SUITES AT FLOORS: 18TH, 19TH, 20TH AND 21ST ONLY AS PER PLANS."

- Line 16 – to clarify, Alderman Reilly said that he would not support a hotel use within a PD.  However, you are correct in that no permits were issued or pending as of the mid-September meeting with respect to floors 2-9. Also, I tried to obtain information on the above referenced application #100521398 and it appears as though this application expired.

  o It is true that Alderman Reilly stated that the PD process would be necessary if he wanted to add any units beyond the existing 253, which, the offering memorandum incorrectly states as having 368 approved dwelling units.

- Line 25 – this is not necessarily true, in theory, a hotel use is permissible under the DX-16.

Lesley – please correct me if I am wrong in the information provided in this email.

Best,

ANTHONY V. CASACCIO

acasaccio@schainbanks.com

D.  312.345.5739

P.  312.345.5700

F.  312.345.5701



**SCHAIN｜BANKS**
SCHAIN BANKS KENNY & SCHWARTZ LTD

**From:** Kaminski, David [mailto:dkaminski@daspinaument.com]
**Sent:** Monday, December 28, 2015 9:30 AM
**To:** Anthony Casaccio
**Cc:** Schaum,Tim; Lesley Magnabosco
**Subject:** RE: Pittsfield Hotel Permits

VDTA000395

Anthony, attached are the two complaints (one for each seller, i.e. Pittsfield (the first floor, retail, office space), and Fornelli (residential section). I am attaching Word versions since I expect Word will open easier/quicker for you than a PDF of the filed copy since you are working remotely via Wifi.

David P. Kaminski

*Partner*

Daspin & Aument, LLP
227 W. Monroe Street, Suite 3500
Chicago, IL 60606
Phone: 312.258.3765

Cell: 312.203.4523
Fax: 312.258.1955
E-Mail: dkaminski@daspinaument.com

This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address. Thank You.

>NOTICE TO PERSONS SUBJECT TO UNITED STATES TAXATION:
>DISCLOSURE UNDER TREASURY CIRCULAR 230: Any advice contained herein (and any attachments hereto) relating to U.S. federal taxation may not be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties. Advice that complies with Treasury Circular 230's "covered opinion" requirements (and thus, may be relied on to avoid tax penalties) may be obtained by contacting the author of this document.

---

**From:** Anthony Casaccio [mailto:acasaccio@schainbanks.com]
**Sent:** Monday, December 28, 2015 8:42 AM
**To:** Kaminski, David
**Cc:** Schaum,Tim; Lesley Magnabosco; Anthony Casaccio
**Subject:** RE: Pittsfield Hotel Permits

David – you mentioned that he lawsuit is based upon a claim of fraud, would you be able to send me a copy of the complaint, it may help in guiding us with the specific information you are looking for.

In response to your question below, "as of right" means that the owner or developer's specific intended use is permissible under the zoning designation of a property.

For example, a hotel use is permissible under the DX-16 zoning designation (see attached).

I am boarding my plane right now but I should have internet access during the flight.

**Best,**

ANTHONY V. CASACCIO

acasaccio@schainbanks.com

D. 312.345.5739

VDTA000396

# EXHIBIT F

Correspondence
Of March 9, 2016



**BRENDAN REILLY**
ALDERMAN—42ND WARD

# CITY COUNCIL
### CITY OF CHICAGO

**42ND WARD OFFICE**
325 WEST HURON STREET
SUITE 510
CHICAGO, ILLINOIS 60654
TELEPHONE (312) 642-4242

**CITY HALL OFFICE**
CITY HALL—ROOM 200
121 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60602
TELEPHONE (312) 744-3062

COMMITTEE MEMBERSHIPS

COMMITTEES, RULES AND ETHICS
FINANCE
TRANSPORTATION AND PUBLIC WAY
WORKFORCE DEVELOPMENT AND AUDIT
COMMITTEE ON ZONING

BUDGET AND GOVERNMENTAL OPERATIONS
(VICE-CHAIRMAN)

March 9, 2016

Chairman Daniel Solis
Committee on Zoning, Landmarks and Building Standards
121 N. LaSalle Street, Room 304
Chicago, IL 60602

Re:  NO. A-8198, Zoning Reclassification Map No. 1-E at 55 E. Washington Street

Dear Chairman Solis,

I introduced this ordinance as a temporary measure to halt a building program that I believe is incompatible with this landmark structure, on this corner within the Central Business District.

The Pittsfield Building is one of our most celebrated landmarks but also one of our most problematic from a use standpoint.  Over the past several years, this structure has lost its identity as a downtown office building and is now a hodge-podge of uses - from residential, to student housing, to commercial, and even some illegal, unlicensed Air BnB units.

This internal chaos has spilled out onto the surrounding streets and alleys as the historic nature of the entrances and loading cannot accommodate multiple uses.  But the city and my office have been unable to properly assist this structure since in a DX, essentially every use within the downtown area is permitted.

It is my job as alderman to not only advocate for my residents and businesses but also the buildings located within my ward boundary.  Buildings are uniquely vulnerable as they have no actual "voice".  Just recently your Committee and its esteemed members helped me landmark Marina City.  A decision I made based upon structural work that the building needed to survive and my ability to steer Adopt-a-Landmark opportunities to assist with that work.  In the instance of the Pittsfield Building, I was forced to do something I have never done before, temporarily downzone and throw a structure into non-conformance for its own protection.

I was alerted of the sale of the Pittsfield Building by potential buyers who sought my counsel on what uses I considered compatible now that we have: 1). a BRT lane along Washington, 2). continued closures on Wabash for the reconstruction of the Washington/Wabash "L" station with a streetscape improvement project to follow, and finally 3). an alley elevation along Garland Court which is used for loading by over 60 businesses and move-ins/outs for hundreds of residents.  I saw an opportunity to assist new ownership with returning this structure to its previous strength as a contributing structure and not the infrastructure nightmare it has become over the years.  *(Photos attached of the surrounding streets and alley)*

**EXHIBIT**
tabbies®
F

Unfortunately, ownership chose not to meet with me even after potential buyers reported back to them that I could not support hotel use based upon: traffic impacts, limited PROW capabilities for loading, and the historic entrances which cannot be altered due to the building's landmark status. Both the Wabash and Washington entrances are inset with historic revolving doors that cannot be altered, loading occurs exterior to the building in a congested alley, and trash is also not enclosed but in several alley dumpsters that often block routine loading operations.

The Applicant has had permits pursuant to a hotel use since last year, only attending to the mechanics of the permit with the Department of Buildings, but zero consideration for traffic impacts, infrastructure, the historic fabric of the building, and compatibility with adjacent neighbors. Their attorney, Graham Grady reached out to my office for a conversation only after his client received postal notice of the downzone. My office has had conversations with Mr. Grady in preparation for an upcoming meeting with me and I look forward to working with his client to restore this structure, in every way, to its original grandeur.

I respectfully request your favorable consideration of my ordinance in order to hit the "pause" button on these changes to this important landmark structure and the surrounding PROW. I appreciate this time and opportunity to request and secure a traffic study, finally meet with the applicant, and help shape the future of this site.

Sincerely,

Brendan Reilly
Vice-Mayor
Alderman, 42nd Ward







# LEGEND

- ▬ Dedicated Bus Lane
- ▬ Bus Routes
- ▬ Protected Bike Lane
- ⚲ BRT Station
- Ⓜ CTA Rail Station
- ▬ CTA Red Line
- ▬ CTA Blue Line
- ▬ CTA Elevated Line
- ✚ Metra Lines

| | |
|---|---|
| J14 | Jeffery Jump |
| 20 | Madison |
| 56 | Milwaukee |
| 60 | Navy Pier |
| 124 | Blue Island/26th |
| 157 | Streeterville/Taylor |

LOOP LINK

Sign Says "Door Frozen, Please do not use"












# EXHIBIT G

Downsizing Ordinance



# Office of the City Clerk

City Hall
121 N. LaSalle St.
Room 107
Chicago, IL 60602
www.chicityclerk.com

## Legislation Details (With Text)

| | | | |
|---|---|---|---|
| **File #:** | O2016-811 | | |
| **Type:** | Ordinance | **Status:** | Introduced |
| **File created:** | 2/10/2016 | **In control:** | Committee on Zoning, Landmarks and Building Standards |
| | | **Final action:** | |
| **Title:** | Zoning Reclassification Map No. 1-E at 55 E Washington St | | |
| **Sponsors:** | Reilly, Brendan | | |
| **Indexes:** | | | |
| **Attachments:** | 1. O2016-811.pdf | | |

| Date | Ver. | Action By | Action | Result |
|---|---|---|---|---|
| 2/10/2016 | 1 | City Council | Referred | |

## ORDINANCE

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF CHICAGO:

SECTION 1. Title 17 of the Municipal Code of Chicago, the Chicago Zoning Ordinance, is hereby amended by changing all of the DX-16 Downtown Mixed Use District symbols and indications as shown on Map No. 1 -E in the area bounded by

East Washington Street; North Garland Court; a line 120 feet south of and parallel to East Washington Street; North Wabash Avenue,

to those of a DR-10 Downtown Residential Use District.
Common Address of Property:     55 East Washington Street

SECTION 2. This ordinance shall be in force and effect from and after its passage and due publication.

EXHIBIT

6

powered by Legistar™